IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRU-CON CONSTRUCTION CORPORATION,

    Plaintiff,

vs.

SACRAMENTO MUNICIPAL
UTILITY DISTRICT, et al,

    Defendants.
_____/

CIV. NO. S-05-0583 LKK GGH

ORDER

        Previously pending on this court's law and motion calendar for June 29, 2006 was defendant Sacramento Municipal Utility District's motion to compel further deposition testimony from Tanya Gale. Also scheduled for this date was a further scheduling conference. Brian Becker, Philip Warden, and Steven Cohn appeared for Sacramento Municipal Utility District ("SMUD"). Charlie Lee, Jennifer L. Dauer McCready, Jonathan Beldon, and Eileen Diepenbrock appeared for Fru-Con Construction Corporation ("Fru-Con"). Having reviewed the joint statements and joint status report, and having heard oral argument, the court now issues the following order.

\\\\\

\\\\\

I. MOTION TO COMPEL FURTHER DEPOSITION TESTIMONY

    A. Background

SMUD's motion concerns Tanya Gale's visit to the site of the Cosumnes Power Plant Project ("Project") as Vice President of Audit and Corporate Development for Fru-Con in September, 2004 where she was sent to conduct fact gathering and financial analysis, and prepared reports as part of her normal financial auditing activities. SMUD contends that during its deposition of this witness on May 26, 2006, Fru-Con gave repeated instructions to Gale not to answer approximately 30 questions based on work product or attorney-client privilege. SMUD claims that according to her deposition testimony, her duties in this regard were "business as usual." (Warden Decl., Exh. A, 42:8-13.) According to SMUD, this witness admits that she never spoke with Fru-Con's lawyers about her visit, was not performing any work pursuant to the direction of counsel, was never told that her work would be used for litigation and protected by any privilege, but she did testify that she realized on the second day of her visit that the Project would likely end up in litigation.

Fru-Con counters by explaining that soon after Gale began her visit and she realized litigation would result, she contacted her superior, CEO Matti Jaekel, who told her that he had been corresponding with Fru-Con counsel regarding the prospect of litigation. Based on this conversation, Gale conducted the remainder of her visit with the understanding that her review was for not only Mr. Jaekel, but also for Fru-Con counsel, Mr. Ruzicka, in anticipation of litigation, and that any reports she created were confidential and privileged, and would be delivered to Ruzicka in his capacity as legal advisor.[1] Her report was addressed only to her immediate superior, the CEO of Fru-Con. (Beldon Decl., Exh. B.) Furthermore, corporate counsel appeared at the site a few days after her phone call to further investigate claims arising at the Project. Fru-Con contends that although Gale did not speak directly with Ruzicka, privilege

---

[1] At her deposition, the witness was instructed not to answer the question of who were the recipients of her report. (Warden Decl., Exh. A, 74:2-3.)

law encompasses this type of communication between employees through a chain of command.

SMUD seeks sanctions for the costs of bringing this motion and re-deposing Gale in McLean, Virginia.

B. Foundational Questions and Instructions not to Answer

SMUD complains that at Gale's deposition, Fru-Con counsel instructed her not to answer approximately 30 questions based on either attorney-client privilege or work product immunity.

An instruction not to answer is normally improper and may be given only under very limited circumstances such as where it is necessary "to preserve a privilege; to enforce a limitation previously ordered by the court; or to adjourn the deposition while seeking a court order limiting further examination." Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial, para. 11:520 (The Rutter Group 1994); Fed. R. Civ. P. 30(d)(1). Instructions not to answer may be more disruptive than objections. Fed. R. Civ. P. 30(d) advisory committee's note. Moreover, "the attorney-client privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts upon which the communications are based...." Aerojet-General Corp. v. Transport Indemnity Insurance, 18 Cal. App. 4th 996, 1004, 22 Cal. Rptr. 2d 862 (1993), quoting Benge v. Superior Court, 131 Cal. App. 3d 336, 349, 182 Cal. Rptr. 275 (1982); Triple A Machine Shop, Inc. v. State of California, 213 Cal. App.3d 131, 143, 261 Cal. Rptr. 493, 500 (1989).

SMUD has set forth the disputed instructions by highlighting them in the transcript, (Exh. A to Warden Decl.), and the court will not repeat all of the colloquy here, except for a few examples of the questions which the witness was instructed not to answer:

What was your task in connection with your visit to the site?

(Warden Decl., Exh. A, 62:5-6.)

Did you render any type of written analysis as a result of your visit

to the site? (Id. at 73:13-15.)

