1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  FRU-CON CONSTRUCTION
    CORPORATION, a Missouri
12  corporation,
                                    NO. CIV. S-05-583 LKK/GGH
13          Plaintiff,

14      v.                                O R D E R

15  SACRAMENTO MUNICIPAL UTILITY
    DISTRICT, a municipal utility
16  district; UTILITY ENGINEERING
    CORPORATION, a Texas
17  corporation,

18          Defendants.
    _____/
19

20      On March 24, 2005, Fru-Con Construction Corp. ("Fru-Con"), a

21  foreign  corporation,  filed  this  federal  action  against  the

22  Sacramento Municipal Utility District ("SMUD"), the owner of the

23  Consumnes  Power  Plant  ("CPP").   The  complaint  alleged  several

24  causes  of  action  related  to  breach  of  contract.   SMUD  filed  a

25  counterclaim against Fru-Con.  Pending before the court is SMUD's

26  motion to file an amended counterclaim adding Bilginger Berger AG

                                    1

("Bilfinger") and Fru-Con Holding Company ("Fru-Con Holding") as defendants.[1]   The amended complaint seeks to impose liability against these additional parties based on the legal theories of alter ego and agency.

# I.

## Background & Procedural History

**A.    Summary of Factual Allegations Regarding Bilfinger and Fru-Con Holding [2]**

Sacramento Municipal Utility District ("SMUD") entered into a contract with Fru-Con under which Fru-Con was to construct the Cosumnes Power Plant (the "CPP"), a 500 megawatt combined cycle power plant.   SMUD alleges that Fru-Con breached its contract.

SMUD maintains that the management of Fru-Con is controlled by Bilfinger and Fru-Con Holding.   Bilfinger exercised control by requiring approval of many relatively routine Fru-Con business activities by the Fru-Con Holding Board.   The Fru-Con Holding Board is comprised of three members of the Executive Board of Bilfinger Berger, including the Chairman of the Bilfinger Berger Executive Board, and has also included at least one senior executive officer from Fru-Con.

Because the contract to construct the CPP was estimated to cost in excess of $50 million, Fru-Con needed the Fru-Con Holding

---

[1] SMUD avers that Fru-Con is wholly owned by Fru-Con Holding, a Delaware corporation, which in turn is wholly owned by Bilfinger Berger, a German corporation.

[2] The court notes that SMUD's motion contained over 25 pages of facts.   The court only summarizes the facts which bear on the pending motion.

Board's approval to bid on SMUD's Requests for Proposals ("RFPs"). By a letter dated March 13, 2003, Fru-Con sought approval to submit a proposal to SMUD to construct the CPP at an estimated cost of $150 million and an estimated construction schedule duration of 24 months.

Fru-Con stated in its Statement of Qualifications submitted in connection with its bid on the CPP project that Fru-Con alone carried a bonding capacity of $750,000,000 through Travelers Casualty & Surety Company of America ("Travelers"). The performance bond was a material issue to SMUD. Through discovery, SMUD now believes that Fru-Con's statement regarding its bonding capacity was fraudulent. The $750,000,000 capacity reflects Fru-Con's capacity together with the capacity of Bilfinger. Further discovery indicated that Bilfinger provided indemnities for all the public jobs upon which Fru-Con obtained performance bonds.

The contract between Fru-Con and SMUD was signed in August 2003. The agreed contract price was $106.84 million. Fru-Con was to complete construction within 573 calendar days. In order to obtain the performance bond Fru-Con was required to deliver for the full amount of the contract price, SMUD avers that Bilfinger provided an indemnity to Travelers.

Mr. Jaekel, former CEO of Fru-Con and a Bilfinger employee, recalls that in 2004, Fru-Con had fewer than five projects where the contract price was in excess of $50 million, and SMUD's CPP project was one of them. According to Mr. Jaekel, Bilfinger monitored those Fru-Con projects where the contract price was $50

1 million or more by sending a senior level representative to the
2 project site to observe the progress of construction, review
3 documents and interview Fru-Con's project management team.

