UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRU-CON CONSTRUCTION
CORPORATION, a Missouri
corporation,
                                        NO. CIV. S-05-583 LKK/GGH
          Plaintiff,

     v.                                 O R D E R

SACRAMENTO MUNICIPAL UTILITY
DISTRICT, a municipal utility
district; UTILITY ENGINEERING
CORPORATION, a Texas
corporation,

          Defendants.
_____/

     On March 24, 2005, Fru-Con Construction Corporation ("Fru-
Con"), a foreign corporation, filed this federal action against the
Sacramento Municipal Utility District ("SMUD"), the owner of the
Consumnes Power Plant ("CPP").   The complaint alleged several
causes of action related to breach of contract.   SMUD subsequently
filed a counterclaim against Fru-Con.
     Pending before the court are three motions for partial summary

1

1  judgment filed by Fru-Con.  The first pertains to the counterclaims
2  for wrongful termination, the second pertains to SMUD's claim
3  against Fru-Con for money paid to Dick Corporation and the third
4  pertains to SMUD's claim against Fru-Con under the California False
5  Claims Act.   For the reasons discussed herein, the motions
6  regarding wrongful termination and the money paid to the Dick
7  Corporation are denied and the motion regarding the California
8  False Claims Act is granted.

9                              **I.**

10                            **FACTS**[1]

11 **A.    Facts Related to Fru-Con's Motion for Partial Summary**
12     **Judgment Regarding Wrongful Termination**

13      **1.   The Contract**

14      Sacramento Municipal Utility District ("SMUD") entered into
15 a contract with Fru-Con Construction Corporation ("Fru-Con") under
16 which Fru-Con was to construct the Cosumnes Power Plant ("CPP")
17 located in Herald, California for a contract price of
18 $106,843,527.00.  Fru-Con's Statement of Undisputed Facts ("Fru-Con
19 SUF") ¶ 1.  The contract required substantial completion on May 3,
20 2005.  Fru-Con SUF ¶ 3.

21      There are several contract terms that are relevant to the
22 pending motions.  First, General Condition 36 of the contract
23 provided that SMUD may terminate the contract on the following
24 basis:

25 _____

26      [1] Undisputed unless otherwise noted.

> If the Contractor refuses or fails to prosecute the work, or any separable part thereof with such diligence as will insure its completion within the time specified in this Contract, or any extension thereof, or fails to complete said work within such time, the Contracting Officer may, by written notice to the Contractor, terminate Contractor's right to proceed with the work or such part of the work to which there has been a delay.

Fru-Con SUF ¶ 5.

Second, the contract provided for certain specified "intermediate milestones." Special Condition 10 and Appendix G set forth these milestones, which were essentially deadlines for the completion of specified stages of the construction. To the extent that Fru-Con failed to meet these milestones, SMUD was entitled to a predetermined amount of liquidated damages. See Contract, SC-10, Ex. 32, Decl. of Robert C. Nelson ("Nelson Decl.").

Finally, General Condition 29 provided that the "contract may be changed only by duly executed Change Orders issued by the District." Contract, GC-29, Ex. 32, Nelson Decl.

**2.   The Delay**

It is undisputed that over time, Fru-Con fell behind schedule. SMUD's May 2004 internal monthly progress report reflects that it believed Fru-Con to be three months behind schedule. See SMUD Report, Ex. F, Decl. of Robert Moore ("Moore Decl.").

On October 7, 2004 Fru-Con presented to SMUD a power-point presentation that described the extent of the construction delays. Fru-Con estimated that the project was five to seven months behind schedule. Fru-Con's Oct. 7, 2004 Presentation to SMUD, Ex. J, Moore Decl. Fru-Con stated that there were two ways of addressing

1   the delay: (1) SMUD could accept the delay, or (2) SMUD could
2   direct Fru-Con to accelerate. Fru-Con explained that the
3   acceleration option could cost SMUD approximately $26 million. <u>Id.</u>

4        Internal SMUD documents revealed that soon after October 7,
5   2004, SMUD began considering alternative ways of proceeding with
6   the construction and one such option included terminating Fru-Con.
7   <u>See</u> Fru-Con SUF ¶¶ 25-28. SMUD wrote to Fru-Con expressing deep
8   concern with the construction delay. In a October 14, 2004 letter,
9   SMUD wrote: "SMUD believes there is a complete disconnect between
10  Fru-Con's project schedule and actual progress . . . Your schedule
11  remains deficient when compared to contract requirements . . . ."
12  Oct. 14, 2004 Letter from SMUD to Fru-Con, Ex. 38, Nelson Decl.

13       Meanwhile, Fru-Con's October 2004 monthly schedule update
14  (submitted after the October 7, 2004 presentation) projected a new
15  substantial completion date: October 3, 2005. Fru-Con SUF ¶ 33.
16  Then, in Fru-Con's November 2004 monthly schedule update, Fru-Con
17  changed the substantial completion date to August 10, 2005. Fru-
18  Con SUF ¶ 37.

19       In a November 14, 2004 e-mail from SMUD to Fru-Con, SMUD made
20  the following request: "Fru-Con to provide key
21  benchmarks/assumptions and exclusions (if any) to accomplish Aug.
22  10th completion date." Fru-Con SUF ¶ 50. In a November 16, 2004
23  letter, SMUD's Project Director stated that "it appears that
24  Fru-Con is not working efficiently and in a manner which will allow
25  you to achieve your revised to-go (forecast) progress numbers and
26  completion on August 10, 2005 as stated in the November 12, 2004

4

1  schedule revision." Fru-Con SUF ¶ 51.

2       SMUD's concerns with the delay were evident. Beginning in
3  December 2004 and continuing through February 2005, SMUD issued
4  eight notices to Fru-Con, alleging that Fru Con failed to meet
5  certain intermediate milestones set forth in the contract and
6  accordingly, that SMUD would be entitled to certain liquidated
7  damages. Notices, Ex. 37, Nelson Decl. Similarly, on December 22,
8  2004 Jim Shetler of SMUD wrote to Fru-Con CEO Matti Jaekel
9  expressing concern about the delay: "As we approach 2005, SMUD
10 believes that there will be several major milestone dates that Fru-
11 Con will not meet, which in turn will initiate liquidated damages."
12 E-mail from Shetler to Jaekel, Dec. 22, 2004, Ex. 23, Decl. of
13 Brian Becker ("Becker Decl.").   This email also conveyed SMUD's
14 concern about Fru-Con laying off 100 craft workers. Id.  It is
15 undisputed that during this time, Fru-Con continued to work on the
16 project, albeit on delayed schedule.  Fru-Con SUF ¶ 76.

17      Beginning in January, the parties began "global settlement"
18 discussions about how to resolve the delay in the construction and
19 other related problems.  See E-mail from Shetler to Jaekel, Jan.
20 7, 2005, Ex. JJ, Moore Decl. On January 18, 2005, SMUD's Board of
21 Directors passed a resolution that should negotiations with Fru-Con
22 fail, the General Manager could terminate the contract.  See Board
23 Resolution 5-01-01 CS, Ex. LL, Moore Decl.[2]  On January 25, Fru-Con

24
_____

25      [2] SMUD objects to any evidence of the global settlement
    discussions on the grounds that this evidence is inadmissable under
    Federal Rule of Evidence 408.  As will be discussed, the court need
26  not rely on this evidence in resolving the pending motion.   The

1  submitted a term sheet, proposing, among other things: (1) an
2  increase in the contract price of $16.5 million; and (2) a time
3  extension of the substantial completion date to August 10, 2005.
4  SMUD submitted a counter proposal that included the August 10, 2005
5  completion date and $7.1 million in additional compensation
6  (instead of $16.5 million).  Fru-Con SUF ¶¶ 71-73.

7       Fru-Con asserts that SMUD accepted Fru-Con's proposal but the
8  evidence does not support this assertion.  Rather, the evidence
9  cited to by Fru-Con demonstrates that Fru-Con and SMUD were
10 attempting to negotiate a price.  SMUD's counter proposal was just
11 that - SMUD agreed to the completion date but only if the
12 additional compensation was $7.1 million, not the $16.5 million
13 requested by Fru-Con.  There is nothing in the evidence cited to
14 by Fru-Con that establishes that SMUD accepted Fru-Con's proposal.
15 See Exs. NN and OO, Moore Decl.

16      **3.   SMUD's Termination of the Contract**

17      On February 11, 2005, SMUD terminated Fru-Con for default.
18 The letter of termination stated:

19          Fru-Con has refused or failed to prosecute the work
20          (construction of the CPP) . . . with such diligence as
            will insure its completion within the time specified in
            the contract.  Therefore, SMUD is exercising its right
21          under General Condition 36 of the Contract to take over
            the work and prosecute the same to completion . . . .
22

23 Letter of Termination, Ex. D, Moore Decl.  The letter listed twelve
24 grounds for termination.  Of those, eight reasons pertained to Fru-
25 _____

26 discussion of the on-going negotiations is included here merely for
   background purposes.

