1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11   FRU-CON CONSTRUCTION
     CORPORATION, a Missouri
12   corporation,
                                          NO. CIV. S-05-583 LKK/GGH
13            Plaintiff,

14       v.                                    O R D E R

15   SACRAMENTO MUNICIPAL UTILITY
     DISTRICT, a municipal utility
16   district; UTILITY ENGINEERING
     CORPORATION, a Texas
17   corporation,

18            Defendants.
     _____/
19

20       Pending before the court in this matter are three motions.

21   The first two are motions to dismiss for lack of personal

22   jurisdiction filed by counter-defendants Bilfinger Berger AG

23   ("Bilfinger") and Fru-Con Holding Corporation ("FCHC").  The third

24   motion, filed by the Sacramento Municipal Utility District

25   ("SMUD"), seeks jurisdictional discovery and a stay of the pending

26   motions to dismiss.  The crux of the present dispute is whether the

                                    1

1 court may exert personal jurisdiction over these counter-defendants

2 based on an alter ego theory.  The court resolves the matter on the

3 parties' papers and after oral argument.  For the reasons set forth

4 below, the court grants the motions to dismiss and denies the

5 motion seeking jurisdictional discovery.

6                              **I. Background**[1]

7       On December 15, 2006, the court granted Fru-Con's motion to

8 file an amended counterclaim adding Bilfinger and FCHC as counter-

9 defendants in this action.  Fru-Con is owned by FCHC, which in turn

10 is owned by Bilfinger.  The first amended counterclaim alleges that

11 Bilfinger and FCHC are directly liable to SMUD "because there

12 exists a unity and identity of interest between Bilfinger Berger,

13 Fru-Con Holding and Fru-Con such that adherence to the fiction of

14 separate existences of these entities would sanction fraud and

15 promote injustice."  Counterclaim ¶ 6.  The counterclaim further

16 alleges that Bilfinger and/or FCHC completely controlled Fru-Con,

17 that Fru-Con was inadequately capitalized, that Bilfinger and/or

18 FCHC made loans to Fru-Con and guaranteed certain aspects of Fru-

19 Con's business obligations, and that employees of the corporations

20 were freely interchanged.  Id.

21       In support of these allegations and in response to the pending

22 motions to dismiss, Fru-Con has set forth two sets of facts

23 (detailed in the analysis section of this order) that fall under

24

---

25       [1] The court dispenses with any recitation of the general
background of this case, as it has been discussed in previous
26 orders.

the two prongs of the alter ego test.  <u>See</u> <u>Sonora Diamond Corp. v.</u>
<u>Super. Ct.</u>, 83 Cal. App. 4th 523, 538 (2000).  One pertains to  the
alleged unity and identity of interest shared by Bilfinger, FCHC,
and Fru-Con (collectively, "the parties").  The other pertains to
the alleged injustice that would result if Bilfinger and FCHC were
not made parties to this action.  With regard to the first set of
facts, SMUD maintains it can prove that (1) Bilfinger and FCHC
exerted  control  over  Fru-Con's  day-to-day  activities  (2)  the
parties shared employees, (3) the parties shared legal services,
(4)  Fru-Con  relied  upon  Bilfinger's  experience  and  financial
wherewithal, and (5) Fru-Con was inadequately capitalized.

**II. Standard**

**Motion to Dismiss for Lack of Personal Jurisdiction**

When  a  defendant  challenges  the  sufficiency  of  personal
jurisdiction, the plaintiff bears the burden of establishing that
the  exercise  of  jurisdiction  is  proper.   <u>Sinatra v. National</u>
<u>Enquirer, Inc.</u>, 854 F.2d 1191, 1194 (9th Cir. 1988).

Analysis  of  the  appropriateness  of  the  court's  personal
jurisdiction  over  a  defendant  in  a  case  in  which  the  court
exercises diversity jurisdiction begins with California's long arm
statute.   <u>Aanestad v. Beech Aircraft Corp.</u>, 521 F.2d 1298, 1300
(9th Cir. 1974).  California's  long  arm  statute  authorizes  the
court to exercise personal jurisdiction on any basis consistent
with the due process clause of the United States Constitution.
Cal. Code Civ. Proc. § 410.10; <u>Rocke v. Canadian Auto Sport Club</u>,
660 F.2d 395, 398 (9th Cir. 1981).

 1          Consistent with the due process clause, the court may exercise

 2   personal jurisdiction over a defendant when the defendant has

 3   certain minimum contacts with the forum state such that the

 4   maintenance of the suit does not offend traditional notions of fair

 5   play and substantial justice.  Int'l Shoe Co. v. Washington, 326

 6   U.S. 310, 316 (1945).  If the defendant is domiciled in the forum

 7   state, or if the defendant's activities there are "substantial,

 8   continuous and systematic," a federal court can exercise general

 9   personal jurisdiction as to any cause of action involving the

10   defendant, even if unrelated to the defendant's activities within

11   the state.  Perkins v. Benguet Consolidated Mining Co., 342 U.S.