Well, can you tell me to whom you rendered a report, if you did so?  (Id. at 74:2-3.)

The court has now reviewed all of the questions, and finds that almost all of them are foundational and involve improper instructions not to answer.  The questions do not call for responses which in themselves would invade attorney-client privilege or work product immunity.  They merely request the deponent to supply factual information of the type which would normally be disclosed in a privilege log if a document request were at issue.

There are a few more difficult questions, such as: "Are the numbers set out in the September report inconsistent with the conclusions that you drew as a result of your visit to the site?"  (Warden Decl., Exh. A, 107:5-8.)  Although the response to this question might otherwise require disclosure of privileged information, for the reasons discussed *infra*, the court finds that the claimed protections are not valid in any event.

### C. Attorney-Client Privilege

California law governs privilege matters in this diversity litigation.  First Pacific Networks, Inc. v. Atlantic Mutual Ins. Co., 163 F.R.D. 576, 576 (N.D. Cal. 1995).  First, privileges under California law are narrowly construed as their invocation tends to impair the search for the truth.  McKesson HBOC, Inc v. Superior Court, 115 Cal. App. 4th, 1236, 9 Cal. Rptr. 3d 812, 817 (2004).  In California, communications between a lawyer and client which are intended to be confidential are protected from disclosure.  Cal. Evid. Code § 952.

> As used in this article, "confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship.

\\\\\

1    The party claiming a privilege shoulders the burden of showing that the evidence
2 it seeks to suppress falls within the terms of an applicable statute. HLC Properties, Ltd. v.
3 Superior Court, 35 Cal. 4th 54, 59, 24 Cal. Rptr. 3d 199, 202 (2005). For example, the party
4 claiming the privilege has the burden to establish that the information was transmitted in the
5 course of professional employment. Witkin, California Evidence, § 1125 (Third Ed.). However,
6 once that initial burden is met, the party attacking maintenance of the privilege has the burden to
7 rebut the presumption of confidentiality. Cal. Evid. Code § 917.
8    Of singular importance in this motion is the fact that information ultimately
9 transmitted to an attorney, if acquired for another dominant purpose, does not become imbued
10 with the attorney-client privilege simply because it was also ultimately needed for litigation
11 purposes.

> The landmark case of D.I. Chadbourne, Inc. v. Superior Court (1964) 60 Cal.2d 723, 36 Cal.Rptr. 468, 388 P.2d 700 (Chadbourne) details eleven basic principles to be applied in determining whether the attorney-client privilege exists in a corporate setting. (Id. at pp. 736-738, 36 Cal.Rptr. 468, 388 P.2d 700.) Where, as here, a corporate employer requires that its employees make a report, the privilege of that report is determined by the employer's purpose in requiring the report. (Id. at p. 737, 36 Cal.Rptr. 468, 388 P.2d 700.) When the corporate employer has more than one purpose in requiring the report, the dominant purpose will control. (Ibid.)

18 Scripps Health v. Superior Court,109 Cal. App. 4th 529, 533, 135 Cal. Rptr. 2d 126, 128 (2003).
19    No dispute exists concerning the fact that Ms. Gale's initial purpose for fact
20 gathering was solely business (as opposed to litigation) related. "I believe it was as simple as
21 the project to date results were deteriorating at that time, and claims were becoming an increasing
22 factor in the final outcome of the result. And as a publicly listed company, Bilfinger Berger has
23 very strict reporting requirements in respect of claims and the financial results. So that was the –
24 the precursor to the visit." (Id. at 53:13-21.)
25    Fru-Con represents that Ms. Gale went to the Project site for one reason, the audit;
26 however, it became clear on the second day that the nature of her visit had changed, after her