4      SMUD avers that through recent discovery it learned the extent
5 to which Bilfinger was involved in monitoring and supervising the
6 CPP project.  For example, in September of 2004, Peter Ophoven, a
7 Bilfinger supervisor, audited the CPP project and noted many
8 problems with Fru-Con's progress.  Ophoven concluded that the
9 project was significantly behind schedule, that Fru-Con would not
10 make any margin, and instead would lose at least $6 million.  The
11 audit also stated that Fru-Con would be assessed liquidated damages
12 for schedule delay, that Fru-Con's project management was
13 disorganized, that Fru-Con's construction schedule was "very
14 unrealistic" and that it was time to develop, "for internal
15 purposes," a realistic schedule.

16      There is additional evidence that Ophoven visited the CPP site
17 numerous times to review the CPP's financial status, ultimately
18 staying on at the CPP site for several months.  Near the end of the
19 contract, Ophoven was deeply involved in the CPP project.  SMUD
20 maintains that the extent of Ophoven's involvement in the CPP was
21 first revealed during discovery.

22      Similarly, as problems at the CPP site worsened, SMUD
23 maintains that Bilfinger infused capital into Fun-Con as needed.
24 SMUD learned of this arrangement on July 27, 2006, when it took the
25 deposition of Fru-Con's former cash manager, Brian Ellsworth.  His
26 testimony allegedly revealed the commingling of funds between

1   Bilfinger and Fru-Con.

2       When SMUD terminated its contract with Fru-Con, it promptly
3   notified Travelers that it had terminated Fru-Con.  Travelers took
4   more than six months to evaluate SMUD's claim and then flatly
5   denied any liability for Fru-Con's failure to perform the work.
6   SMUD avers that the decision was likely made by Bilfinger.

7       In addition to the foregoing evidence of Bilfinger's
8   involvement in the contract, SMUD avers that recent discovery also
9   revealed that Bilfinger and Fru-Con Holding agreed to indemnify
10  Travelers for any losses suffered by Travelers as a result of Fru-
11  Con's work on the CPP.  Travelers bears no financial exposure as
12  a consequence of these indemnity agreements.  Moreover, Travelers'
13  witnesses have testified that Travelers thinks of Bilfinger and
14  Fru-Con as one and the same, and reports to them concerning this
15  litigation.

16      SMUD also avers that through discovery it learned that
17  Bilfinger maintains a $1.5 billion credit through Travelers and
18  that it can be used by any of the Bilfinger entities around the
19  world, including Fru-Con and Fru-Con Holding.  SMUD maintains that
20  since any settlement by Travelers will come dollar-for-dollar
21  directly out of Bilfinger's pocket, Traveler's positions are likely
22  being directed by Bilfinger.

23  **B.   Procedural History**

24      Fru-Con brought suit against SMUD on March 24, 2005.[3]  The

25  _____

26      [3]  The court notes that SMUD filed suit against Fru-Con in
    state court as well.  Fru-Con sought removal to this court based

                                5

complaint alleged causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of the implied warranty, professional negligence, and breach of the California Prompt Payment Act. On April 18, 2005 SMUD filed an answer and counterclaim against Fru-Con. SMUD's counterclaim alleged causes of action for declaratory relief, breach of contract, violation of the California False Claims Act, negligence and equitable indemnity.

A scheduling order was issued on July 21, 2005. Per the scheduling order, discovery is to be completed by January 18, 2007. The deadline for law and motion practice is March 18, 2007. A forty to sixty day jury trial is set for September 18, 2007.

**II.**

**Rule 16 (b) Standards**

Because the court has filed a pretrial scheduling order Federal Rule of Civil Procedure 16 governs the procedure for amending the pleadings. Unlike Rule 15(a)'s liberal amendment policy which focuses on the bad faith of the party seeking to interpose an amendment and the prejudice to the opposing party, Rule 16(b)' s "good cause" standard primarily considers the diligence of the party seeking the amendment. <u>Johnson v. Mammoth Recreations, Inc.</u>, 975 F.3d 604 (9th Cir. 1992); <u>see</u> 6A Wright,

---

on a claim of fraudulent joinder, but the case was remanded on May 31, 2005. Soon thereafter, SMUD filed a motion to stay in favor of the state court action pursuant to <u>Colorado River Water Conservation Dist v. United States</u>, 424 U.S. 800 (1976). The court denied SMUD's motion on August 11, 2005.

1  Miller & Kane, Federal Practice and Procedure § 1522.1 at 231 (2d

2  ed. 1990) ("good cause" means scheduling deadlines cannot be met

3  despite party's diligence).