                                6

Con's failure to meet the milestones set forth in Appendix G of the contract and referenced in the notice letters sent from SMUD to Fru-Con.  Two of the reasons pertained to the project completion date:

> By its own admission, as evidenced by Fru-Con's schedule dated November 10, 2004 which was presented to SMUD on November 12, 2004, Fru-Con has conceded that the Project will not be completed within the time specified in the Contract, and anticipates project completion to be delayed by at least three months.

> Because of Fru-Con's consistently poor workmanship, as evidenced by its excessive pipe weld rejection rate of nearly 15 percent (which is several times higher than industry standards), and Fru-Con's decision to lay off approximately 100 pipefitters during the height of the pipe assembly process this winter, it is no longer possible for Fru-Con to meet the Project Substantial Completion Milestone.

Letter of Termination, Ex. D, Moore Decl.

**B.    Facts Relevant to Fru-Con's Motion for Partial Summary Judgment Regarding SMUD's Claim for Monies Paid to Dick Corporation**

After SMUD terminated the contract with Fru-Con, SMUD entered into a separate contract with Dick Corporation ("Dick Corp.") for construction services for the CPP.  Fru-Con SUF ¶ 237.  In this lawsuit, SMUD seeks to recover $9,534,976.00 from Fru-Con for monies SMUD paid to Dick Corp.  Fru-Con SUF ¶ 239.  In its motion, Fru-Con contends that this payment to Dick Corp. was improper as the contractors who performed the work at the CPP were unlicenced.

It is undisputed that Dick Corp. entered into a contract with SMUD for construction services for the CPP on June 9, 2004.  SMUD's

7

1  Response to Fru-Con's Statement of Undisputed Facts ("SMUD RSUF")

2  ¶ 447.  Dick Corp. possessed a valid California contractors license

3  at all times it provided services with respect to the CPP.  SMUD

4  RSUF ¶ 449.  Work performed under the  contract was done pursuant

5  to task orders which set forth an agreed upon scope of work and

6  total compensation for that work.  SMUD RSUF ¶ 450.  Task orders

7  were issued from SMUD directly to Dick Corp.  SMUD RSUF ¶ 451.

8  Dick Corp. was responsible for completing the work agreed upon in

9  the task orders and was responsible for any problems that occurred

10 in performing those services.  SMUD RSUF ¶ 453.  Dick Corp. was

11 required to and did post a bond in connection with its work on the

12 Project.   SMUD RSUF ¶ 456.   All invoices for work performed

13 pursuant to Dick Corp.'s contract with SMUD were sent from Dick

14 Corp. to SMUD.  SMUD RSUF ¶ 457.  SMUD paid Dick Corp. directly for

15 those invoiced services.  SMUD RSUF ¶ 458.

16     It is also undisputed that Dick Corp. is related to a company

17 known as Dick Environmental Services, LLC ("DES").  DES is not

18 licensed in the state of California.   The extent of DES'

19 relationship to Dick Corp. is not completely clear.  Ron Terry, the

20 Project Manager for the CPP project explained in his declaration:

21         I am a Project Manager employed by DES, a related company
           to Dick Corp.  Since DES and Dick Corp are related
22         companies, Dick Corp. occasionally utilized my services
           for Dick Corp. projects.  Indeed, Dick Corp. utilized my
23         services as project supervisor on the Consumnes Power
           Plane construction project.
24

25 Decl. of Ronald Terry ("Terry Decl.").

26     SMUD avers that the majority of the work performed at the CPP

1  was done by DES and not by Dick Corp.  However, the facts are not

2  clear.  When asked what entity performed services on the Project,

3  Mr. Terry testified in his deposition:  "Dick Corporation . . .Can

4  I clarify?  . . .On this particular project, I worked for Dick

5  Environmental Services, LLC, in Jacksonville; but when we bid this

6  job, we bid it as Dick Corporation.  So it was Dick Environmental

7  Services acting as Dick Corporation, just for the record."  Fru-Con

8  SUF ¶ 242.

9  **C.  Procedural History**

10      Fru-Con brought suit against SMUD on March 24, 2005.[3]  The

11  complaint alleged causes of action for breach of contract, breach

12  of the implied covenant of good faith and fair dealing, breach of

13  the implied warranty, professional negligence, and breach of the

14  California Prompt Payment Act.  On April 18, 2005 SMUD filed an

15  answer and counterclaim against Fru-Con.  SMUD's counterclaim

16  alleged causes of action for declaratory relief, breach of

17  contract, violation of the California False Claims Act, negligence

18  and equitable indemnity.

19                              **II.**

20                  **STANDARD FOR SUMMARY JUDGMENT**

21      Summary judgment is appropriate when it is demonstrated that

22

23      [3]  The court notes that SMUD filed suit against Fru-Con in
    state court as well.  Fru-Con sought removal to this court based
24  on a claim of fraudulent joinder, but the case was remanded on May
    31, 2005.  Soon thereafter, SMUD filed a motion to stay in favor
25  of the state court action pursuant to <u>Colo. River Water
    Conservation Dist. v. United States</u>, 424 U.S. 800 (1976).  The
26  court denied SMUD's motion on August 11, 2005.

1  there exists no genuine issue as to any material fact, and that the

2  moving party is entitled to judgment as a matter of law.  Fed. R.

3  Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144,

4  157 (1970); Sicor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir.

5  1995).

6      Under summary judgment practice, the moving party
       [A]lways bears the initial responsibility of informing

7      the district court of the basis for its motion, and
       identifying those portions of "the pleadings,

8      depositions, answers to interrogatories, and admissions
       on file, together with the affidavits, if any," which it

9      believes demonstrate the absence of a genuine issue of
       material fact.

10

11  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

12  nonmoving party will bear the burden of proof at trial on a

13  dispositive issue, a summary judgment motion may properly be made

14  in reliance solely on the 'pleadings, depositions, answers to

15  interrogatories, and admissions on file.'"  Id.  Indeed, summary

16  judgment should be entered, after adequate time for discovery and

17  upon motion, against a party who fails to make a showing sufficient

18  to establish the existence of an element essential to that party's

19  case, and on which that party will bear the burden of proof at

20  trial.  See id. at 322.  "[A] complete failure of proof concerning

21  an essential element of the nonmoving party's case necessarily

22  renders all other facts immaterial."  Id.  In such a circumstance,

23  summary judgment should be granted, "so long as whatever is before

24  the district court demonstrates that the standard for entry of

25  summary judgment, as set forth in Rule 56(c), is satisfied."  Id.

26  at 323.

1    If the moving party meets its initial responsibility, the

2    burden then shifts to the opposing party to establish that a

3    genuine issue as to any material fact actually does exist.

4    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

5    586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv. Co.,

6    391 U.S. 253, 288-89 (1968); Sicor Ltd., 51 F.3d at 853.

7    In attempting to establish the existence of this factual

8    dispute, the opposing party may not rely upon the denials of its

9    pleadings, but is required to tender evidence of specific facts in

10   the form of affidavits, and/or admissible discovery material, in

11   support of its contention that the dispute exists.  Fed. R. Civ.

12   P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First Nat'l

13   Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir.

14   1998).  The opposing party must demonstrate that the fact in

15   contention is material, i.e., a fact that might affect the outcome

16   of the suit under the governing law, Anderson v. Liberty Lobby,

17   Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Ass'n of

18   Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992)

19   (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,

20   809 F.2d 626, 630 (9th Cir. 1987)), and that the dispute is

21   genuine, i.e., the evidence is such that a reasonable jury could

22   return a verdict for the nonmoving party, Anderson, 477 U.S. 248-

23   49; see also Cline v. Indus. Maint. Eng'g & Contracting Co., 200

24   F.3d 1223, 1228 (9th Cir. 2000).    In the endeavor to

25   establish the existence of a factual dispute, the opposing party

26   need not establish a material issue of fact conclusively in its

1  favor. It is sufficient that "the claimed factual dispute be shown
2  to require a jury or judge to resolve the parties' differing
3  versions of the truth at trial." First Nat'l Bank, 391 U.S. at
4  290; see also T.W. Elec. Serv., 809 F.2d at 631. Thus, the
5  "purpose of summary judgment is to 'pierce the pleadings and to
6  assess the proof in order to see whether there is a genuine need
7  for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P.
8  56(e) advisory committee's note on 1963 amendments); see also Int'l
9  Union of Bricklayers & Allied Craftsman Local Union No. 20 v.
10 Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

11      In resolving the summary judgment motion, the court examines
12 the pleadings, depositions, answers to interrogatories, and
13 admissions on file, together with the affidavits, if any. Rule
14 56(c); see also In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th
15 Cir. 1999). The evidence of the opposing party is to be believed,
16 see Anderson, 477 U.S. at 255, and all reasonable inferences that
17 may be drawn from the facts placed before the court must be drawn
18 in favor of the opposing party, see Matsushita, 475 U.S. at 587
19 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)
20 (per curiam)). Nevertheless, inferences are not drawn out of the
21 air, and it is the opposing party's obligation to produce a factual
22 predicate from which the inference may be drawn. See Richards v.
23 Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),
24 aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

25      Finally, to demonstrate a genuine issue, the opposing party
26 "must do more than simply show that there is some metaphysical

12

1  doubt as to the material facts. . . . Where the record taken as a

2  whole could not lead a rational trier of fact to find for the

3  nonmoving party, there is no 'genuine issue for trial.'"