12   437 (1952); Data Disc, Inc. v. Systems Technology Assoc., Inc., 557

13   F.2d 1280, 1287 (9th Cir. 1977).

14          If a non-resident defendant's contacts with California are not

15   sufficiently continuous or systematic to give rise to general

16   personal jurisdiction, the defendant may still be subject to

17   specific personal jurisdiction on claims arising out of defendant's

18   contacts with the forum state.  Burger King Corp. v. Rudzewicz, 471

19   U.S. 462, 477-78 (1985); Haisten v. Grass Valley Medical

20   Reimbursement Fund, Ltd., 784 F.2d 1392, 1397 (9th Cir. 1986).

21          The court employs a three-part test to determine whether the

22   exercise of specific jurisdiction comports with constitutional

23   principles of due process.  See Schwarzenegger v. Fred Martin Motor

24   Co., 374 F.3d 797, 802 (9th Cir. 2004).  First, specific

25   jurisdiction requires a showing that the out-of-state defendant

26   purposefully directed its activities toward residents of the forum

1  state or purposefully availed itself of the privilege of conducting

2  activities in the forum state, thus invoking the benefits and

3  protections of its laws. <u>Burger King</u>, 471 U.S. at 474-75.  Second,

4  the controversy must be related to or arise out of defendant's

5  contact with the forum. <u>Ziegler v. Indian River County</u>, 64 F.3d

6  470, 473 (9th Cir. 1995).  Third, the exercise of jurisdiction must

7  comport with fair play and substantial justice, i.e., it must be

8  reasonable. <u>Haisten</u>, 784 F.2d at 1397.

9                          **III. Analysis**

10     Here, SMUD argues that the court may exercise personal

11  jurisdiction under an alter ego or agency theory, or directly.  As

12  explained below, none of these avenues is availing, and the motions

13  to dismiss must be granted.

14  **A. Alter Ego & Agency Theory**

15     First, SMUD asserts that the court may exercise personal

16  jurisdiction over Bilfinger and FCHC because they are alter egos

17  of Fru-Con.  Under California law, two conditions must both be met

18  in order to invoke the alter ego theory: (1) a unity of interest

19  and ownership must exist between two corporate entities such that

20  there does not exist a separateness between them; and (2) injustice

21  would result if the acts in question were treated as those of only

22  one of the corporate entities. <u>Sonora Diamond</u>, 83 Cal. App. 4th

23  at 538.  "[B]oth of these requirements must be found to exist

24  before the corporate existence will be disregarded." <u>Associated</u>

25  <u>Vendors, Inc. v. Oakland Meat Co.</u>, 210 Cal. App. 2d 825, 837

26  (1962).  SMUD bears the burden in presenting evidence that

1   satisfies both prongs of the test.   Mid-Century Ins. Co. v.

2   Gardener, 9 Cal. App. 4th 1205, 1212 (1992).

3        The agency theory of jurisdiction is closely related but

4   distinct.   In the case of agency, "the question is not whether

5   there exists justification to disregard the subsidiary's corporate

6   identity, the point of the alter ego analysis, but instead whether

7   the degree of control exerted over the subsidiary by the parent is

8   enough to reasonably deem the subsidiary an agent of the parent

9   under traditional agency principles."[2] Sonora Diamond, 83 Cal.

10  App. 4th 523, 541.   Nevertheless, in the case at bar, one of the

11  principal arguments marshaled by SMUD in support of its claim that

12  a unity of interest exists (under the first prong of the alter ego

13  test) is that FCHC and Bilfinger exerted day-to-day control over

14  Fru-Con.   Accordingly, the court addresses both the alter ego and

15  agency theories simultaneously, because they both rely on a similar

16  body of evidence.

17       **1. Injustice**

18       Here, in reverse order, the motions can be resolved on the

19  second prong of the test, because SMUD has not put forward (and

20  cannot put forward) enough evidence to prove that injustice would

21

---

22       [2] A "variant" of the agency theory is the "representatives
    services" doctrine, which permits jurisdiction where the subsidiary
23  "performs a function that is compatible with, and assists the
    parent in the pursuit of, the parents' *own business*."   Sonora
24  Diamond, 83 Cal. App. 4th at 543.   This doctrine is inapplicable
    to the facts here, because Fru-Con operated its business for over
25  100 years prior to its relationship with Bilfinger, just as
    Bilfinger has likewise conducted its business operations for a
26  century prior to affiliating with Fru-Con.

1  result if Bilfinger and FCHC were not made parties to this action.