1  conversation with the CEO who had talked to Fru-Con's counsel.  She then allegedly understood
2  that her task had evolved into one in anticipation of litigation.   "The initial review was business
3  as usual.  By the end of the week it had become clear that this was a serious legal issue, and that
4  prior to any report being formulated or issued it was clear that we had a serious legal issue that
5  needed to be addressed."  (Id. at 42:8-13.)   However, Fru-Con has not presented substantial,
6  specific  evidence in support of its assertion/conclusion, and therefore has not met its burden to
7  show that the attorney-client privilege applied to Ms. Gale's work.  No attempt has been made to
8  show *specifically* that what was initially a business dominated trip transformed into
9  predominantly a legal fact gathering trip.  Fru-Con has also failed to show *how* Gale's task
10 changed after litigation was anticipated.  There is no testimony by Gale indicating that she
11 terminated her original task or purpose.  There are no declarations by Fru-Con's CEO or counsel
12 to explain that Ms. Gale was under instructions to keep all communications confidential, and
13 disseminated only when counsel was present either alone or in a litigation related meeting.  The
14 transcript itself states Gale visited the Project site in September, 2004 "at the request of Mr.
15 Jaekel in consultation with the legal position of the project at that particular point in time."
16 (Warden Decl., Exh. A at 41:18-21.)  She specifically denied that her task was to investigate the
17 validity of the claims.  (Id. at 62:2-4.)  Ms. Gale stated repeatedly during her deposition that her
18 duties during this visit came at the instruction of Jaekel, and not through Fru-Con counsel, either
19 directly or indirectly.  (Id. at 40:7-11; 77:7-13; 290:4-9.)  She did not see Mr. Ruzicka at the site
20 or speak with him.  (Id. at 63:8-12; 72:19-73:4; 78:20-79:1.)  All of her contact was directly with
21 Jaekel.  (Id. at 73:1-4.)  In fact, when asked whether her reporting chain of command changed
22 after the second day at the site (after it became clear that there were serious legal problems), Ms.
23 Gale emphatically reaffirmed that she only worked at the direction of CEO Jaekel, and not at the
24 direction of Fru-Con counsel:

25         Q.  Is it your testimony that after the first day, beginning on the
           second day of your visit to the CPP project, that you were working
26            at the behest of and under the direction of Fru-Con's lawyer?

      A. No, that's not my testimony. I was working under the direction of Matti Jaekel.
      Q. And it's also your testimony that Mr. Jaekel never told you that he was instructing you consistent with some directive from Mr. Ruzicka?
      A. I have no reporting chain to Mr. Ruzicka. It would not be – it would not be normal for Mr. Jaekel to instruct me by referring to another one of his reporting chains.
         Mr. Ruzicka reports to Mr. Jaekel and I report to Mr. Jaekel.

(Id. at 88:3-20.)

Furthermore, the report generated by Gale as a result of this visit was directed only to Jaekel, according to Fru-Con's supplemental privilege log. Warden Decl., Exh. D. Since there is no evidence to support that Ms. Gale's visit to the site was at the direction of legal counsel, or that she had any direct or indirect communication with counsel, or that the report was predominantly prepared for counsel's review, both her testimony and report created as a result of this visit are not attorney-client privileged. The mere fact that counsel might see the report at a later time does not make it attorney-client privileged.

In sum, even if Gale's purpose changed somewhat during the course of her visit to the site, Fru-Con has not met its burden to show that it *predominantly* changed. Recognition that a contractual dispute presents legal issues does not make all of a company's employees related to the contract performance functionaries of the house counsel. The same holds true for the work product issues as discussed next.

    D. Work Product Immunity

Work product is not a "privilege," but rather is a court created immunity from disclosure. As such, the applicability of the work product doctrine is governed by federal law in diversity cases. Harper v. Auto Owners Ins. Co., 138 F.R.D. 655, 658 (S.D. Ind. 1991). Airheart v. Chicago & Northwestern Transp. Co., 128 F.R.D. 669 (D.S.D. 1989); W.W. Schwarzer, A.W. Tashima & J. Wagstaffe, Federal Civil Procedure Before Trial § 11:32a.

The work-product doctrine protects documents and tangible things that have been prepared by or for a party or his representative in anticipation of litigation or for trial. Fed. R.