4      Moreover, carelessness is not compatible with a finding of

5  diligence and offers no reason for a grant of relief. Cf. Engleson

6  v. Burlington Northern R.R. Co., 972 F.2d 1038, 1043 (9th Cir.

7  1992) (carelessness not a ground for relief under Rule 60(b));

8  Martella v. Marine Cooks & Stewards Union, 448 F.2d 729, 730 (9th

9  Cir. 1971) (same), cert. denied, 405 U.S. 974 (1972). Although the

10 existence or degree of prejudice to the party opposing the

11 modification might supply additional reasons to deny a motion, the

12 focus of the inquiry is upon the moving party's reasons for seeking

13 modification. See Gestetner Corp. v. Case Equip. Co., 108 F.R.D.

14 138, 141 (D. Me. 1985). If the moving party was not diligent, the

15 inquiry should end.

16                              **III.**

17                            **ANALYSIS**

18      In interpreting the "good cause" requirement under Rule 16,

19 the court considers, primarily, "the diligence of the party seeking

20 the amendment." Johnson, 975 F.2d at 609. As a secondary

21 consideration, the court considers the degree of prejudice to the

22 opposing party. Id. The court finds that SMUD acted diligently

23 and that the degree of prejudice to Bilfinger and Fru-Con Holding

24 is minimal.

25 **A.   Diligence**

26      SMUD maintains that its motion to amend was prompted by new

1    evidence obtained through the discovery process.  Mot. to Amend at

2    3 ("through discovery. . . [SMUD] learned that overwhelming

3    evidence exists to impose liability on Bilfinger . . . and Fru-Con

4    Holding as the alter egos of Fru-Con or, in the alternative, on the

5    ground that Fru-Con is the mere agent of Bilfinger . . . and/or

6    Fru-Con Holding.").

7        Specifically, SMUD explains that the evidence obtained in

8    discovery revealed the many ways in which Bilfinger and Fru-Con

9    Holding were actively involved in the CPP project.  For example,

10   Bilfinger and Fru-Con Holding gave financial support to Fru-Con,

11   Bilfinger personnel were involved in monitoring the CPP project,

12   and controlled part of the decision to initially bid on the SMUD

13   contract.  SMUD also maintains that discovery revealed that Fru-Con

14   had made misrepresentation regarding its bonding capacity by

15   claiming that Bilfinger's bonding capacity was its own.

16       The court agrees with SMUD that this information is new

17   evidence which might constitute the factual basis for liability

18   under either an alter ego or agency theory.

19       It is well established California law that two conditions must

20   be met before the alter ego doctrine may be invoked.  First, there

21   must be such a unity of interest and ownership between the

22   corporation and its equitable owner that the separate personalities

23   of the corporation and the shareholder do not in reality exist.

24   Second, there must be an inequitable result if the acts in question

25   are treated as those of the corporation alone.  <u>Sonora Diamond</u>

26   <u>Corp. v. Superior Court</u>, 83 Cal. App. 4th 523, 538 (5 Dist. 2000).

The information obtained during discovery is clearly relevant to a claim of alter ego.

The newly obtained information is also relevant to a claim of agency.   Under state law, "the principal/agent theory is a fact-driven inquiry that requires examination of whether the parent exercises a sufficient degree of control over its subsidiary to establish that the subsidiary can be described as a means through which the parent acts, or is nothing more than an incorporated department of the parent." Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc., 99 Cal. App. 4th 228, 245 (4 Dist. 2002).   Here again, the information obtained during discovery relates to this claim.

In its opposition, Fru-Con argues that SMUD cannot establish either claim against Bilfinger or Fru-Con Holding.[4]   While this may be the case, the motion before the court is a motion to amend, not a motion on the merits.   As noted previously, the standard for a motion to amend is whether the moving party was diligent, not whether the moving party will ultimately succeed on the merits. Here, it appears that SMUD acted diligently.

The discovery process in this case has been a massive undertaking for both parties.   According to SMUD, over four million pages of documents have been exchanged and 100 depositions have been taken.   Both parties contend that the other party complicated discovery and made it more difficult than necessary.   Regardless

---

[4]   Indeed, Fru-Con spends only two pages addressing the requirements of Rule 16(b) and instead focuses the majority of its 44 page brief addressing the merits of SMUD's claims.

1  of which party is more or less responsible, it is undisputed that

2  discovery has been marked by delay and complication.   The first

3  deposition occurred on April 2, 2006 and the last deposition was

4  set for November 14, 2006.