4  <u>Matsushita</u>, 475 U.S. at 586-87 (citation omitted).

**III.**

**Analysis**

7       Pending before the court are three motions for partial summary

8  judgment filed by Fru-Con.  For the reasons explained herein, the

9  motions regarding wrongful termination and monies paid to the Dick

10  Corp. are denied, and the motion on SMUD's claim pursuant to the

11  California False Claims Act is granted.  Each motion is addressed

12  in turn.

**A.    Fru-Con's Motion for Partial Summary Judgment On The Issue of Wrongful Termination**

15       Fru-Con seeks partial summary judgment on Counts I (Breach of

16  Contract) and II (Breach of the Implied Covenant of Good Faith and

17  Fair Dealing) of its complaint, and on Count I (Declaratory Relief

18  on the Propriety of the Default Termination) of SMUD's Amended

19  Counterclaim.

20       Fru-Con makes three general arguments.  First, Fru-Con argues

21  that SMUD failed to provide Fru-Con with an opportunity to cure the

22  delays and failed to complete a scheduling analysis prior to

23  termination.   Second,  Fru-Con  argues  that  SMUD  waived  its

24  objections to Fru-Con's schedule.  And third, Fru-Con asserts that

25  SMUD's termination based on Fru-Con's failure to meet certain

26  deadlines and alleged failure to remove defective concrete was

13

1  improper and wrongful.[4]

2      **1.   Opportunity to Cure & Scheduling Analysis**

3      Fru-Con's primary argument is that SMUD's termination of the

4  contract was improper because SMUD failed to provide Fru-Con with

5  an opportunity to cure the delays and failed to conduct a "proper

6  schedule analysis" prior to termination.  Fru-Con's argument must

7  fail since the contract plainly does not require that SMUD take

8  either of these actions.

9      **a.   The Wording of the Contract**

10     In California, "[t]he fundamental goal of contractual

11 interpretation is to give effect to the mutual intention of the

12 parties.   If contractual language is clear and explicit, it

13 governs." <u>Bank of the West v. Superior Court</u>, 2 Cal. 4th 1254, 1264

14 (1992).

15     Here, the contract language is clear and explicit.  General

16 Condition 36 of the contract provides that SMUD may terminate the

17 contract on the following basis:

18     If the Contractor refuses or fails to prosecute the work,
       or any separable part thereof with such diligence as will
19     insure its completion within the time specified in this
       Contract, or any extension thereof, or fails to complete
20     said work within such time, the Contracting Officer may,
       by written notice to the Contractor, terminate
21     Contractor's right to proceed with the work or such part
       of the work to which there has been a delay.
22
23 Fru-Con SUF ¶ 5.  Pursuant to this provision, SMUD issued a notice

24 _____

25     [4] Fru-Con fails to discuss its claim for breach of the implied
   covenant of good faith and fair dealing.  The court assumes, but
26 does not know, that this claim is premised solely on Fru-Con's
   allegation that SMUD wrongfully terminated the contract.

1  of termination.   Fru-Con SUF ¶ 4.   As discussed in the facts
2  section of this order, the notice set forth twelve grounds for
3  termination,   the   majority   of   which   related   to   Fru-Con's
4  construction delay.  Fru-Con fails to cite to any provision of the
5  contract which supports its position that SMUD should have provided
6  Fru-Con with an opportunity to cure and conducted a scheduling
7  analysis.   Instead, Fru-Con suggests that the court look to non-
8  binding federal law construing United States government contracts.
9  Fru-Con argues that the language of General Condition 36 mirrors
10 the default language in the Federal Acquisition Regulation ("FAR")
11 provision that applies to United States government contracts.  See
12 Fru-Con Mot. for Partial Summ. J. at 10.

13      Fru-Con's suggestion that the court look to federal law is
14 unpersuasive.   There is simply no indication that the contract at
15 issue here was intended to mirror or reflect the FAR provision.
16 SMUD is a municipal entity created under the Municipal Utility
17 District Act, California Public Utilities Code section 11501, et
18 seq.  Case law governing contracts entered into with the federal
19 government is therefore inapplicable.  This case involves a classic
20 contracts dispute and therefore, under Erie, the court looks to
21 California contract law.

22      Under California law, a court is "bound to give effect to the
23 plain and ordinary meaning of the language used by the parties."
24 Coast Plaza Doctors Hosp. v. Blue Cross of Cal., 83 Cal. App. 4th
25 677, 684 (2000).  Thus, where "contract language is clear and
26 explicit and does not lead to absurd results, we ascertain intent

1   from the written terms and go no further." Shaw v. Regents of

2   Univ. of Cal., 58 Cal. App. 4th 44, 53 (1997).   Moreover, in the

3   absence of substantial parol evidence tending to solve an

4   ambiguity, the terms of a contract will not be extended by

5   implication.   Apra v. Aureguy, 55 Cal. 2d 827 (1961).

6        In the case at bar, General Condition 36 clearly sets forth

7   the specific grounds on which SMUD may terminate the contract and

8   there is no evidence to suggest that the terms of the contract

9   should be extended by implication.   Indeed, in California, a

10  "contract may contain a valid provision giving one or the other

11  party an option to terminate it on specified conditions." Call v.

12  Alcan Pac. Co., 251 Cal. App. 2d 442, 447 (1967); see also R. J.

13  Cardinal Co. v. Ritchie, 218 Cal. App. 2d 124, 143 (1963)

14  ("contract may contain a valid provision giving one or either of

15  the parties thereto an option to terminate it within a certain time

16  or on specified conditions.") As one California court explained:

17       [A] contract which provides that it may be terminated on
         specified notice cannot reasonably be interpreted to
18       require good cause as well as notice for termination,
         unless extrinsic evidence establishes that the parties
19       used the words in some special sense.

20

21  Bionghi v. Metro. Water Dist. of S. Cal., 70 Cal. App. 4th 1358,

    1369 (1999).   Here, the wording of General Condition 36 clearly
22
    sets forth the grounds for termination.   Neither party cites to
23
    extrinsic evidence which would suggest that the provisions of
24
    General Condition 36 be extended by implication to include
25
    additional requirements.
26

1          **b.  The Delay Giving Rise to Termination**

2          It is undisputed that Fru-Con was behind schedule.  It is also

3  undisputed that the contract set forth specific time frames for the

4  completion of certain "milestones" as well as a deadline for the

5  completion of the project.  <u>See</u> Contract, Special Condition 10

6  ("SC-10") and Appendix G, Ex. 32, Nelson Decl.  The contract also

7  provided that changes to the terms of the contract would be by

8  change orders.  Contract, GC-29, Ex. 32, Nelson Decl.  There were

9  no  finalized  change  orders  that  reset  the  deadlines  in  the

10 contract.  Instead, in the fall of 2004 and into 2005, SMUD and

11 Fru-Con engaged in extensive discussions about how to address the

12 delay.

13         Fru-Con cites to various construction law treatises for the

14 principle that prior to terminating a contractor for default, an

15 owner "must be extremely careful when making a determination to

16 terminate  a  contractor  for  cause.   Records  must  be  carefully

17 documented  to  demonstrate  .  .  .  that  the  owner  has  given  the

18 contractor  an  opportunity  to  cure  the  breach  [and]  that  the

19 contractor has failed to do so . . . ."  Gibbs & Hunt, <u>California</u>

20 <u>Construction Law</u> § 6:04 (16th ed. 2007).  Not only is this treatise

21 not binding, but it is undisputed that Fru-Con had constructive

22 notice that SMUD might terminate the contract.

23         In a November 16, 2004 letter, SMUD's Project Director stated

24 that "it appears that Fru-Con is not working efficiently and in a

25 manner  which  will  allow  you  to  achieve  your  revised  to-go

26 (forecast) progress numbers and completion on August 10, 2005 as

17

1  stated in the November 12, 2004 schedule revision." Fru-Con SUF

2  ¶ 51. Moreover, beginning in December 2004 and continuing through

3  February 2005, SMUD issued eight notices to Fru-Con, alleging that

4  Fru-Con failed to meet certain intermediate milestones set forth

5  in the contract and accordingly, that SMUD would be entitled to

6  certain liquidated damages. Notices, Ex. 37, Nelson Decl.

7  Similarly, on December 22, 2004 Jim Shetler of SMUD wrote to Fru-

8  Con CEO Matti Jaekel expressing concern about the delay: "As we

9  approach 2005, SMUD believes that there will be several major

10 milestone dates that Fru-Con will not meet, which in turn will

11 initiate liquidated damages." E-mail from Shetler to Jaekel, Dec.

12 22, 2004, Ex. 23, Becker Decl. In short, even though there was no

13 notice requirement in the contract, Fru-Con was effectively on

14 notice that contract termination was a real possibility.