2      SMUD initially maintains that "inequity would result because

3  . . . Bilfinger, FCHC, and Fru-Con failed in key instances to draw

4  any division between themselves as allegedly separate entities."

5  Opp. at 28.  If this were sufficient, however, the injustice prong

6  of the test would collapse into the unity prong and become

7  superfluous.  Acknowledging as much, SMUD then goes on to argue

8  that Fru-Con would not be able to pay a judgment if one is obtained

9  in the District's favor, or that there is at least a risk of such

10  a result.  In the vast majority of cases, courts have only pierced

11  a corporation that was bankrupt, insolvent, or otherwise incapable

12  of paying judgment.[3]

13      There appears to be no dispute that at all times relevant to

14  this matter, that Fru-Con was covered by a bond that had a minimum

15  capacity of $750 million dollars, and its present uncommited

16  capacity is in excess of $500 million dollars -- which would almost

17  certainly cover any judgment that SMUD might obtain in this action.

18  Decl. of James Scott, ¶ 8.  This fact alone is sufficient to negate

19

20

21

22      [3] See, e.g., Norins Realty Co. v. Consol. Abstract & Title Guar. Co., 80 Cal. App. 2d 879, 883 (1947); M.O.D. of the Islamic

23  Republic of Iran v. Gould, Inc., 969 F.2d 764, 770 (9th Cir. 1992); Wady v. Provident Life & Accident Ins. Co. of Am., 216 F. Supp. 2d

24  1060, 1070 (C.D. Cal. 2002); Haskell v. Time, Inc., 857 F. Supp. 1392, 1403 (E.D. Cal. 1994).  Nevertheless, there have also been

25  cases in which the courts were silent on the ability of a defendant to satisfy a judgment.  See, e.g., Elliott v. Occidental Life Ins.

26  Co. of Cal., 272 Cal. App. 2d 373, 377 (1969); Mathes v. Nat'l Utility Helicopters Ltd., 68 Cal. App. 3d 182, 190 (1977).

1  the imposition of alter ego liability.[4]   In addition, Fru-Con has

2  provided evidence that it is presently involved in ongoing projects

3  throughout the United States totaling approximately $600 million.

4  Scott Decl., ¶ 8.   Of course, this figure represents the gross

5  total value of its current construction contracts -- not

6  necessarily its ability to pay a judgment of a particular size --

7  but it is at least suggestive of Fru-Con's current financial

8  health.

9      SMUD makes several arguments, none of which are responsive to

10  the fact that a bond covers the project.  For example, SMUD asserts

11  that Fru-Con may be unable to pay because it was allegedly

12  undercapitalized for the project.  The alleged undercapitalization

13  stems from the fact that the project's performance bond, which SMUD

14  required, was obtained by Bilfinger, rather than independently by

15  Fru-Con.  Nevertheless, the counterclaim states that "[a]s part of

16  the Contract, Fru-Con was obligated to obtain and provide to the

17  District a performance bond in a form acceptable to the District,

18  which Fru-Con did" -- suggesting that SMUD found the bond itself

19  to be acceptable, even if it was unhappy to discover the ultimate

20  source supporting the bond.   Counterclaim ¶ 2.

21      SMUD also points out that there have been frequent infusions

22

23      [4] The fact that the bonding company, Travelers, has filed its
    own suit and disputes its obligation to pay does not change this
24  conclusion.  SMUD has the burden of showing that injustice would
    result, and the chance that Travelers might be able to avoid
25  liability is not enough to satisfy SMUD's burden under the alter
    ego test.  Furthermore, this is an obstacle that no amount of
26  discovery pertaining to the unity of interest prong can cure.

1  of money into Fru-Con by Bilfinger.  Decl. of John Poulos, Ex. P

2  (discussing cash infusions from Bilfinger).    There is also

3  evidence, however, indicating that Fru-Con has never failed to have

4  cash available to meet its obligations as they became due.  Poulos

5  Decl., Ex. P.  See Platt v. Billingsley, 234 Cal. App. 2d 577, 583

6  (1965) (focusing on whether company had assets to meet its debts

7  "as they came due").  To the extent that this cash was infused by

8  Bilfinger, there is no guarantee that such an infusion would be

9  forthcoming in the event of a judgment against Fru-Con, but Fru-

10 Con's historical payment history is nevertheless probative of its

11 future payment ability.[5]

12      Furthermore, while it is unclear if the presence of bad faith

13 is a requirement for alter ego liability or merely a factor,

14 compare Sonora Diamond, 83 Cal. App. 4th at 539 with Elliott, 272

15 Cal. App. 2d at 377, there is also insufficient evidence from which

16 to conclude that Fru-Con acted in bad fath.  SMUD claims that it

17 was misled because Fru-Con described itself in its Statement of

18 Qualifications as "a major international constructor" and that it

19 had a $750 million bonding capacity -- which SMUD maintains would

20 be true only if the statements encompassed both Fru-Con and

21 Bilfinger, rather than only Fru-Con.  This is far from clear,

22

23      [5] Although SMUD has presented (hearsay) evidence that Bilfinger is
   contemplating getting out of the U.S. construction business, this does
24 not prove that Fru-Con or Bilfinger is in financial trouble.  Poulos
   Decl., Ex. YY (news article reporting Bilfinger is considering pulling
25 out of the U.S. construction business).  It is also worth noting that
   Fru-Con has been in existence for over 130 years and is the 10th oldest
26 contracting firm in the U.S.