1  Civ. P. 26(b)(3). As codified in Rule 26(b)(3), the work product doctrine protects against the
2  disclosure of documents and tangible things "prepared in anticipation of litigation or for trial by
3  or for another party or by or for that other party's representative . . . ." As noted in 1970 by the
4  Advisory Committee on Rules, "Subdivision (b)(3) reflects the trend of the cases by requiring a
5  special showing, not merely as to materials prepared by an attorney, but also as to materials
6  prepared in anticipation of litigation or preparation for trial by or for a party or any representative
7  acting on his behalf." Work product includes "the so-called 'qualified work product' (facts
8  derived from an attorney's investigation) and the 'absolute' version (the attorney's mental
9  thought processes)." Doubleday v. Ruh, 149 F.R.D. 601, 606, 607 (E.D. Cal. 1993); Holmgren
10 v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) (showing beyond
11 substantial need/undue hardship to discover "opinion" work product); Handgards, Inc. v. Johnson
12 & Johnson, 413 F. Supp. 926, 933 (N.D. Cal. 1976) (distinguishing between opinion work
13 product and non-mental impression work product).
14         The party asserting the work-product rule has the burden of establishing, for each
15 document, the rule's application. Green v. Baca, 226 F.R.D. 624 (C.D. Cal. 2005). The
16 protection of the rule is not absolute. When mental impressions are at issue and the need for
17 material protected by the work product rule is compelling, work product may be discovered.
18 Holmgren v. State Farm, 976 F.2d at 577.
19         "Anticipation of litigation" has been defined in the Ninth Circuit as preparation of
20 a document "because of the prospect of litigation." United States v. Torf, 357 F.3d 900, 908 (9th
21 Cir. 2004). The District of Columbia Circuit has further explained it: "[A]t the very least some
22 articulable claim, likely to lead to litigation, must have arisen, ... so that the attorney's work
23 could fairly, if generously, be characterized as 'in contemplation of litigation ....'" Coastal States
24 Gas Corp. v. Department of Energy, 617 F.2d 854, 865 (D.C.Cir.1980)). "'[T]he mere fact that
25 litigation does eventually ensue does not, by itself, cloak materials' with work product
26 immunity." National Union Fire Ins. Co. v. Murray Sheet Metal Co., 967 F.2d 980, 984 (4th Cir.

1992), quoting Binks Mfg. Co. v. National Presto Indus., Inc., 709 F.2d 1109, 1118 (7th Cir. 1983).

        Documents prepared by employees which may later be used in litigation or forwarded to an attorney are not automatically cloaked with privileged status. Businesses frequently prepare documents for multiple purposes, such as to supervise corporate employees, administer self insurance programs, analyze safety, prevent accident reoccurrences, respond to regulatory agencies, and comply with state and federal statutory and regulatory law. See Ledgin v. Blue Cross & Blue Shield of Kansas City, 166 F.R.D. 496 (D.Kan.1996) (memorandum prepared by in-house counsel for insurer, to be used for multiple purposes, not work product); Fox v. California Sierra Financial Services, 120 F.R.D. 520 (N.D.Cal.1988) (securities opinion letter prepared in ordinary course of business not work product); Soeder v. General Dynamics Corp., 90 F.R.D. 253 (D.Nev.1980) (report of aircraft accident prepared in ordinary course of business where motives included improvement of products, protection of future pilots and passengers, preventing adverse publicity, and promoting economic interests not work product). That one of several purposes may be of potential use in prospective litigation ordinarily is not sufficient to invoke the protected status conferred by the doctrine. See McEwen v. Digitran Sys. Inc., 155 F.R.D. 678, 684 (D.Utah 1994) (work product inapplicable where "primary motivating purpose" for creating of accounting reports was to reissue party's financial statements). As this court previously stated in its Wheeler order, People ex rel. Wheeler v. Southern Pac. Transp. Co., Civ.S. 92-1117 LKK GGH, 1993 WL 816066 (E.D.Cal. Sept. 2, 1993), well established case law has refused to protect that information which a party has acquired because of a public or business duty simply because a litigation involving that information is probable or in existence. In Goosman v. A. Duie Pyle, Inc., 320 F.2d 45, 52 (4th Cir. 1963), the court declined to extend this type of protection to documents created pursuant to the Interstate Commerce Commission's regulations because they were made in the ordinary course of business, and could not have represented the attorney's work product. More recently, in National Union

Fire Ins. v. Murray Sheet Metal, 967 F.2d 980, 984 (4th Cir. 1992), the court stated:

> ... we have held that materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3).

Cases deciding that documents were generated in the ordinary course of business or as a result of an independent duty, have all reached the conclusion that such reports will not receive work product protection.  For example, in cases deciding that police reports were not protected by the work product doctrine, the court looked at whether the police investigation was made in anticipation of litigation or whether it was routine procedure.  Miller v. Pancucci, 141 F.R.D. 292, 303 (C.D.Cal. 1992); Kelly v. City of San Jose, 114 F.R.D. 653, 659 (N.D.Cal. 1987).  Further, a medical examiner's report which was prepared pursuant to an obligation to determine the cause of death, and in furtherance of his routine duties as a city employee, was held not to be in anticipation of litigation, and Rule 26(b)(4)(B) was inapplicable.  Harasimowicz v. McAllister, 78 F.R.D. 319 (E.D.Pa. 1978).