5       SMUD maintains, and Fru-Con does not dispute, that it received

6  information regarding Bilfinger and Fru-Con holding over the summer

7  of 2006 and into the fall.   For example, several key witnesses who

8  were able to speak to Bilfinger and Fru-Con Holding's involvement

9  in the CPP were deposed recently.   The deposition of Peter Ophoven

10  was taken on August 21, 2006, Earle Hardgrave's deposition was

11  taken September 5 through September 8, 2005 and Matti Jaekel's

12  deposition took place on September 12 and September 13, 2006.   SMUD

13  filed the motion to amend roughly two months after the deposition

14  of Jaekel and prior to the close of discovery.   There has been no

15  substantive law and motion practice to date.   Taken together these

16  facts suggest that SMUD acted with reasonable diligence.

17       Fru-Con also suggests that SMUD knew of Fru-Con's relationship

18  to Bilfinger and Fru-Con Holding well before this lawsuit was even

19  filed.   Even if this is true, SMUD maintains that simply knowing

20  that there is a relationship between the three entities is

21  insufficient information on which to bring a counterclaim naming

22  two new defendants.   SMUD maintains that it was only through

23  discovery that SMUD learned the details on which it now bases its

24  amended counterclaim.

25       Allowing parties to amend based on information obtained

26  through discovery is common and well established.   For example, in

1   <u>Safeway, Inc. v. Sugarloaf Partnership, LLC.</u>, 423 F. Supp. 2d 531

2   (D. Md. 2006), the court granted leave to amend based on "new

3   information revealed in discovery." <u>Id.</u> at 539.  <u>See</u> <u>also</u>

4   <u>Pumpco, Inc. v. Schenker Intern., Inc.</u>, 204 F.R.D. 667 (D. Colo.

5   2001) (learning through discovery of new information which is

6   necessary for the assertion of a claim constitutes good cause under

7   Rule 16); <u>Sithon Maritime Co. v. Holiday Mansion</u>, 177 F.R.D. 504

8   (D. Kan. 1998) (no knowledge of factual basis for new fraud claims

9   until after discovery constituted good cause under Rule 16).

10       For these reasons, the court concludes that SMUD acted with

11  diligence in seeking leave to file an amended counterclaim.

12  **B. Prejudice**

13       Fru-Con argues that it will be prejudiced by the amendment.[5]

14  Fru-Con maintains that the discovery deadline (set for January 18,

15  2007) will have to be extended and that the trial will be made

16  substantially more complicated with two additional parties.  The

17  court is unpersuaded that these facts constitute the type of

18  prejudice which precludes amendments under Rule 16.

19       The majority of facts relating to the corporate relationship

20  between the three entities appear to have already been revealed in

21  discovery.  Moreover, information about how the three entities are

22  related is information which Bilfinger and Fru-Con Holding posses.

23  That said, should Fru-Con, Bilfinger or Fru-Con Holding want to

24  ────────────────

25       [5]   The court cannot help but notice that although Fru-Con
    filed a 44 page brief, only two paragraphs (not even a full page)
26  are dedicated to the question of prejudice.

1  extend the discovery deadline and the other deadlines set forth in

2  the scheduling order, the court will be amenable to such requests.

3      The fact that the amended counterclaim may cause more work

4  does not constitute prejudice.  This is especially true in light

5  of "Rule 16(b)'s 'good cause' standard which primarily considers

6  the diligence of the party seeking the amendment." <u>Johnson</u>, 975

7  F.2d at 609.  Given that SMUD has met the diligence standard

8  discussed above, any considerations regarding the extra labor

9  required of Bilfinger or Fru-Con Holding are outweighed.

10     Accordingly, the court orders as follows:

11     1.  Sacramento Municipal Utility District's Motion to Amend

12  its Counterclaim to add Bilfinder Berger AG and Fru-Con Holding

13  Corporation as counterdefendants is GRANTED.

14     2.  Fru Con has informed the court that it does not desire

15  to alter the present dates but that the new defendants do not, as

16  yet, have counsel for the instant case.  Those parties shall, at

17  the time they file their answers, inform the court and the present

18  parties, in writing, of their desire in that regard.

19     IT IS SO ORDERED.

20     DATED: December 15, 2006.

23                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
24                              UNITED STATES DISTRICT COURT