15      In support of its position, Fru-Con also relies on the

16 California Contract Code, section 10253.[5] However, this section

17 of the Contract Code does not apply to SMUD. Section 10253 falls

18 under Part 2 of the Public Contracts Code and applies to state

19 _____

20      [5]  This section provides:

21      [If] a contractor has failed to supply an adequate working
        force, or material of proper quality, or has failed to comply
22      with Section 10262, or has failed in any other respect to
        prosecute the work with the diligence and force specified by
23      the contract, the [public owner] may: . . . (b) If he
        considers that the failure is sufficient ground for such
24      action, he may give written notice of at least five days to
        the contractor and the contractor's sureties, that if the
25      defaults are not remedied the contractor's control over the
        work will be terminated.

26      Cal. Pub. Cont. Code § 10253 (West 2004).

                              18

1  agencies only.  Municipal Utility Districts are covered in Part 3
2  of the Code that addresses contracting by local agencies.
3  There is no matching notice of default and opportunity to cure
4  requirement in the section covering SMUD.

5       In sum, the contract is clear.  General Condition 36 provided
6  that SMUD could terminate the contract if Fru-Con failed to perform
7  the work in a manner that would insure completion within the time
8  specified in the contract.  It is undisputed that Fru-Con fell
9  behind schedule and, without obtaining any change orders, adjusted
10 the completion date of the contract.  Therefore, on February 11,
11 2005, SMUD terminated the contract according to the terms of
12 General Condition 36.  There is nothing in the contract, nor any
13 requirement under California law, that obligated SMUD provide Fru-
14 Con with an opportunity to cure or to perform a "schedule analysis"
15 prior to termination.

16      **2.  Waiver**

17      Fru-Con also argues that SMUD waived its right to terminate
18 the contract.  As part of this argument, Fru-Con avers that SMUD
19 was aware of the delay and, through its actions, accepted the
20 delay.  See Fru-Con Mot. for Partial Summ. J. at 22, 37.  This
21 argument fails based on both the law and the facts.

22      **a.  Applicable Law**

23      It is "well settled that a contracting party may waive
24 provisions placed in a contract solely for his benefit." Wesley N.
25 Taylor Co. v. Russell, 194 Cal. App. 2d 816, 828 (1961).  In
26 California, the question of waiver is a question of fact and not

1  law, "hence the intention to commit a waiver must be clearly

2  expressed." <u>Moss v. Minor Props., Inc.</u>, 262 Cal. App. 2d 847, 857

3  (1968).  Waiver may be established as a matter of law "only when

4  it is proved by the express declaration of the party charged with

5  waiver, or by undisputed words or conduct so inconsistent with a

6  purpose to stand upon the contractual right allegedly waived as to

7  leave no possibility of any reasonable inference to the contrary."

8  Lord, <u>Williston on Contracts</u> § 39:21 (2007).

9      **b.   Whether SMUD Waived Its Right to Terminate the Contract**

10      Relying on non-binding case law, Fru-Con argues that a waiver

11  of the right to terminate occurs when the owner allows "a

12  delinquent contractor to continue [substantial] performance past

13  a due date." <u>DeVito v. United States</u>, 413 F.2d 1147, 1153 (Ct. Cl.

14  1969)(per curiam).  Even if this court were bound by the cases

15  relied on by Fru-Con, the cases are clearly distinguishable.  In

16  each of the cases cited to, the original deadline had passed and

17  it was only after that point in time that the owner terminated the

18  contract.  <u>See</u> <u>Id.</u>  But <u>see</u> <u>Fla., Dep't of Ins. v. United States</u>,

19  81 F.3d 1093, 1097 (Fed. Cir. 1996)(waiver doctrine was

20  inapplicable because the Postal Service terminated the contractor

21  before the deadline passed and did not indicate any forbearance of

22  the contractual time requirements).  Here, the contract was

23  terminated in February 2005, three months before the original

24  completion deadline.  Accordingly, the cases cited to by Fru-Con

25  are inapplicable.

26      Fru-Con also asserts that the facts undisputedly demonstrate

1  that SMUD "accepted" the delay, thereby waiving its right to
2  terminate.  Fru-Con makes two general arguments.

3      First, Fru-Con argues that at its October 7, 2004 presentation
4  to SMUD, Fru-Con stated that SMUD could either accept the delay or
5  direct Fru-Con to accelerate.  See Fru-Con SUF ¶ 17.  This much is
6  undisputed.  Fru-Con goes on to argue, however, that because SMUD
7  never directed Fru-Con to accelerate the work, SMUD, by default,
8  accepted the delay.  Fru-Con does not cite to any evidence that
9  supports the specific factual conclusion that SMUD accepted the
10 delay.  Instead, Fru-Con appears to argue that by virtue of not
11 terminating the contract in October of 2004, SMUD agreed to the
12 delay.

13     SMUD disputes this factual conclusion and cites to numerous
14 pieces of evidence to suggest that SMUD did not in fact accept the
15 delay.  Most obviously, from December 2004 to February 2005, SMUD
16 sent eight letters to Fru-Con about Fru-Con's failure to meet
17 intermediate milestone deadlines set forth in the contract.  SMUD
18 RSUF ¶ 260.  Similarly, in a November 14, 2004 e-mail from SMUD to
19 Fru-Con, SMUD made the following request: "Fru-Con to provide key
20 benchmarks/assumptions and exclusions (if any) to accomplish Aug.
21 10th completion date."  Fru-Con SUF ¶ 50.  In a November 16, 2004
22 letter, SMUD's Project Director stated that "it appears that
23 Fru-Con is not working efficiently and in a manner which will allow
24 you to achieve your revised to-go (forecast) progress numbers and
25 completion on August 10, 2005 as stated in the November 12, 2004
26 schedule revision."  Fru-Con SUF ¶ 51.  This evidence suggests that

1  SMUD did not accept the delay.

2      Fru-Con also argues that SMUD accepted Fru-Con's proposed term

3  sheet, which was presented to SMUD on January 25, 2005 and

4  contained a proposed project completion date of August 10, 2005.

5  Again, the evidence does not support Fru-Con's assertion.  It is

6  undisputed that Fru-Con submitted a term sheet proposing, among

7  other things: (1) an increase in the Contract Price of $16.5

8  million; and (2) a time extension of the Substantial Completion

9  date to August 10, 2005.  It is also undisputed that SMUD submitted

10  a counter proposal that included the August 10, 2005 completion

11  date and $7.1 million in additional compensation (instead of $16.5

12  million).  Fru-Con SUF  ¶¶ 71-73.  Fru-Con asserts that SMUD

13  accepted Fru-Con's proposal and cites to an e-mail sent by SMUD to

14  Fru-Con as well as Mr. Shetler's deposition.  These two pieces of

15  evidence do not reveal that SMUD accepted Fru-Con's proposal.

16  Instead, the evidence demonstrates that Fru-Con and SMUD were

17  attempting to negotiate a settlement to avoid litigation.  SMUD

18  RSUF ¶ 278.  In short, there is nothing in the evidence cited to

19  by Fru-Con that establishes that SMUD accepted Fru-Con's proposal.

20  Moreover, SMUD presents evidence which directly contradicts Fru-

21  Con's factual conclusion that SMUD accepted the proposal.

22      Taken together, and drawing all reasonable inferences in favor

23  of SMUD, material factual disputes preclude partial summary

24  judgment as to Fru-Con's assertion that SMUD waived the May 3, 2005

25  completion deadline.

26      This conclusion is in keeping with California law that views

the question of waiver as a question of fact and not law, "hence the intention to commit a waiver must be clearly expressed." <u>Moss</u>, 262 Cal. App. 2d at 857.  Here, the intention to commit waiver was not clearly expressed and factual disputes abound.

### 3.   Defective Concrete & Failure to Meet Intermediate Milestones

Fru-Con's third and final argument is that there was no material breach justifying termination.  Specifically, Fru-Con argues that any failure to achieve the intermediate milestones was not a material breach.  <u>See</u> Fru-Con's Mot. for Partial Summ. J. at 31.  Similarly, Fru-Con argues that its failure to remove certain defective concrete was not a material breach.  <u>See</u> <u>id.</u> at 33.

### a.   Failure to Achieve Intermediate Milestones

FRU-Con argues that because the contract provided for liquidated damages, the remedy for delay was liquidated damages only and delay could not be construed as a material breach justifying termination.

The contract, however, was terminated pursuant to General Condition 36 which does not contain a requirement that the breach be material.  In forming the contract, the parties already bargained for what circumstances would give rise to the right to terminate.  Thus, the relevant inquiry is not whether there was a material breach, but whether the conditions giving rise to a right to terminate occurred.