1  however, and SMUD has not discharged its heavy burden in piercing

2  the corporate veil.[6]

3      In any event, because the bond is sufficient to cover any

4  judgment, the court finds that it is not apparent that injustice

5  would result if Bilfinger and FCHC were not party to this action.

6      **2. Unity and Identity of Interest**

7      Even if Fru-Con could meet the hurdle presented by the

8  injustice prong of the alter ego analysis, it would nevertheless

9  falter under the unity prong.  The factors relevant to whether

10 there is a unity and identity of interest between corporations were

11 set forth in <u>Associated Vendors</u>.  210 Cal. App. 2d at 837-40.  They

12 include, as SMUD maintains is present here, the control of the

13 subsidiary's day-to-day operations, commingling of funds, shared

14 employees, shared legal services, disregard of corporate

15 formalities, and inadequate capitalization.  <u>Id.</u>  There is no

16 required magic number of factors that must be met in order for

17 alter ego liability to be imposed.  See <u>Mesler v. Bragg Mgmt. Co.</u>,

18 _____

19      [6] With regard to the quibble over whether Fru-Con was an
   "international" constructor, there is evidence that the company
20 had, at the time of its application, conducted "start-up work" in
   non-U.S. countries such as Mexico and Indonesia, Poulos Decl., ¶
21 17, Ex. M, but it is unclear if this could reasonably refer to
   "construction" work, and if not, whether this would rise to the
22 level of bad faith conduct.
       With regard to the bonding issue, there is simply no dispute
23 that Fru-Con was in fact covered by a $750 million bond.  The only
   point of contention is that SMUD was unaware of the parental
24 guarantee that supported the bond.  The ability to secure a bond
   may have been valuable to SMUD for, primarily, its existence and,
25 incidentally, what it signaled (i.e., Fru-Con's wherewithal to
   secure a bond), but it is doubtful that the non-disclosure of
26 Bilfinger's role rose to the level of bad faith.

1   39 Cal. 3d 290, 300 (1985) ("There is no litmus test to determine

2   when the corporate veil will be pierced").  A corporate veil,

3   however, ought to be pierced only in "rare" and "exceptional"

4   circumstances.  <u>Dole Food Co. v. Patrickson</u>, 538 U.S. 468, 475

5   (2003).

6         Some of the factors alleged in the counterclaim, such as

7   commingling of funds and the diversion of assets, lack any

8   evidentiary support whatsoever.  <u>See</u> Decl. of Joerg Mrosek ¶ 11-12

9   (adherence to corporate formalities and no shared bank accounts);

10  Scott Decl. ¶ 5-6 (same).  Accordingly, the court only focuses on

11  the factors supported by evidence.

12              **a. Day-to-Day Control**

13        Where a parent dictates every facet of a subsidiary's business

14  from policy to day-to-day operations, courts have found the alter

15  ego test satisfied.  <u>See Rollins Burdick Hunter of S. Cal., Inc.</u>

16  <u>v. Alexander & Alexander Servs., Inc.</u>, 206 Cal. App. 3d 1, 11

17  (1988) (finding alter ego where "every facet" of the subsidiary's

18  business seemed to be dictated by the parent, including budget

19  approval, hiring, compensation, and certain real estate purchases

20  and leases); <u>Mathes v. Nat'l Utility Helicopters Ltd.</u>, 68 Cal. App.

21  3d 182, 190-91 (1977) (finding alter ego where parent exercised

22  control over subsidiary's budget, replaced the subsidiary's general

23  manager, and sent employees to subsidiary to investigate problems

24  and report back).

25        Nevertheless, a "parent corporation may be directly involved

26  in the activities of its subsidiaries without incurring liability

11

1    so long as that involvement is 'consistent with the parent's
2    investor status.'   Appropriate parental involvement includes:
3    'monitoring of the subsidiary's performance, supervision of the
4    subsidiary's finance and capital budget decisions, and articulation
5    of general policies and procedures.'"  AT&T v. Compagnie Bruxelles
6    Lambert, 94 F.3d 586, 591 (9th Cir. 1996); see also Calvert v.
7    Huckins, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (holding that
8    plaintiffs "must present evidence showing that [the parent
9    companies] do more than exercise the broad oversight indicated by
10   common ownership and common directorship").