The transcript citations outlined in the previous section supports SMUD's position that Ms. Gale's visit to the site, and resulting report, were for the predominant purpose of ordinary business, and not in anticipation of litigation.  Gale testified that her purpose in visiting the site was for an ordinary business audit.  Warden Decl., Exh. A at 53.  Fru-Con argues that this issue requires a look at the totality of the circumstances and whether the document "would not have been created in substantially similar form but for the prospect of that litigation," citing In re Grand Jury Subpoena, 357 F.3d 900, 907 (9th Cir. 2004).  In support, Fru-Con points to Gale's deposition testimony that she anticipated litigation early in her visit due to Jaekel's contact with counsel during this time.  Fru-Con cites to Gale's testimony that there was no Bilfinger Berger counsel involved: "My conversation was direct with Matti Jaekel.  When we spoke, it was clear that it was a huge legal issue and that everything that we were doing from that point forward was preparing ourselves to defend ourselves in any litigation and protect the

interests of the company as best as we can. (Beldon Decl., Exh. C at 157:14-20.) Her understanding was based on the fact that Jaekel was discussing the case directly with counsel, and had instructed counsel to go to the site. (Id. at 289:18-22.) Although Gale understood from Jaekel that they were heading toward litigation, she admitted that he never communicated to her that their conversations were protected by attorney-client or work product or any words to that effect. (Id. at 290:13-22.) Most significantly, Gale was not told to alter her initial task, send the report to counsel, or in any event change the business nature of her duties at the scene because of anticipated litigation.

Based on the aforementioned testimony, even if Gale's purpose in conducting the site audit became somewhat dual in nature, it did not predominantly change to transform such into work product. Moreover, if there is significant ambiguity regarding the role played by employees in reviewing or creating documents, such ambiguity should be resolved in favor of the party seeking discovery. Fru-Con has not met its burden to establish that work product protects Gale's testimony or her report.

E. Sanctions

SMUD requests sanctions pursuant to Fed. R. Civ. P. 30(d)(3), 37(a)(4)(A), and 45(d)(2). Fru-Con argues it was substantially justified and seeks its own sanctions, as well as a protective order to prevent further deposition of Ms. Gale. Fed. R. Civ. P. 37(a)(4)(A) provides that "[i]f [a motion to compel] is granted," as provided by the instant order, the court shall require the party whose conduct necessitated the motion to pay reasonable expenses unless that party was substantially justified or "other circumstances make an award of expenses unjust." Although the court finds Fru-Con's instructions not to answer foundational questions were not "substantially justified," its substantive argument on attorney-client privilege and work product immunity had sufficient merit to avoid sanctions other than those inherent in the retaking of Gale's deposition. Therefore, the only expense imposed will be the costs of Gale's further deposition detailed in the conclusion section.

11

## II. FURTHER SCHEDULING CONFERENCE

On June 27, 2006, the parties filed a joint status report. As a result, the court makes the following orders:

1. This court will set a discovery status review conference for September 14, 2006 at 10:00 a.m. Reports are due one week before the conference.

2. Depositions may not be rescheduled absent extraordinary circumstances. The parties may seek court ordered subpoenas if witnesses are uncooperative.

3. Contention interrogatories and requests for admissions shall be served no earlier than September 1, 2006.

4. SMUD's motion to compel interrogatory responses, currently scheduled for July 20, 2006, is reset to July 27, 2006. The joint stipulation shall by filed by July 24, 2006.

5. The deadline for Fru-Con to serve objections to SMUD's first set of interrogatories is July 3, 2006. Fru-Con shall serve responses, beyond objections, to SMUD's first set of interrogatories by July 14, 2006, as well as the supplemental responses which are to be filed by July 14 pursuant to the stipulated order of June 30, 2006.

## CONCLUSION

In accordance with the reasoning outlined in this opinion, IT IS ORDERED that:

1. SMUD's motion to compel further deposition testimony from Tanya Gale, filed June 6, 2006, is granted. Ms. Gale shall be deposed at the earliest convenience of the parties. Her audit memo, dated September, 2004, shall be disclosed to SMUD within fifteen calendar days of this order.

2. SMUD's motion for sanctions is granted in part. Fru-Con shall pay the reasonable expenses of the further deposition including SMUD counsel travel, if any, and court reporter/logistics costs.

\\\\\
\\\\\

```
```

3. Fru-Con's motion for sanctions and protective order are denied.

DATED: 7/21/06

/s/ Gregory G. Hollows

GREGORY G. HOLLOWS
U. S. MAGISTRATE JUDGE

GGH:076
Fru-Con0583.gale.wpd