As previously explained, it is well established that a "contract may contain a valid provision giving one or the other

23

1  party an option to terminate it on specified conditions." <u>Call</u>,

2  251 Cal. App. 2d at 447.   Moreover, as SMUD points out, the very

3  treatise cited to by Fru-Con states that:

> Some construction contracts contain termination causes
> that allow one party to terminate the other upon the
> occurrence of a specifically stipulated default or
> failure of performance.  Such contract provisions define
> the grounds for termination thereunder.   Thus, if
> termination meets those specific contractual criteria, it
> need not otherwise satisfy the legal criteria for
> materiality.

9  Gibbs & Hunt, <u>California Construction Law</u> §6.04.  General Condition

10  36 was this type of provision -- it explicitly provided the grounds

11  upon which SMUD could terminate the contract.   Delay was one such

12  ground.[6]

13       **b.   Defective Concrete**

14       In its February 11, 2005 default termination letter, SMUD

15  alleged that Fru-Con "refused to remove portions of the concrete

16  cooling tower foundation that do not comply with contract

17  specifications."   Fru-Con SUF ¶ 121.   Fru-Con asserts that the

18  allegedly defective concrete is not a viable basis for default

19  under General Condition 36.  Fru-Con also argues that the allegedly

20  defective concrete did not constitute a material breach.   These

21  arguments are unavailing.

22  ////

23  _____

24       [6] Even if the court were to determine the materiality of Fru-
Con's breach, it is well established that  "when time is made of
the essence of a contract, a failure to perform within the time
25  specified is a material breach of the contract." <u>Gold Mining &</u>
<u>Water Co. v. Swinerton</u>,  23 Cal. 2d 19, 27 (1943).

26

1                    **i.   Facts Regarding the Defective Concrete**

2           It is undisputed that the contract required Fru-Con to

3     construct the CPP in accordance with plans and specifications

4     prepared by SMUD's Design Engineer, UEC.  SMUD RSUF ¶ 287.  The UEC

5     engineering drawings and specifications for the CPP included a

6     cooling water tower and a related cooling water tower foundation.

7     SMUD RSUF ¶ 288.  The foundation is comprised of seven separate

8     steel reinforced concrete slabs for holding the cooled hot water.

9     SMUD RSUF ¶ 290.  Each of the seven sections of the cooling water

10    foundation was given a letter designation.  SMUD RSUF ¶ 291.  The

11    slab at issue here is Section C.

12          Fru-Con poured the concrete for Section C on May 3, 2004 and

13    prepared Non-Conformance Report ("NCR") # 72 on the same date.

14    The NCR explained that the air entrainment was only 2.25%, when the

15    specifications required air entrainment of 4% to 6%.   SMUD RSUF

16    ¶ 302.[7]   On June 8, 2004, Fru-Con issued another NCR, this one

17    pertaining to the compression test cylinders.  Apparently, the 12

18    compression test cylinders failed to reach the minimum required

19    compressive strength.  SMUD RSUF ¶¶ 304-05.[8]  In short, by Fru-

20    Con's own reports, the concrete in Section C was defective.

21          On September 9, 2004, SMUD wrote to Fru-Con explaining that

22    the concrete in Section C did not meet the project specifications.

23    _____

24          [7] Fru-Con disputes this fact yet fails to cite to any
      admissible evidence in support of its dispute.
25
26          [8] Again, Fru-Con disputes this point but fails to cite to any
      supporting evidence.

1  SMUD directed Fru-Con to "submit a plan to replace the unacceptable

2  concrete in the cooling tower."  Letter from Disney to McPherson,

3  Ex. 12, Decl. of Kevin Alan Disney ("Disney Decl.").  Additional

4  letters to Fru-Con followed.  See SMUD RSUF ¶¶ 316-21.  By letter

5  dated December 10, 2004 to Fru-Con's Project Director, Earle

6  Hardgrave, SMUD notified Fru-Con that it was in default of the

7  contract by failing to remove and replace Section C.  SMUD RSUF ¶

8  321.

9       Fru-Con responded by letter dated December 22, 2004:

10      Fru-Con will not remove Section C of the cooling tower
        foundation as directed by your [December 10, 2004]
11      letter.  Such directive is inconsistent with the prior
        course of conduct between the parties, commercially
12      unreasonable and motivated by claims made by Fru-Con
        against SMUD.  A declaration of default or withholding of
13      payment as a result of such directive would be considered
        made in bad faith and just another indication of SMUD's
14      abandonment of the contract.

15 SMUD RSUF ¶ 324.  On February 2, 2005 Fru-Con wrote again, stating

16 that removal of Section C was not required and instead recommended

17 the application of a specific epoxy coating to the surface of

18 Section C.  SMUD RSUF ¶ 327.   This proposal was reviewed and

19 rejected by the Engineer of Record.  SMUD RSUF ¶ 328.   He

20 determined that Section C needed to be removed and replaced.  On

21 February 4, 2005, SMUD sent a letter to Fru-Con stating that

22 Fru-Con remained in default of its obligations through its failure

23 to remove and replace the Section C concrete.  SMUD RSUF ¶ 329.

24       **ii.  Contract Provision**

25      The contract provided a mechanism by which Fru-Con could have

26 protested SMUD's direction to replace the defective concrete.

General Condition 32 provided that a contractor could dispute work orders within ten days after such demand is given.   Pending resolution of the protest, the contractor "shall proceed with the work in accordance with the determination or instructions of the Engineer."   Contract, GC-32, Ex. 32, Nelson Decl.

The contract also provided that "[i]f the Contractor fails to proceed at once with the replacement of rejected material or the correction of defective work . . . the District may exercise the remedies set forth under GC-36 DISTRICT'S RIGHT TO TERMINATE RIGHT TO PROCEED."   Contract, GC-24, Ex. 32, Nelson Decl.   As discussed previously, General Condition 36 provided that SMUD could terminate the contract under certain circumstances.

### iii.   Grounds for Termination

As evidenced by Fru-Con's Non-Conformance Reports, the concrete in Section C was defective.   It is undisputed that on September 9, 2004, SMUD specifically informed Fru-Con that the concrete did not comply with the contract specifications and that it would need to be replaced.   SMUD RSUF ¶ 315.   A follow up letter was sent on September 29, 2004.   Pursuant to General Condition 32, Fru-Con had ten days to protest SMUD's request, however, no protest was lodged.   Instead, Fru-Con wrote a letter to SMUD on December 22, 2004 informing SMUD that it would "not remove Section C . . . as directed by your [December 10, 2004] letter."   SMUD RSUF ¶ 324. This course of action failed to comply with the express provision of General Condition 32 which set forth the procedure for protest. General Condition 24   provided   that if the contractor fails to

proceed "at once" with the replacement of defective work, SMUD could exercise its remedy of termination pursuant to General Condition 36.

In light of these undisputed facts, the court cannot find that, as a matter of law, SMUD acted wrongfully in invoking its right to terminate the contract under General Condition 36. Similarly, the court rejects Fru-Con's argument that the defective concrete was not a material breach. For the reasons discussed in reference to the scheduling delays, there is simply no materiality requirement in either General Condition 24 or 36. The parties previously bargained for what grounds could give rise to termination. Failing to prosecute the work in a timely fashion and failing to correct or replace defective work are two such grounds.

In conclusion, it is evident that Fru-Con's motion for partial summary judgment must be denied. First, under the contract's provisions, SMUD provided Fru-Con with ample notice that it was dissatisfied and that termination was a distinct possibility. Second, both the scheduling delays and the defective concrete were valid grounds for termination under the provisions of the contract. Third, whether SMUD waived its right to terminate the contract is an issue of fact that is disputed. For these reasons, the motion must be denied.

**B.   Fru-Con's Motion for Partial Summary Judgment on SMUD's Claim for Monies Paid to Dick Corporation**

Fru-Con seeks partial summary judgment on SMUD's claim for monies paid to Dick Corporation ("Dick Corp."). After SMUD

28

1   terminated the contract with Fru-Con, SMUD entered into a contract

2   with Dick Corp. for construction services for the CPP.  Fru-Con SUF

3   ¶ 237.  In this lawsuit, SMUD seeks to recover $9,534,976.00 from

4   Fru-Con for monies SMUD paid to Dick Corp. Fru-Con SUF ¶ 239.  In

5   its motion, Fru-Con contends that SMUD's payment to Dick Corp. was

6   improper as the contractors who performed the work at the CPP were

7   unlicensed.

8       Because the contractors were unlicensed Fru-Con argues, the

9   contract between SMUD and Dick Corp. was void and therefore, SMUD

10  cannot recover for money paid under an invalid contract.  Fru-Con

11  also argues that since the Dick Corp. contract was void, there is

12  a risk of double recovery.  The arguments are unavailing.

13      **1.**   **The Scope of Section 7031 of the California Business and**

14            **Professions Code**

15       Relying on section 7031 of the Business and Professions Code,

16  Fru-Con argues that Dick Corp. was not entitled to compensation and

17  therefore, SMUD cannot seek to recover from Fru-Con for money paid

18  to Dick Corp.  Even assuming that the court accepts as true Fru-

19  Con's contention that the contractors who performed the work were

20  unlicensed, the law does not support Fru-Con's position.