11        Here, SMUD identifies two examples of Bilfinger's and (to a
12   lesser extent) FCHC's alleged day-to-day control over Fru-Con.
13   First, SMUD points to a "Letter of Direction" issued by Bilfinger
14   to Fru-Con setting forth the overall limits of Fru-Con's management
15   authority.  Poulos Decl., ¶¶ 7, Ex. C.  The Letter required Fru-Con
16   to seek the written approval of the FCHC Board for what SMUD terms
17   "routine" activities, such as "buying or selling real estate;
18   leasing real estate for more than five years; opening or closing
19   branch offices; entering into contracts outside of Fru-Con's
20   traditional business activities; initiating litigation estimated
21   to cost more than $200,000; setting an annual salary budget for
22   employees; and appointing officers."  Opp. at 11-12.

23        These activities may reasonably be characterized, as counter-
24   defendants term them, "macro-management" decisions.  They show that
25   only FCHC was entitled to make decisions regarding significant
26   contracts and major personnel decisions.  They do not evidence day-

1   to-day control over Fru-Con.  <u>See</u> <u>Wady</u>, 216 F. Supp. 2d at 1068-69

2   (finding appropriate parental involvement where parent monitored

3   subsidiary's performance, supervised the subsidiary's finance and

4   capital budget decisions, and articulated general policies and

5   procedures); <u>Fletcher v. Atex, Inc.</u>, 68 F.3d 1451, 1459-60 (2d Cir.

6   1995) (no alter ego liability where parental approval was required

7   for leases, major capital expenditures, and the sale of its

8   subsidiary's assets).  The fact that some of the required approvals

9   were obtained via telephone with a group of three board members,

10  Poulos Decl. ¶ 8, Ex. D, rather than through the formality of a

11  full board meeting, gives the court pause, but this does not

12  justify alter ego liability.

13      The second example cited by SMUD of alleged day-to-day control

14  stems from the involvement of Peter Ophoven, a Bilfinger executive,

15  at the project site.  Ophoven testified that he was present at the

16  site for a maximum of approximately 36 days spread out over the

17  course of several months.  Poulos Decl., Ex. T (4 days in March;

18  5 days in September; 2 days in December; 18 days in January; 7 days

19  in February); <u>Id.</u> (stating that "[m]ost of the guys knew me.").

20  He was at the site long enough that he was listed as a "monthly

21  employee" (at least for accounting purposes).  Poulos Decl. ¶ 21,

22  Ex. Q.  He also had his own telephone extension at the site.

23  Poulos Decl. ¶ 22, Ex. R.  During his visits, Ophoven discussed the

24  project schedule, cost forecasts, possible improvements regarding

25  cost and time, and interviewed various project executives.  Poulos

26  Decl. ¶ 25, Ex. U.

1    Again, these activities are not enough to show that Bilfinger

2    overstepped its bounds.   Permissible parental conduct includes

3    monitoring and oversight of the subsidiary.  See Wady, 216 F. Supp.

4    2d at 1068-69; AT&T, 94 F.3d 586 at 591.   Interviewing project

5    executives, keeping abreast of project developments, and discussing

6    potential  improvements  do  not  rise  to  the  level  of  day-to-day

7    control.   Unlike the cases in which courts pierced the corporate

8    veil, see, e.g., Rollins, 206 Cal. App. 3d at 11; Mathes, 68 Cal.

9    App. 3d at 182, Fru-Con and Bilfinger each adhered to their own set

10   of  corporate  formalities  from  accounting  and  tax  standpoints

11   through annual meetings, had separate bank accounts and payrolls,

12   and separately maintained corporate minutes.   Jrosek Decl. ¶ 11;

13   Scott Decl. ¶ 5.

14          **b. Shared Employees**

15   Next, SMUD points out that Bilfinger, FCHC, and Fru-Con have

16   shared  some  of  the  same  employees.[7]   Courts  have  noted  the

17   existence  of  shared  employees  in  imposing  alter  ego  liability.

18   See, e.g., Rollins, 206 Cal. App. 3d at 11; Mathes, 68 Cal. App.

19   3d at 191.   At the same time, however, other courts have observed

20   that "[i]t  is  considered  a  normal  attribute  of  ownership  that

21

22          [7] For example, Fru-Con Vice President and General Counsel Len
     Ruzicka testified that he was an officer of Fru-Con, FCHC, and
23   other Fru-Con related entities.   Poulos Decl. ¶ 38, Ex. HH.  Fru-
     Con controller Martin Schaper and Vice President of Audit Tanya
24   Gale testified about various positions that they alternately filled
     for Bilfinger and Fru-Con over the years.   Poulos Decl. ¶ 12, Ex.
25   H; ¶ 59, Ex. CCC.  Fru-Con Operations Manager Earle Hardgrave also
     came from Bilfinger and went back to Bilfinger.  Poulos Decl. ¶ 35,
26   Ex. EE.