21       Section 7031 provides:

22      [N]o person engaged in the business or acting in the
         capacity of a contractor, may bring or maintain any

23      action, or recover in law or equity in any action, in any
         court of this state for the collection of compensation

24      for the performance of any act or contract where a
         license is required by this chapter without alleging that

25      he or she was a duly licensed contractor at all times
         during the performance of that act or contract . . . .

26

1   Cal. Bus. & Prof. Code § 7031 (West 1995).  In other words, this

2   section prohibits suits when a person is "engaged in business or

3   acting in the capacity of a contractor . . . without alleging and

4   proving that he was a duly licensed contractor . . . ." Id.  Fru-

5   Con argues that since unlicensed contractors cannot sue, owners are

6   not obligated to pay those contractors and therefore, third parties

7   (such as Fru-Con) are not liable for damages.  Nothing in the plain

8   language of the code supports this interpretation.

9        In American Sheet Metal, Inc. v. EM-Kay Engineering Co., this

10  court concluded that California case law limited the scope of

11  section 7031 to only reach suits between the contractor and his

12  principal.  478 F. Supp. 809, 813-14 (E.D. Cal. 1979) (Karlton,

13  J.).  Accordingly, this court held that section 7031 did not apply

14  to a suit by an unlicensed contractor for recovery of the allegedly

15  defective work of a subcontractor.  The court reasoned that the

16  purpose of the statute was to protect the "public" (i.e., the

17  principal) by essentially "clos[ing] the door" of the courthouse

18  to unlicensed contractors who attempt to bring suit.  Id. at 812-

19  14.  Since the general public did not appear to be directly

20  involved   in   the   dispute   between   the   contractor   and   the

21  subcontractor, section 7031 did not apply.  Id. (citing Davis v.

22  Superior Court, 1 Cal. App. 3d 156 (1969)).

23       Other courts have similarly found that the purpose of the

24  statute is to protect the public from incompetence and dishonesty

25  in those who provide building and construction services.  Lewis &

26  Queen v. N.M. Ball Sons, 48 Cal. 2d 141, 149-50 (1957).  "Section

1   7031 advances this purpose by withholding judicial aid from those
2   who seek compensation for unlicensed contract work.  The obvious
3   statutory intent is to discourage persons who have failed to comply
4   with the licensing law from offering or providing their unlicensed
5   services for pay." <u>Hydrotech Sys., Ltd. v. Oasis Waterpark</u>, 52
6   Cal. 3d 988, 995 (1991).

7        Given the statute's purpose, it has been applied only to those
8   situations in which an unlicensed contractor seeks compensation
9   from the owner.  "Regardless of the equities, section 7031 bars all
10  actions, however they are characterized, which effectively seek
11  'compensation' for illegal unlicensed contract work." <u>Ranchwood</u>
12  <u>Communities Ltd. P'ship v. Jim Beat Constr. Co.</u>, 49 Cal. App. 4th
13  1397, 1409 (1996)(citations omitted).

14       Fru-Con argues that under section 7031, the contract is void
15  and thus, Fru-Con should not be liable.  Fru-Con cites to no
16  authority for the proposition that section 7031 should be read
17  broadly so as to protect parties in Fru-Con's situation.  Indeed,
18  courts have held just the opposite:  "The effect of section 7031
19  is not to render the contract with the unlicensed contractor void,
20  but simply to bar the unlicensed contractor from bringing an action
21  for compensation based on the contract." <u>K & K Servs., Inc. v. City</u>
22  <u>of Irwindale</u>, 47 Cal. App. 4th 818, 826 (1996).  In the case at
23  bar, SMUD has already paid Dick Corp. and Dick Corp. is not seeking
24  "compensation" for unlicensed contract work.  The suit before this
25  court is between Fru-Con and SMUD.  Dick Corp. is not a party to
26  the suit.  Put simply, the plain wording of section 7031 does not

31

1  address the situation at issue here.  Accordingly, Fru-Con cannot

2  avail itself of the protections set forth in section 7031.

3              **2.   Whether the Contract was Void Based on Other**
                 **Provisions   of   the   California   Business   and**
4                **Professions Code**

5

6       Citing to section 7028.15 of the California Business and

   Professions Code, Fru-Con argues that the contract between Dick
7
   Corp. and SMUD was void and therefore, SMUD cannot recover any
8
   payments it made to Dick Corp.  This argument is also unavailing.
9
        Section 7028.15 provides in pertinent part:
10
            Unless one of the foregoing exceptions applies, a bid
11          submitted to a public agency by a contractor who is not
            licensed   in   accordance   with   this   chapter   shall   be
12          considered nonresponsive and shall be rejected by the
            public agency . . .  <u>Any contract awarded to, or any</u>
13          <u>purchase   order   issued   to,   a   contractor   who   is   not</u>
            <u>licensed pursuant to this chapter is void</u>.
14

15  Cal. Bus. & Prof. Code § 7028.15 (emphasis added).[9]  Moreover,

16  subsection (b) of section 7031 provides: "[A] person who utilizes

17  the services of an unlicensed contractor may bring an action in any

18  court of competent jurisdiction in this state to recover all

19  compensation paid to the unlicensed contractor for performance of

20

21

22  ───────────────

         [9]    The court notes that this provision is not completely
23  consistent with case law interpreting section 7031, as courts have
    routinely held that  "[t]he effect of section 7031 is not to render
24  the contract with the unlicensed contractor void, but simply to bar
    the unlicensed contractor from bringing an action for compensation
25  based on the contract."  <u>K & K Servs., Inc.</u>,  47 Cal. App. 4th at
    826.  This ambiguity in the law, however, does not preclude the
26  court from adjudicating the pending motion.

1  any act or contract."[10]

2      Fru-Con cannot seek protection under this statute.  As

3  previously discussed, the licensing statute's purpose is to protect

4  the public from unlicensed contractors.  Here, Dick Corp. is not

5  a party in the pending case and Fru-Con fails to cite to any legal

6  basis for how Fru-Con, a third-party, can take advantage of the

7  licensing laws.

8      Moreover, even if the licensing laws could be construed so

9  that Fru-Con could take advantage of them, factual disputes

10  preclude summary judgment.  Although under § 7028.15 a contract

11  with an unlicenced contractor is considered void, the undisputed

12  facts do not establish that SMUD entered into a contract with an

13  unlicensed contractor.

14      Fru-Con argues that although Dick Corp.'s name is on the

15  contract, the work was actually performed by DES, an unlicenced

16  contractor.  In essence, Fru-Con argues that DES was using Dick

17  Corp. as a corporate front.

18      Under the California Business and Professions Code, a

19  "contractor" is defined as:

20          any person who undertakes to or offers to undertake to,
           or purports to have the capacity to undertake to, or
21          submits a bid to, or does himself or herself or by or
           through others, construct, alter, repair, add to,
22          subtract from, improve, move, wreck or demolish any

23  _____

24      [10]    Subsection 7031(b) was added by amendment to the Business
   and Professions Code in 2001.  See Deering's California Codes
25  Annotated, Cal. Bus. & Prof. Code § 7031 (Deering 2006).   It
   applies to all contracts entered into after the effective date of
   the amendment, January 1, 2002.  Lee William Dev. Corp. v. Chalker,
26  No. G033804, 2005 WL 1100646 (Cal. Ct. App. May 9, 2005).

1    building . . . . "Contractor" includes subcontractor and
2    specialty contractor.

3    Cal. Bus. & Prof. Code § 7026.  Fru-Con argues that the majority

4    of people who worked on the CPP contract were actually unlicensed

5    DES employees, not employees of Dick Corp.  See Fru-Con SUF ¶¶ 242-

6    43, 247-48, 251.  Without more, however, these facts do not support

7    a finding that the contract between Dick Corp and SMUD was  void.

8         SMUD submits evidence which suggests that Dick Corp. was not

9    a corporate front.  For example, task orders for work were issued

10   from SMUD to Dick Corp.   SMUD RSUF ¶ 451.  Dick Corp. was

11   responsible for completing the work agreed upon in the task orders

12   and was responsible for any problems that occurred or might have

13   occurred in performing those services.   SMUD RSUF ¶ 453.   Dick

14   Corp. was required to and did post a bond in connection with its

15   work on the Project.   SMUD RSUF ¶ 456.   All invoices for work

16   performed pursuant to Dick Corp.'s contract with SMUD were sent

17   from Dick Corp. to SMUD.  SMUD RSUF ¶ 457.  Finally, SMUD paid Dick

18   Corp. directly for those invoiced services.   SMUD RSUF ¶ 458.

19        Ron Terry, the Project Manager for the CPP project, explained

20   in his declaration:

21        I am a Project Manager employed by DES, a related company
          to Dick Corp.   Since DES and Dick Corp are related
22        companies, Dick Corp. occasionally utilized my services
          for Dick Corp. projects.  Indeed, Dick Corp. utilized my
23        services as project supervisor on the Consumnes Power
          Plane construction project.
24

25   Terry Decl.

26        In sum, the relationship between DES and Dick Corp. as far as

                                    34

1  the CPP project is concerned, is far from clear.  What is clear is
2  that SMUD entered into a contract with a licensed contractor, Dick
3  Corp.  It is also evident that Dick Corp. played a significant role
4  in the CPP project and assumed responsibility for the completion
5  of the work.  In drawing all reasonable inferences in SMUD's favor,
6  the court cannot conclude, that, as a matter of fact, SMUD entered
7  into a contract with an unlicensed contractor and that therefore
8  the contract is void.