1  officers and directors of the parent serve as officers and

2  directors of the subsidiary." <u>Sonora Diamond</u>, 83 Cal. App. 4th at

3  548-49; <u>see</u> <u>also</u> <u>Doe v. Unocal</u>, 248 F.3d 915, 925-26 (9th Cir.

4  2001) (noting that it is appropriate for directors of a parent to

5  serve as directors of the subsidiary without exposing the parent

6  to liability for the subsidiary's act).  Accordingly, while this

7  factor carries some weight, the court will not impose alter ego

8  liability without a more substantial showing.

9         **c. Legal Services**

10        SMUD also argues that Len Ruzicka, Fru-Con's general counsel,

11 provided legal services for both Fru-Con and FCHC, and was an

12 officer of both.  Poulos Decl. ¶ 38, Ex. HH.  The use of the same

13 lawyers is another relevant factor in the alter ego analysis.  <u>See</u>

14 <u>Slottow v. Am. Cas. Co.</u>, 10 F.3d 1355, 1360 (9th Cir. 1993) (use

15 of same lawyer a "relevant factor[]"); <u>Marr v. Postal Union Life</u>

16 <u>Ins. Co.</u>, 40 Cal. App. 2d 673, 683 (1940) (use of same lawyer "a

17 fact entitled to consideration"); <u>Calvert</u>, 875 F. Supp. at 679 (use

18 of same lawyer "carries plaintiffs' [alter ego] argument the

19 furthest" but nevertheless finding no alter ego liability).  At the

20 same time, "common characteristics [such] as . . . shared

21 professional services" may be normal and appropriate.  <u>See</u> <u>Sonora</u>

22 <u>Diamond</u>, 83 Cal. App. 4th at 540-41.

23        Here, Ruzicka did not testify that he provided legal advice

24 to both Fru-Con and FCHC in his capacity as an officer of each

25 corporation; rather, he stated that it was his role in such

26 capacities to complete the meeting minutes and oversee certain

15

1   activities from a corporate legal standpoint.  Poulos Decl. ¶ 38,

2   Ex. HH ("My primary function as a secretary of each of those

3   corporations is to do the corporate minutes, [] be involved in

4   overseeing what was done from a legal corporate point of view.  So

5   it would have been more of . . . corporate legal services.").  That

6   Ruzicka "change[d] hats," <u>Sonora Diamond</u>, 83 Cal. App. 4th at 548-

7   49, like the other employees who have worked for Fru-Con in

8   addition to FCHC and/or Bilfinger, is still not enough to establish

9   alter ego liability.

10       Ruzicka's contact with Bilfinger was even less direct than the

11  contact with FCHC.  He testified that he would call Bilfinger's

12  general counsel and "keep him informed."  Poulos Decl. ¶ 38, Ex.

13  HH.  As a subsidiary, Fru-Con had a duty to report significant

14  legal issues to its parent.  <u>Sonora Diamond</u>, 83 Cal. App. 4th at

15  548-89.  There is no indication that Bilfinger or its general

16  counsel directed Fru-Con's day-to-day litigation.

17              **d. Experience and Financial Wherewithal**

18       SMUD also maintains that Fru-Con misrepresented its

19  experience, relying on Bilfinger's track record for its

20  representation that it was a "major international constructor," (a

21  point addressed above) and also misrepresented its financial

22  wherewithal by not disclosing Bilfinger's backing in obtaining the

23  bond.  "[T]he concealment and misrepresentation of the identity of

24  responsible ownership, management and financial interest, or

25  concealment of personal business activities" is a factor in the

26  alter ego analysis.  <u>Associated Vendors</u>, 210 Cal. App. 2d at 840-

41; <u>Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP</u>, 69 Cal. App. 4th 223, 251 (1999) (describing "financial misrepresentation" as an "important" factor).

Fru-Con's conduct, however, does not rise to the level of a "financial misrepresentation." The fact that Bilfinger used its financial weight to secure Fru-Con's bond is insufficient to establish alter ego liability. <u>See</u> <u>Akzona, Inc. v. E.I. Du Pont De Nemours and Co.</u>, 607 F. Supp. 227, 238 (D. Del. 1984) (parental guaranty of third party loans insufficient); <u>Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil</u>, 456 F. Supp. 831, 841-43 (D. Del. 1978) (surety on bank loans insufficient); <u>Calvert</u>, 875 F. Supp. at 679 (parental guarantees appropriate feature of parent-subsidiary relationship). As noted above, from all that appears, what was most valuable to SMUD (and what SMUD inquired about) was the existence of the bond, not its source.