9      For these reasons, Fru-Con's motion for partial summary
10 judgment with respect to SMUD's claim for monies paid to Dick
11 Corporation must be denied.

12 **C.    Fru-Con's Motion for Partial Summary Judgment on SMUD's Claim**
13 **      under the California False Claims Act**

14     Fru-Con seeks partial summary judgment with respect to SMUD's
15 third claim for relief pursuant to the California False Claims Act
16 ("CFCA").  Although SMUD presents evidence of the multitude of
17 contractual disputes that exist this case, SMUD does not cite to
18 any evidence which disputes Fru-Con's assertion that it never
19 submitted a claim that it knew was false.  In short, even when
20 drawing all reasonable inferences in SMUD's favor, there is no
21 evidence that Fru-Con knowingly submitted false claims.  For the
22 reasons explained herein, the motion must be granted.

23     **1.    Applicable Law**

24     The legislature designed the California False Claims Act
25 ("CFCA") to prevent fraud on the public treasury, and the ultimate
26 purpose of the CFCA is to protect the public finances.  <u>State v.</u>

1   <u>Altus Fin., S.A.</u>, 36 Cal. 4th 1284, 1296-97 (2005).  Because

2 California's False Claims Act is patterned on a similar federal

3 statutory scheme, it is appropriate to turn to federal cases for

4 guidance in interpreting the state act.  <u>State ex rel. Grayson v.</u>

5 <u>Pac. Bell Tel. Co.</u>, 142 Cal. App. 4th 741, 747 n.3 (2006); <u>see also</u>

6 <u>United States v. Shasta Servs., Inc.</u>, 440 F. Supp. 2d 1108, 1111

7 (E.D. Cal. 2006) (England, J.).

8       The CFCA imposes liability on any person who "knowingly

9 presents or causes to be presented to an officer or employee of the

10 state or of any political subdivision thereof, a false claim for

11 payment or approval."  Cal. Gov't Code § 12651.  In order to

12 establish liability under the CFCA, a plaintiff must prove three

13 elements: (1) a "false or fraudulent" claim; (2) which was

14 presented, or caused to be presented to the government entity; (3)

15 with knowledge that the claim was false.  <u>See</u> <u>United States v.</u>

16 <u>Mackby</u>, 261 F.3d 821, 826 (9th Cir. 2001).

17       In California, a "claim" is defined as including:

18       any request or demand for money, property, or services
      made to any employee, officer, or agent of the state or
19       of any political subdivision, or to any contractor,
      grantee, or other recipient, whether under contract or
20       not, if any portion of the money, property, or services
      requested or demanded issued from, or was provided by,
21       the state (hereinafter "state funds") or by any political
      subdivision thereof (hereinafter "political subdivision
22       funds")

23

24 Cal. Gov't Code § 12650; <u>see also</u> <u>Costner v. URS Consultants, Inc.</u>,

25 153 F.3d 667, 677 (8th Cir. 1998) ("[O]nly those actions by the

26 claimant . . . [calculated to] caus[e] the United States to pay out

1   money it is not obligated to pay . . . are properly considered

2   'claims' within the meaning of the FCA.").

3       Claims are not "false" under the FCA when reasonable persons

4   can disagree regarding whether the service was properly billed to

5   the government. <u>See</u> <u>United States ex rel. Lamers v. City of Green</u>

6   <u>Bay</u>, 168 F.3d 1013, 1018 (7th Cir. 1999) (holding that "errors

7   based simply on faulty calculations or flawed reasoning are not

8   false under the FCA. . . . [a]nd imprecise statements or

9   differences in interpretation growing out of a disputed legal

10  question are similarly not false under the FCA" (citations

11  omitted)); <u>see also</u> <u>United States ex rel. Butler v. Hughes</u>

12  <u>Helicopters, Inc.</u>, 71 F.3d 321, 329 (9th Cir. 1995)(allegedly

13  improper interpretation of a contract "without more, does not

14  constitute a false claim for payment").

15      The requisite intent is the knowing presentation of what is

16  known to be false. "In short, the claim must be a lie." <u>Hindo v.</u>

17  <u>Univ. of Health Sciences/The Chi. Med. Sch.</u>, 65 F.3d 608, 613 (7th

18  Cir. 1995).  Under California law,

19          knowing and 'knowingly' mean that a person, with respect
            to information, does any of the following: (A) Has actual
20          knowledge of the information; (B) Acts in deliberate
            ignorance of the truth or falsity of the information; (C)
21          Acts in reckless disregard of the truth or falsity of the
            information.
22

23  Cal. Gov't Code § 12650.

24      **2.   SMUD's Specific Allegations**

25      SMUD cites to numerous claims that Fru-Con submitted.  For the

26  reasons discussed herein, there is a want of evidence from which

37

1  a jury could reasonably infer that Fru-Con knowingly asserted false

2  claims.   The court addresses each alleged false claim in turn.

3              **a.   Fru-Con's October 7, 2004 Powerpoint Presentation**

4        In   its   counterclaim,   SMUD   alleged   that   the   October   7th

5  powerpoint presentation constituted a claim under the FCA: "Fru-Con

6  claimed that [it] was entitled to an increase of over $25 Million

7  to the lump sum price agreed upon in the contract."   Countercl. ¶

8  23.   There are two problems with SMUD's position.

9        First, it is not entirely clear that a powerpoint presentation

10 constitutes  a  "claim"  under  the  FCA.   As  previously  noted,  in

11 California,  a  "claim"  is  "any  request  or  demand  for  money,

12 property, or services."   Cal. Gov. Code § 12650; see also Costner,

13 153  F.3d  at  677  ("[O]nly  those  actions  by  the  claimant  . . .

14 [calculated to] caus[e] the United States to pay out money it is

15 not obligated to pay . . . are properly considered 'claims' within

16 the meaning of the FCA.").

17       It is undisputed that at the October 7th presentation, Fru-Con

18 explained  that  it  was  behind  schedule  and  gave  SMUD  two  options:

19 accept  the  delay  or  direct  Fru-Con  to  accelerate.   Fru-Con

20 explained that acceleration would involve a cost of roughly $25

21 million.   Here, SMUD was given options – albeit not ideal options.

22 Accordingly, the court is hesitant to catagorize the presentation

23 as a "claim."

24       The second problem with SMUD's position is more fundamental.

25 Even if the powerpoint presentation could constitute a claim, there

26 is simply no evidence that Fru-Con knowingly presented a "false"

                                    38

1   claim.    Although SMUD avers that the claims made at the
2   presentation were false, it cites to no evidence which suggests
3   that Fru-Con knowingly presented false information.   The only
4   evidence cited to by SMUD are two expert reports – one of which
5   does not even mention the presentation.   The other report is that
6   of Robert A. Dieterle, who merely states, "Fru-Con knew it was not
7   entitled to the additional revenue that it was claiming that day."
8   Dieterle Report, Ex. 89, Becker Decl.   This statement is made
9   without any explanation of how Mr. Dieterle knows this to be true.
10  Moreover, this statement does not speak to whether Fru-Con was
11  presenting what it knew to be "false."

12      As previously noted, claims are not "false" under the FCA when
13  reasonable persons can disagree regarding whether the service was
14  properly billed to the government agency.   See Lamers, 168 F.3d
15  1013, 1018 (7th Cir. 1999) (holding that "errors based simply on
16  faulty calculations or flawed reasoning are not false under the
17  FCA. . . . [a]nd imprecise statements or differences in
18  interpretation growing out of a disputed legal question are
19  similarly not false under the FCA" (citations omitted)).

20      As this court recently noted, "it is well established in this
21  Circuit and elsewhere that imprecise statements or differences in
22  interpretation growing out of a disputed legal question are not
23  false under the FCA." United States ex rel. Englund v. Los Angeles
24  County, No. CIV S-04-282, 2006 WL 3097941 (E.D. Cal. Oct. 31,
25  2006)(Karlton, J.)(citing Hagood v. Sonoma County Water Agency, 81
26  F.3d 1465, 1477 (9th Cir. 1996) ("Even viewing [plaintiff's]

1   evidence in the most favorable light, that evidence shows only a

2   disputed legal issue; that is not enough to support a reasonable

3   inference that the allocation was false within the meaning of the

4   False Claims Act.")).

5        In the case at bar, Fru-Con's October 7th presentation

6   apparently set forth what Fru-Con believed to be the cause of the

7   delay and proposed two alternative courses of action.  Fru-Con SUF

8   ¶¶ 16-17.  SMUD disagreed with the content of the presentation and

9   was dissatisfied with the proposals.  See, e.g., SMUD RSUF ¶ 17

10  (disputing any implication that the project delay was caused by

11  anything or anybody other than Fru-Con).  This type of dispute does

12  not constitute a "false claim."  The parties were - and are -

13  disputing whether the other party breached the contract.  Divergent

14  interpretations of a contract "without more, do[] not constitute

15  a false claim for payment".  Butler, 71 F.3d 321 (9th Cir. 1995).