### e. Undercapitalization

SMUD argues that Fru-Con was undercapitalized, another factor in the alter ego analysis. <u>See</u> <u>Associated Vendors</u>, 210 Cal. App. 2d at 839. To be adequately capitalized, a subsidiary must have "capital reasonably regarded as adequate to enable the corporation to operate its business and pay its debts as they mature." <u>Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., Inc.</u>, 736 F.2d 516, 524 (9th Cir. 1984).

SMUD bases its argument on Bilfinger's role in securing the bond (addressed above) and on the cash infusions that Fru-Con received from Bilfinger. Poulos Decl. ¶ 20, Ex. P (testimony of

1  Fru-Con's cash manager, who stated that "if there was ever a need
2  for cash that Bilfinger would -- there would be a cash infusion.").
3  This latter practice, however, is a common feature of parent-
4  subsidiary relationships, and the fact that a subsidiary receives
5  cash infusions from time to time does not necessarily mean that it
6  has been inadequately capitalized.   See Sonora Diamond, 83 Cal.
7  App. 4th at 546 (finding corporation "was adequately capitalized
8  at the outset and regularly funded, by intercompany loans, when
9  operational losses made cash infusions necessary"); Poulos Decl.
10 ¶ 20, Ex. H (Fru-Con controller testifying that when Fru-Con "had
11 some longer-term cash flow problems" in the 1980s, Bilfinger would
12 send cash).

13       In sum, SMUD has not tendered sufficient evidence to show that
14 there was a unity of interest and identity between Fru-Con, on the
15 one hand, and Bilfinger or FCHC, on the other.   With regard to
16 FCHC, the only evidence presented in support of an alter ego theory
17 is that (1) Fru-Con was required to obtain FCHC board approval with
18 respect to certain "macro-management" decisions contained in the
19 Letter of Direction, (2) Fru-Con and FCHC shared certain employees,
20 and (3) Fru-Con's general counsel also performed certain tasks as
21 an officer of FCHC from a legal standpoint.   This falls far short
22 of the required showing for alter ego liability.

23            With regard to Bilfinger, the evidence at issue consists
24 of (1) Ophoven's periodic visits to the site over a span of several
25 months, (2) shared employees, (3) the description of Fru-Con as a
26 major international constructor and the alleged reliance on

Bilfinger's experience in making that statement, (4) Bilfinger's role in obtaining the bond, and (5) Bilfinger's cash infusions to Fru-Con.  While perhaps a closer issue than that presented by FCHC, SMUD has also not introduced sufficient evidence to prove that alter ego liability is warranted.

**B. Direct Contacts**

Alternately, SMUD asserts that the court may exert jurisdiction over Bilfinger and FCHC based on their direct contacts with California.  As detailed below, this argument is even less availing than jurisdiction under an alter ego or agency theory.

**1. General Jurisdiction**

General jurisdiction can exist where a foreign corporation's contacts with the forum are "continuous and systematic general business contacts." Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414-16 (1984).  The standard for establishing general jurisdiction is "fairly high and requires that the defendant's contact be of the sort that approximate physical presence." Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000) (internal citations and quotations omitted).

With regard to Bilfinger, the only alleged direct contact with California consists of two general engineering licenses, the most recent of which expired in 1992, a decade before Fru-Con's contract with SMUD was negotiated.  Poulos Decl. ¶¶ 17, 19, Ex. O.  These licenses are simply too stale to permit the exercise of general jurisdiction.  Courts reach back no more than five to seven years

in examining jurisdictional facts.  <u>See</u> <u>Metropolitan Life Ins. Co.</u> <u>v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 569 (2d Cir. 1996) (noting that other courts have found three to seven years to be reasonable); <u>Slurry Sys. v. Berminghammer Found. Equip.</u>, 2006 U.S. Dist. LEXIS 20238, *12-13 (N.D. Ind. 2005) (declining to examine contacts beyond seven years).

With regard to FCHC, there are two alleged contacts: (1) a lease for three cars associated with the project and (2) an insurance policy endorsement that covered some project-related equipment.  Poulos Decl. ¶ 27, Ex. W (lease agreements); ¶ 28, Ex. X (insurance policy).  These two contacts are not the sort that "approximate physical presence." <u>Bancroft & Masters</u>, 223 F.3d at 1086.

## 2. Specific Jurisdiction

Alternately, a court may exert specific jurisdiction where (1) the defendant has purposefully availed itself of a forum benefit, (2) the controversy is related to or arises out of the defendant's contacts, and (3) the exercise of jurisdiction would comport with fair play and substantial justice.  <u>Burger King</u>, 471 U.S. at 475-78.