16       In order to survive Fru-Con's motion, SMUD must produce

17  sufficient evidence to support an inference of Fru-Con knowingly

18  making a false statement.  See United States ex rel. Anderson v.

19  N. Telecom, Inc., 52 F.3d 810, 815 (9th Cir. 1995), cert. denied,

20  516 U.S. 1043 (1996).  As one District Court remarked, "[a]t a

21  minimum, the FCA requires proof of an objective falsehood . . . .

22  Expressions of opinion, scientific judgments, or statements as to

23  conclusions about which reasonable minds may differ cannot be

24  false."  United States ex rel. Roby v. Boeing Co., 100 F. Supp. 2d

25  619, 625 (S.D. Ohio 2000).  Even when drawing all reasonable

26  inferences in favor of SMUD, there is simply no evidence to suggest

1  that Fru-Con knowingly presented a false claim.

2              **b.   Fru-Con's Payment Applications**

3      In its counterclaim, SMUD also alleges that Fru-Con "submitted

4  payment requests to the District falsely certifying that Fru-Con

5  had accomplished various contract milestones." Countercl. ¶ 20.

6  Similarly, SMUD alleges that Fru-Con submitted "false or inflated

7  Pay Applications." <u>Id.</u> ¶ 36.

8      Under the construction contract, Fru-Con was paid on the basis

9  of achieving certain milestones.   SMUD argues that on several

10 occasions, Fru-Con submitted pay applications based on milestones

11 that had not, in fact, been achieved. "When [SMUD] confronted Fru-

12 Con on the inclusion of the subject milestones in payment

13 applications, Fru-Con sent revised applications removing those

14 milestones without protest." SMUD Opp'n to Fru-Con's Partial Mot.

15 for Summ. J. at 6.

16     Even assuming SMUD's version of the facts are undisputed, SMUD

17 again fails to offer any evidence suggesting that Fru-Con knowingly

18 made false claims.   The only evidence cited to by SMUD is an

19 internal Fru-Con email which lists certain milestones and notes

20 next to them. <u>See</u> Ex. 85, Becker Decl.   The notes are not

21 comprehensible and the email does not, as SMUD avers, demonstrate

22 that Fru-Con knowingly submitted false claims for milestones not

23 completed.   Rather, the evidence as a whole suggests that Fru-Con

24 and SMUD disputed the extent to which Fru-Con had completed certain

25 tasks.   That Fru-Con submitted revised payment applications does

26 not, without more, suggest that Fru-Con knowingly submitted false

1   claims.

2       As previously noted, claims are not "false" when reasonable

3   persons can disagree regarding whether the service was properly

4   billed.  See Lamers, 168 F.3d at 1018.  With respect to knowingly

5   making a false claim, the Ninth Circuit has explained:

6           The requisite intent is the knowing presentation of what
            is known to be false, as opposed to innocent mistake or
7           mere negligence. Bad math is no fraud, proof of mistakes
            is not evidence that one is a cheat, and the common
8           failings of engineers and other scientists are not
            culpable under the Act.  The statutory phrase known to be
9           false does not mean 'scientifically untrue'; it means 'a
            lie.'
10

11  Anderson v. N. Telecom, Inc., 52 F.3d at 815-16.  Here, there is

12  proof of mistake, and possibly negligence – there is no evidence

13  that Fru-Con presented what it knew to be false.  Although the

14  court is to draw all reasonable inferences in SMUD's favor,

15  inferences are not drawn out of the air, and it is SMUD's

16  obligation to produce a factual predicate from which the inference

17  may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp.

18  1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

19  1987).   There is simply no factual predicate from which one can

20  infer that Fru-Con submitted claims it knew to be false.

21      SMUD also argues that the payment applications were false

22  because Fru-Con certified on each application that "to the best of

23  the Contractor's knowledge, information and belief the Work covered

24  by this Application has been completed in accordance with the

25  Contract documents . . . ."  SMUD RSUF ¶ 358.  This argument is

26  also unavailing.

1    Both parties cite to this court's unpublished decision in El

2 Dorado Irrigation District v. Traylor Brothers, Inc., October 5,

3 2005 Order. There, this court concluded that implied certification

4 does not suffice to support a cause of action under the False

5 Claims Act:

6           It seems unlikely that the legislature intended to make
            construction contractors on periodic payments potentially
7           liable under the FCA for all deviations from contract
            specifications. Under such a regimen, the parties would
8           litigate whether vague provisions in the contract and
            ambiguous statements in the claim for payment add up to
9           a false claim. There appears to be no reason to elaborate
            simple contract violations into potential claims for
10          compensation under the state's False Claims Act,
            especially given California's broad fraud jurisprudence.
11

12 El Dorado Irrigation Dist. v. Traylor Bros., Inc., Oct. 5, 2005

13 Order at 32.

14    The same logic applies with equal force to the case at bar.

15 Taken together, the undisputed facts reveal that SMUD and Fru-Con

16 disagreed about Fru-Con's payment applications.  As previously

17 noted and discussed, disagreements over contract provisions do not,

18 without more, constitute false claims for payment. See Butler, 71

19 F.3d at 329.

20           **c.   Boiler Weld Certification**

21    SMUD also alleges that Fru-Con billed SMUD for overtime and

22 double time costs that Fru-Con never incurred in working on the

23 boiler weld certification.   Again, SMUD fails to cite to any

24 evidence suggesting that the claims were knowingly false.

25    The facts surrounding this issue are somewhat convoluted.

26 After Fru-Con was terminated, SMUD hired Fru-Con to complete

43

1    certification of certain welds.  SMUD and Fru-Con agreed that SMUD

2    would pay Fru-Con based upon agreed set rates.  Citing to a string

3    of email exchanges, SMUD avers that Fru-Con stated that it would

4    pay its workers overtime.  See Ex. 50, Disney Decl.  Upon review,

5    the email is not as clear as SMUD purports.  The email discusses

6    the employee base rate but does not specifically discuss over time.

7         After the work was completed and SMUD paid Fru-Con, Fru-Con

8    in turn, paid its workers and gave them bonuses (not overtime).

9    Dep. of Rory R. Riedy ("Riedy Dep."), Ex.  87, Becker Decl.  SMUD

10   claims that since the workers were not paid overtime, Fru-Con made

11   a false claim in asking SMUD to pay for overtime.

12        SMUD once again fails to cite to any evidence suggesting that

13   Fru-Con presented claims that it knew to be false or fraudulent.

14   As previously noted, on a motion for summary judgment, inferences

15   are not drawn out of the air, and it is the opposing party's

16   obligation to produce a factual predicate from which the inference

17   may be drawn.  See Richards, 602 F. Supp. at 1244-45.  Here, the

18   only evidence cited to by SMUD is the email exchange about the rate

19   Fru-Con employees would be paid.  As previously noted, however,

20   this email does not demonstrate that Fru-Con was falsely asking for

21   overtime.

22        **d.   Change Order Requests**

23        SMUD also argues that certain Change Order Requests (CORs)

24   submitted by Fru-Con represented false claims.  First, SMUD argues

25   that COR No. 139 was false because Fru-Con had already been

26   compensated in COR No. 1 for certain damages included in COR 139.

1  Second, SMUD claims that CORs No. 361 and No. 362 were false

2  because Fru-Con requested more than a 20% mark-up for costs other

3  than direct costs.  And third, SMUD argues that COR No. 270 was

4  false because Fru-Con changed the amount requested.

5       The details of the COR are not important as SMUD's arguments

6  suffer from the same fatal flaw, namely, the disputes over the CORs

7  are classic contract disputes.  Evidence of disagreements over

8  contract provisions, without more, does not constitute a claim

9  under the FCA.  In short, SMUD has failed to come forth with any

10 evidence to suggest that when submitting the CORs, Fru-Con

11 presented claims it knew to be false or fraudulent.   For these

12 reasons, the court finds that there is a want of evidence from

13 which a jury could infer that the Fru-Con knowingly asserted a

14 false claim to SMUD and summary judgment must be entered for Fru-

15 Con.

16                              **IV.**

17                          **CONCLUSION**

18      1.   Fru-Con's Motion for Partial Summary Judgment Regarding

19 Wrongful Termination is DENIED.

20      2.   Fru-Con's Motion for Partial Summary Judgment on SMUD's

21 counterclaim for monies paid to Dick Corporation is DENIED.

22      3.   Fru-Con's Motion for Partial Summary Judgment on SMUD's

23 claim under the California False Claims Act is GRANTED.

24      IT IS SO ORDERED.

25      DATED: June 15, 2007.

26                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
                                UNITED STATES DISTRICT COURT