With regard to Bilfinger, all of SMUD's jurisdictional claims are derivative.  Accordingly, because SMUD cannot establish jurisdiction under an alter ego or agency theory, there is no specific jurisdiction over Bilfinger.  With regard to FCHC, the evidence shows that FCHC received the lease agreements, but there is no indication that FCHC was the contracting party or in control

20

1  of the cars in question.  Moreover, although there is evidence that

2  an insurance policy obtained by FCHC was amended to include certain

3  Fru-Con equipment used on the project, this contact, like the lease

4  agreement, is simply too peripheral to be said to give rise to the

5  present controversy.  Relatedly, it would not comport with fair

6  play and substantial justice to hail international defendants into

7  California on such an attenuated basis.

8  **C. Discovery**

9      The final matter before the court is SMUD's motion, which

10 seeks jurisdictional discovery and requests that the court stay any

11 decision on the pending motions to dismiss.

12     There is no definitive standard for whether to permit

13 jurisdictional discovery.  Some courts have held that before

14 allowing such discovery, the plaintiff must first make a "colorable

15 or prima facie showing of personal jurisdiction."  See Central

16 States v. Reimer Express World Corp., 230 F.3d 934, 946 (7th Cir.

17 2000); see also United States v. Swiss Am. Bank, Ltd., 274 F.3d

18 610, 625 (1st Cir. 2001) ("[A] diligent plaintiff who sues an out-

19 of-state corporation and who makes out a colorable case for the

20 existence of in personam jurisdiction may well be entitled to a

21 modicum of jurisdictional discovery if the corporation interposes

22 a jurisdictional defense."); Jazini v. Nissan Motor Co., 148 F.3d

23 181, 186 (2d Cir. 1998) (denying discovery where plaintiffs "did

24 not establish a prima facie case that the district court had

25 jurisdiction").

26     Other courts, however, have rejected the requirement of a

21

1  prima facie case.  See Orchid Biosciences Inc. v. St. Louis Univ.,

2  198  F.R.D.  678,  673  (S.D.  Cal.  2001)  ("It  would  []  be

3  counterintuitive  to  require  a  plaintiff,  prior  to  conducting

4  discovery,  to  meet  the  same  burden  that  would  be  required  in  order

5  to  defeat  a  motion  to  dismiss.   Moreover,  the  authorities  from  our

6  circuit  .  .  .  indicate  that  our  Federal  Rules  envision  a  broader

7  scope  of  even  preliminary  discovery.").   The  Ninth  Circuit  has

8  also  held  that  while  "[a]n  appellate  court  will  not  interfere  with

9  the  trial  court's  refusal  to  grant  discovery  except  upon  the

10  clearest  showing  that  the  dismissal  resulted  in  actual  and

11  substantial  prejudice  to  the  litigant,"  discovery  "should  be

12  granted  where  pertinent  facts  bearing  on  the  question  are

13  controverted  .  .  .  or  where  a  more  satisfactory  showing  of  the

14  facts  is  necessary."   Wells Fargo & Co. v. Wells Fargo Exp. Co.,

15  556  F.2d  406,  430  n.24  (internal  quotation  marks  omitted).

16     Here,  most  of  the  facts  themselves  are  not  seriously  in

17  dispute;  the  issue  is  whether  they  rise  to  a  level  warranting

18  application  of  the  alter  ego  theory.   Furthermore,  there  is  no

19  reasonable  likelihood  that  additional  discovery  would  help  SMUD  to

20  prove  that  injustice  would  result  if  Bilfinger  and  FCHC  were  not

21  made  party  to  this  action.[8]   Without  proof  of  this  necessary

22  element,  any  other  discovery  would  be  futile.   The  simple  fact

23

24     [8] As  noted  earlier,  although  SMUD  maintains  that  Travelers'
   legal  obligation  to  pay  is  in  doubt,  this  doubt  is  not  enough  to
25  satisfy  its  burden  of  showing  that  injustice  will  result.
   Furthermore,  additional  discovery  would  not  help  SMUD  with  regard
26  to  this  issue.

1  remains that a bond exists (with an uncommited capacity almost

2  assuredly large enough to satisfy any judgment).  In addition, Fru-

3  Con has ongoing projects worth hundreds of millions of dollars and

4  has a track record of timely payment of debts.  Against this

5  background, it would be unfair to permit SMUD to conduct

6  jurisdictional discovery.

7  **IV. Conclusion**

8      For the reasons set forth above, the court GRANTS Bilfinger

9  and Fru-Con Holding Corporation's motions to dismiss for lack of

10  personal jurisdiction (Doc. Nos. 410 & 412) and DENIES SMUD's

11  motion for jurisdictional discovery (Doc. No. 419).

12      IT IS SO ORDERED.

13      DATED: August 17, 2007.

14

15

16                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
17                              UNITED STATES DISTRICT COURT

18

19

20

21

22

23

24

25

26