UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRU-CON CONSTRUCTION
CORPORATION, a Missouri
corporation,

NO. CIV. S-05-583 LKK/GGH

       Plaintiff,

  v.

O R D E R

SACRAMENTO MUNICIPAL UTILITY
DISTRICT, a municipal utility
district; UTILITY ENGINEERING
CORPORATION, a Texas
corporation,

       Defendants.

_____/

    The case centers around a contract dispute between Fru-Con Construction Corporation ("Fru-Con") and Sacramento Municipal Utility District ("SMUD"). Fru-Con brought suit against SMUD for breach of a construction contract; SMUD counterclaimed against Fru-Con for the same. Travelers Casualty and Surety Company ("Travelers") has also sued SMUD, seeking a declaratory judgment of Travelers' non-liability. SMUD counterclaimed against Travelers

1

1   for the same and also asserts a breach of contract cause of action.

2       SMUD has moved for partial summary judgment against Fru-Con

3   for the declaratory relief SMUD seeks against Fru-Con in SMUD's

4   counterclaim, and for two portions of Fru-Con's claims against

5   SMUD. SMUD has also moved for partial summary judgment against

6   Travelers for Travelers' claim against SMUD and on the claim for

7   declaratory relief in SMUD's counterclaim against Travelers.

8       The court resolves the motions on the papers and after oral

9   argument.

10   **I. FACTS**[1]

11   **A.   SMUD's Counterclaim: Section C Concrete Issue**

12       In its counterclaim against Fru-Con, SMUD seeks a

13   declaratory judgment that its termination of Fru-Con was proper

14   due to defendant's failure to replace a certain portion of

15   concrete in the construction project. SMUD seeks summary

16   judgment on that issue.

17       In August 2003, SMUD entered into a written contract with

18   Fru-Con by which the latter was to construct the Cosumnes Power

19   Plant. The Power Plant was to include a cooling water tower,

20   which itself includes a foundation / basin that holds the cooled

21   water. The foundation / basin is made of slabs of steel

22   reinforced concrete, adjacent to one another and surrounded by a

23

24   [1]The facts are undisputed unless otherwise noted. Each party
objects to various pieces of evidence that the opposing party has
presented. Some of the evidence to which the parties object is
25   irrelevant to the court's analysis of the summary judgment motion.
To the extent that the evidence is relevant, the objections are
26   OVERRULED.

concrete wall. Each slab was designated by a different letter, resulting in Sections A-G. Section C is the subject of one of the disputes between SMUD and Fru-Con.

The Power Plant, including the cooling water tower, was to be constructed according to the specifications of SMUD's design engineer, Utility Engineering Corporation (UEC). UEC required specific standards be met for the foundation / basin concrete, including that it have a minimum compressive strength of 5,000 psi at 28 days after having been poured and that it have an air entrapment of 4-6 percent by volume.

### 1.   Problems With Section C Concrete

On May 3, 2004, Fru-Con notified SMUD that the air entrapment in Section C did not meet UEC's standards, as it was only 2.25 percent by volume. On June 8, 2004, Fru-Con notified SMUD that the Section C concrete was "not making" the 5,000 psi requirement at twenty-eight days. Fru-Con had run the test with twelve samples of concrete and all failed. On June 29, 2004, Fru-Con's Project Engineer recommended the Section C concrete not be replaced if its compression strength was found to be adequate at 56 days. On July 27, 2004, six concrete samples were taken from Section C and tested at Kleinfelder lab. The lab reported to Fru-Con that none of the samples had a compressive strength of 5,000 psi, but rather fell in the range of 3100-4530 psi. These results were reported to SMUD.

### 2.   Contract Terms

By the terms of the contract, Fru-Con was required to

3

construct the Power Plant in accordance with UEC's specifications. No deviation from UEC's design was permitted without prior approval by UEC's Design Engineer or SMUD's Project Director. The Engineer had the right to reject defective material and work. Rejected material was to be replaced to the satisfaction of the Engineer and without charge to SMUD. If Fru-Con failed to do so, SMUD could replace the material at the expense of Fru-Con or could terminate Fru-Con's right to proceed with the construction. Specifically, General Condition 36 stated, in pertinent part:

> If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will ensure its completion within the time specified in this Contract, or any extension thereof, or fails to complete said work within such time, the Contracting Officer may, by written notice to the Contractor terminate Contractor's right to proceed with the work or such part of the work to which there has been delay. In such event, the District may take over the work and prosecute the same to completion, by contract or otherwise, and the Contractor and Contractor's sureties shall be liable to the District for any excess cost occasioned the District thereby, and for liquidated damages for delay, as fixed by the Contractor, until such reasonable time as may be required for final completion of the work.

The contract also provided Fru-Con a right of protest if it believed SMUD demanded work that was outside the scope of the contract, per General Condition 32. In that situation, Fru-Con was to "within 10 calendar days after such demand, instruction, ruling or decision [was] given, file a written protest with the Engineer," which stated Fru-Con's objections and reasons. If there was no resolution of the dispute, the Engineer was

1   required to forward the protest to the Contracting Officer for a
2   final decision. Pending the final decision, Fru-Con was to
3   continue with the work demanded by the Engineer. "The
4   Contracting Officer [was to] notify the Contractor of the
5   decision in writing. The Contractor [was required to] promptly
6   comply with the decision, but [retained] the right to have the
7   dispute resolved by a court . . . ." Fru-Con's failure to follow
8   this process for protest constituted a waiver of "all claims for
9   extra work, damages, and extensions of time on account of
10   demands, instructions, rulings, and decisions" of SMUD.

11      Under Special Condition 14.5, if Fru-Con failed to perform
12   in any material respect, SMUD could withhold all payments at any
13   time.

14      Finally, the contract stated that time was of the essence.

15   **3.    Communications Between Fru-Con and SMUD Regarding**
16   **Problems With Section C Concrete**

17      On September 9, 2004, Kevin Disney, SMUD's Project
18   Director's authorized representative, sent a letter to Brett
19   McPherson, Fru-Con's Project Director, stating that the Section
20   C concrete samples taken on July 27 and July 29, 2004 did not
21   meet the compressive strength requirements of the project
22   specifications. It stated that "testing . . . has not shown
23   acceptable concrete" and that the concrete was "not acceptable
24   to SMUD." He requested that Fru-Con replace the unacceptable
25   ////
26   ////

1   concrete.[2]

2        On September 29, 2004, Mr. Disney of SMUD sent a letter to

3   Brett McPherson of Fru-Con reiterating that UEC recommended

4   removal and replacement of Section C and that SMUD concurs. Mr.

5   Disney requested Fru-Con "provide a schedule for demolition and

6   replacement of the concrete." Attached to this letter was a copy

7   of a September 27, 2004 letter from Tim Pillsbury, the UEC

8   Engineer, to Chris Moffit, SMUD's Engineer, recommending that

9   Section C be removed and replaced because the concrete samples

10  showed their compressive strength was 25 percent less than the

11  required minimum.

12       Evidence submitted by Fru-Con shows that on October 20,

13  2004, Lucas Mallory, Mechanical Engineer of Fru-Con, sent an

14  email to Anis Sury of SMUD as a "follow-up to the conversation"

15  the two had the previous day. In the email, Mr. Mallory

16  suggested that Section C could be repaired rather than replaced

17  and indicated that he had posed this to Tim Pillsbury of UEC.

18  Declaration of Lucas Mallory In Support of Fru-Con's Opposition

19  to SMUD's Motions for Partial Summary Judgment and Summary

20  Adjudication ("Mallory Decl.") ¶ 13, Exh. L. On October 28,

21  2004, Chris Moffitt of SMUD emailed Tim Pillsbury to inquire

22  about the possibility of using epoxy to repair Section C, in

23  lieu of replacement. Declaration of Michael Gandee In Support of

24  Fru-Con's Opposition to SMUD's Motions for Partial Summary

25  ───────────────

26       [2]Fru-Con disputes the contents of the letter to the extent
    that SMUD suggests the concrete was unacceptable.

1 Judgment and Summary Adjudication ("Gandee Decl.") ¶ 36, Exh.

2 FFF. On December 10, 2004 Mr. Pillsbury sent a letter to Mr.

3 Moffitt stating that no sample of the Section C concrete met the

4 28-day strength requirement and that he "still recommend[ed]

5 Cooling Tower Section C be removed and replaced." Moffitt Decl.

6 ¶ 25, Exh. 6.

7      On December 10, 2004, Bob Nelson, SMUD's Project Director's

8 authorized representative, sent a letter to Earle Hardgrave,

9 Project Director of Fru-Con. The letter was titled "Notice of

10 Default." It stated that SMUD has not received a schedule for

11 demolition of Section C by Fru-Con. Furthermore, "all

12 discussions of substitute remedies have been unsatisfactory."

13 Because the Engineer of Record would not grant an exception to

14 the design specifications, "no further options remain[ed]" other

15 than removal and replacement. It also stated that the letter was

16 providing notice to Fru-Con of default for the purposes of

17 Special Condition 14.5. This provision allowed SMUD to suspend

18 payments to Fru-Con if Fru-Con did not remedy the work as

19 directed within fifteen days. Attached to this letter were the

20 September 27, 2004 and December 10, 2004 letters from Mr.

21 Pillsbury and the original notices by Fru-Con to SMUD of the

22 defectiveness of the concrete.[3]

23      On December 22, 2004, Mr. Hardgrave responded by letter to

24 Mr. Nelson. He stated that Fru-Con refused to remove the Section

25 ───────────────

26      [3]Fru-Con disputes this fact to the extent that it suggests
Fru-Con was in default of the contract.

7

1  C concrete because SMUD's demand that it be done was

2  "inconsistent with the prior course of conduct with the

3  parties," referencing prior conversations about alternative

4  remedies. He also stated that Mr. Pillsbury's December 10 letter

5  was based on incomplete information, in that it was not based on

6  56-day stress tests.[4]

7      On January 20, 2005, SMUD sent Fru-Con a debit memo. It

8  included a debit against Fru-Con representing the liquidated

9  damages for Fru-Con's failure to achieve certain contract

10  milestones and suspended payment to Fru-Con because of Fru-Con's

11  failure to remove the Section C concrete. On January 24, 2005,

12  Mr. Hardgrave of Fru-Con sent a letter to Mr. Nelson of SMUD,

13  objecting to the liquidated damages in the debit memo as

14  untimely. On February 1, 2005, SMUD issued another debit memo to

15  Fru-Con, in which payments continued to be suspended.

16      On February 2, 2005, Mr. Hardgrave of Fru-Con sent Mr.

17  Nelson of SMUD a letter in which he stated that Fru-Con was

18  prepared to repair Section C. Nelson Decl. ¶ 8, Exh. 19. He

19  attached a letter from a Fru-Con engineer describing remedial

20  treatment and an information sheet on the epoxy that would be

21  used. This was apparently passed on to Mr. Pillsbury of UEC, who

22  in a February 4, 2005 letter to Mr. Moffitt of SMUD, described

23  Fru-Con's repair proposal as "the first solid proposal" from

24  Fru-Con. Moffitt Decl. ¶ 27, Exh. 7. Mr. Pillsbury nevertheless

25  _____

26      [4]Given the specification requiring testing in 28 days, Fru-Con's contention appears unjustified.

8

1  concluded that the proposed repairs would be less effective and
2  more expensive than replacing Section C, and reiterated his
3  recommendation that Section C be removed and replaced. Id.

4  In a February 4, 2005 letter to Mr. Hardgrave, Mr. Nelson
5  called Fru-Con's repair plan "belated" and stated that Mr.
6  Pillsbury found the plan inferior to replacing the concrete.
7  Nelson Decl. ¶ 9, Exh. 20. He reiterated that UEC would not
8  grant Fru-Con an exception to the design specifications for the
9  Section C concrete. He stated that Fru-Con was in default of its
10 contractual obligations, "as previously noticed in my [December
11 10, 2004] letter, in accordance with SC-14.5." Mr. Nelson stated
12 that all payments to Fru-Con were suspended. Id.

13 Fru-Con tenders evidence that on February 10, 2005, Matti
14 Jaekel, CEO of Fru-Con, had a conversation with James Shetler of
15 SMUD, who promised to look into the Section C concrete issue
16 "again." Gandee Decl. ¶ 55, Exh. VVV. On the same day, Mr.
17 Hardgrave of Fru-Con sent Mr. Nelson of SMUD a letter objecting
18 to the debit memo and requesting payment. He referred Mr. Nelson
19 to his letters from December 22, 2004 and February 2, 2005.

20 On February 11, 2005, Mr. Shetler of SMUD sent Mr. Jackel
21 and Mr. Hardgrave of Fru-Con a letter terminating Fru-Con,
22 citing General Condition 36 of the contract. The letter listed
23 twelve grounds for Fru-Con's termination, including failure to
24 remove the Section C concrete.

25 **B.    Weather Delays Issue**

26 In its complaint against SMUD, Fru-Con alleges that SMUD

9

breached the construction contract in part because SMUD failed

to grant extentions for completing the project due to weather

delays. SMUD seeks summary judgment against Fru-Con on this

portion of that cause of action.

**1.   Relevant Contract Provisions**

General Condition 19,[5] titled "Time for Performance of the

Work" states, in relevant part:

> The time for performance of the contract work shall
> commence with the date of the Notice to Proceed.  The
> Contractor shall complete the work, or any specified
> portion of the work, within the time limitations set
> forth in the SPECIAL CONDITIONS.   Unless otherwise
> stated in the SPECIAL CONDITIONS, time shall be measured
> in working days.
>
> A **working day** is defined as any day, except: . . .
>
> D. Days on which the Contractor is prevented from
>    working at least 60 percent of the time on the
>    current controlling operation, due to inclement
>    weather or its residual effects, or as otherwise
>    determined by the Field Representative of the
>    Engineer.
>
>    The term **"current controlling operation"** refers to
>    any part of the work that, if postponed will delay
>    the completion of the entire Contract work.
>
> The determination of each non-working day . . . shall be
> made daily by the Field Representative of the Engineer.
> . . .
>
> Except when working days are not being charged due to
> specified or written "temporary suspension of work", the
> Field Representative of the Engineer will furnish the
> Contractor a weekly statement showing:
> A. The number of working days charged for the preceding
>    week.
>
> B. Approved time extension.

---

[5]General Condition 6 stated that General Conditions of the
contract controlled over Special Conditions.

10

C. The number of days originally specified for the completion of the work.

D. The number of working days remaining to complete the work.

E. The revised Contract completion date.

If the Contractor disagrees with the working day determination, Contractor must submit a written request for review to the Engineer within seven (7) days of receiving the Field Representative's statement.  This request must state the reasons Contractor disagrees with the Field Representative's determination.  The Engineer will issue a decision promptly, and it shall be final unless the Contractor files a written protest in accordance with GC-32 PROCEDURE FOR PROTEST.[6]

Special Condition 10 of the contract is entitled "Commencement, Completion Time & Liquidated Damages." It states in relevant part:

The contract will involve a schedule of bonus payments as defined in Exhibit G, Schedule of Liquidated Damages and Incentives.  In addition to bonuses, the contract will involve a schedule of liquidated damages as defined in Exhibit G, Schedule of Liquidated Damages and Incentives that will not exceed ten (10) percent of the total contract price (as it may be adjusted from time to time).  The Contractor agrees to pay said liquidated damages as herein provided, and in case the same are not paid, agrees that the District Project Director may deduct the amount thereof from any moneys due, or that may become due, the Contractor under the Contract.

Appendix G (referenced as "Exhibit G" in Special Condition 10) is titled "CPP Project Liquidated Damage Calculations." It contains a table of "intermediate milestones" of specific parts of the construction project to be completed, the date by which

---

[6]General Condition 32 is described in section I.A.2, *supra*.

11

1  that milestone was to be reached, and the liquidated damages to

2  which SMUD would be entitled if the milestone was not reached.

3  The date by which the milestone should be reached is measured in

4  calendar days from the issuance of the Final Notice to Proceed.

5      General Condition 27 described when extensions of time

6  would be given to Fru-Con. It stated:

7          If the Contractor is delayed in the progress of the
           work due to abnormal or unforeseeable causes beyond
8          the control of the Contractor, the Contractor may file
           a written request, with the Engineer, for an extension
9          of time for completion of that portion of the affected
           work. Such delays may be caused by acts of God, acts
10         of public enemy, strikes, fires, floods, quarantine
           restrictions, shortage of materials, or failure of the
11         District to acquire right of way.

12  It also provided that if Fru-Con sought a time extension under

13  General Condition 27, it shall "state specifically the reasons

14  for and the extent of the delay and shall include full

15  substantiating evidence thereof." The request must be made

16  within seven calendar days of the date of the delay, but only

17  one request was necessary for a "continuing delay." The Engineer

18  would then determine the reasonableness of the request and make

19  a recommendation to the Contracting Officer.

20      In Special Condition 31, the contract stated that "Events

21  such as high winds, unexpected rain, hail, lightning, and other

22  hazards . . . present risks to . . . work progress. The

23  Contractor shall assume such risks except as provided in GC-27."

24

25

26

12

1          **2.    Communications Between SMUD and Fru-Con Regarding**

2          **Weather Delays**

3        From September 23, 2003 to at least January 7, 2005, Fru-

4   Con sent Daily General Reports to SMUD. Declaration of Ronald

5   Funk in Support of Fru-Con's Opposition to SMUD's Motions for

6   Partial Summary Judgment and Summary Adjudication ("Funk Decl.")

7   ¶¶ 8-10. In several of these, Fru-Con reported inclement weather

8   on particular days and Fru-Con's resultant inability to complete

9   work on that date. Id. ¶¶ 15-38. Of the reports that described

10  inclement weather, most indicated rain was the reason for the

11  inability to complete work; some gave high winds or muddy

12  conditions as the reason. These weather delays were reiterated

13  in letters from Fru-Con's Earle Hardgrave to SMUD's Bob Nelson

14  during these months, as well. These letters were characterized

15  as notices under General Condition 19 that weather conditions

16  had prevented work at least 60 percent of the time. Funk Decl.

17  ¶¶ 44-45, Exh. AAAAA-BBBBB.

18       On January 1, 2004, Thom Childress, Project Director of

19  Fru-Con, sent a letter to Bob Nelson of SMUD notifying him of

20  the "extreme" weather conditions presently occurring at the

21  project site. He stated that the letter served as a "request for

22  an extension of time for all affected work in accordance with

23  SC-31 and GC-27 of the Contract." Declaration of Robert Moore in

24  Support of Fru-Con's Opposition to SMUD's Motions for Partial

25  Summary Judgment and Summary Adjudication ("Moore Decl.") ¶ 50,

26  Exh. 48.

1    On February 23, 2004, Thom Childress sent a letter to Chris

2  Moffit of SMUD. In it, Mr. Childress stated that "per GC-19,"

3  Fru-Con had lost eighteen working days from November 3, 2003 to

4  February 19, 2004 date, as a result of "inclement weather." The

5  letter listed the specific days on which Fru-Con was prevented

6  from working due to poor weather. These correspond to days for

7  which Fru-Con had reported in its Daily General Reports that

8  work could not be completed on that day due to inclement

9  weather. Mr. Childress requested that the Field Representative

10  of the Engineer grant an extension on the project completion

11  deadline for each day that was lost due to weather. Mr.

12  Childress also stated that Fru-Con had never received the weekly

13  reports from the Field Representative of the Engineer, as

14  described in General Condition 19. Mr. Childress asked for "this

15  process" to begin as soon as possible.

16    On March 10, 2004, Mr. McPherson sent another letter to Mr.

17  Moffitt, reiterating this request. Bob Nelson of SMUD replied by

18  letter dated March 22, 2004. In it, he directed Mr. McPherson to

19  General Conditions 19 and 27 and asked Mr. McPherson to submit

20  documents in conformity with these conditions, upon which SMUD

21  could make a determination as to whether an extension was

22  warranted. Moore Decl. ¶ 52, Exh. 50. On April 1, 2004, Mr.

23  McPherson replied by letter, explaining that Fru-Con's position

24  was that only GC-19 applied to the extensions sought. He agreed

25  to provide copies of the relevant Daily General Reports per

26  SMUD's request.

1    Bob Nelson of SMUD responded by letter on April 8, 2004. In

2  his letter, he stated that SMUD did not need to provide Fru-Con

3  with weekly reports of working days (as described in General

4  Condition 19) because the completion time for the project was

5  measured in calendar days, as described in Special Condition 10.

6  As a result, "no working days need to be charged under this

7  Contract because the time for performance is specified in

8  calendar days. . . ."

9    On April 12, 2004, Mr. McPherson replied by letter, stating

10 that Fru-Con agreed that the Special Conditions controlled when

11 there was a conflict between them and the General Conditions. He

12 stated, "This would apply to the measurement of time and

13 therefore we agree with you that the determination under GC-19

14 should be in calendar days and not working days." Nevertheless,

15 he contended that SMUD was required to provide the weekly

16 reports to Fru-Con as described in GC-19 and that failure to do

17 so was a material breach of the contract.

18    From April through September 2004, the parties exchanged

19 letters reiterating their respective positions. See Nelson Decl.

20 ¶ 22-26, Exh. 30-34; Declaration of Steven Cohn In Support of

21 SMUD's Motions for Summary Judgment and Summary Adjudication

22 ("Cohn Decl.") ¶¶ 3-5, Exh. 13-15. Fru-Con has presented

23 evidence that SMUD directed it to omit from monthly schedules

24 any requests for time extensions, any delays noticed but not

25 quantified, and any potential claims for delay. Moore  Decl. ¶¶

26 44-45, Exh. 42-43; Declaration of Matthew Ellis in Support of

15

1  Fru-Con's Opposition to SMUD's Motions for Partial Summary

2  Judgment and Summary Adjudication ("Ellis Decl.") ¶¶ 19, 21-22,

3  Exh. X. Fru-Con has also presented evidence from experts that

4  weather data from the period at issue would support its

5  assertion of inclement weather. Declaration of Paul Stynchcomb

6  in Support of Fru-Con's Opposition to SMUD's Motions for Partial

7  Summary Judgment and Summary Adjudication ("Stynchcomb Decl.")

8  ¶¶ 6, 8-9, Exh. YYY.

9  **C. Accord and Satisfaction Related to Change Order 3**

10      Under General Condition 29 of the contract, changes to the

11  contract terms could only be made with a change order. If either

12  Fru-Con or SMUD believed a change in the contract should be made

13  because of an event or an action, that party could request a

14  change within seven days of the event. If the parties agreed to

15  the change, SMUD would issue a change order. Per General

16  Condition 30, change orders could be used to alter the scope of

17  Fru-Con's work.

18      In June and July 2004, Fru-Con made fourteen requests for

19  change orders, based on SMUD's issuance of design drawings after

20  the execution of the contract. Specifically, Fru-Con sought an

21  increase of the contract price. Fru-Con and SMUD negotiated

22  three change orders to accommodate Fru-Con's request. The third

23  ("Change Order 3") lists thirty changes to the contract and the

24  corresponding change in the contract price for each. Each of the

25  thirty changes explicitly references a document by number and,

26  where applicable, by date. The nineteenth item states

16

All costs/impacts related to Contract drawing changes
through 4/1/04 (Reference Fru-Con Documents #00209
dated 6/12/04, #00210 dated 6/21/04, #00211 dated
6/21/04, #00212 dated 6/21/04, #00213 dated 6/21/04,
#00214 dated 6/21/04, #00215 dated 6/21/04, #00216
dated 6/21/04, #00217 dated 6/21/04, #00227 dated
6/29/04, #00228 dated 6/29/04, #00229 dated 6/29/04,
#00230 dated 6/29/04, #00237 dated 7/7/04):
$1,050,000.000

Change Order 3 states that the parties agree that the
changes included therein would be made to the original contract.
The documents also states, "The parties agree that this Contract
Change fully resolves all cost and scheduling issues regarding
the referenced Fru-Con Change Order Requests, Field Directives,
or other items referenced herein, and that there will be no
Contract schedule changes or impacts as a result of this
Contract Change." The change order also gives a revised total
contract amount, based on the original contract price and the
three change orders agreed upon up to that date. Change Order 3
was signed by representatives from SMUD and Fru-Con, on
September 23 and 24, 2004, respectively.

**D.   Travelers' Performance Bond**

SMUD and Travelers' claims against each other center around
whether each party acted in accordance with the terms of the
performance bond. SMUD seeks summary judgment on several of the
sub-issues comprising this determination.

Pursuant to the terms of the contract between Fru-Con and
SMUD, Fru-Con obtained a performance bond from Travelers by
which Travelers would compensate SMUD for the cost of completing

17

1  the construction project and for liquidated damages, if Fru-Con
2  did not perform as promised. The bond stated that if SMUD
3  declared Fru-Con in default of the construction contract,
4  Travelers "may promptly remedy the default in any manner
5  acceptable to the District." <u>See</u> Travelers' First Amended
6  Complaint for Declaratory Relief, Exh. A.

7       After Fru-Con was terminated on February 11, 2005,
8  Travelers sent SMUD a letter on February 28, 2005. In it,
9  Travelers recommended that Fru-Con be reinstated. Travelers also
10 requested a meeting between it and SMUD in order to discuss
11 "issues and proposed solutions." SMUD, however, was unwilling to
12 reinstate Fru-Con. According to Travelers, SMUD never agreed to
13 participate in the meeting that Travelers proposed. Declaration
14 of Kevin Lybeck In Support of Travelers' Opposition to SMUD's
15 Motion for Partial Summary Judgment and Summary Adjudication
16 ("Lybeck Decl.") ¶¶ 6-8. SMUD and Travelers dispute whether
17 Travelers conducted any investigation prior to or after
18 contacting SMUD on February 28. <u>See</u> Declaration of Philip Warden
19 In Support of SMUD's Motion for Partial Summary Judgment and
20 Summary Adjudication Against Travelers ("Warden Decl.") ¶ 16,
21 Exh. M; Declaration of Bennett Lee In Support of Travelers'
22 Opposition to SMUD's Motion for Partial Summary Judgment and
23 Summary Adjudication ("Lee Decl.") ¶¶ 24-30, Exh. W-CC.
24 Travelers asserts that SMUD hired a new contractor on February
25 13, 2005, less that one business day after terminating Fru-Con,
26

1  without notifying Travelers. Lybeck Decl. ¶ 6; Lee Decl. ¶¶ 13-
2  14, Exh. L, M.

3  **E.   Procedural History**

4       Fru-Con brought suit against SMUD on March 24, 2005.[7]  The
5  complaint alleged causes of action for breach of contract,
6  breach of the implied covenant of good faith and fair dealing,
7  breach of implied warranty, professional negligence, and breach
8  of the California Prompt Payment Act.  On April 18, 2005 SMUD
9  filed an answer and counterclaim against Fru-Con.  SMUD's
10 counterclaim alleged causes of action for declaratory relief,
11 breach of contract, violation of the California False Claims
12 Act, negligence and equitable indemnity.

13      Travelers filed its First Amended Complaint seeking a
14 declaratory judgment on its liability under the terms of the
15 performance bond, on December 30, 2005. SMUD filed its answer,
16 including a counterclaim also seeking declaratory judgment and
17 asserting a cause of action for breach of contract, on January
18 6, 2006.

19      On February 18, 2007, Fru-Con moved for summary judgment on
20 Counts I (Breach of Contract) and II (Breach of the Implied
21 Covenant of Good Faith and Fair Dealing) of its complaint, and

22 ─────────────

23      [7]SMUD originally filed suit against Fru-Con in state court.
   Fru-Con sought removal to this court based on a claim of fraudulent
24 joinder, but the case was remanded on May 31, 2005.   Soon
   thereafter, SMUD filed a motion to stay in favor of the state court
25 action pursuant to <u>Colorado River Water Conservation Dist v. United
   States</u>, 424 U.S. 800 (1976).  The court denied SMUD's motion on
26 August 11, 2005.

1   on Count I (Declaratory Relief on the Propriety of the Default

2   Termination) of SMUD's Amended Counterclaim. Fru-Con based its

3   motion on three theories: that SMUD failed to provide Fru-Con

4   with an opportunity to cure scheduling delays; that SMUD waived

5   its objections to Fru-Con's schedule; and that SMUD's

6   termination of Fru-Con was wrongful under the terms of their

7   contract. The court denied the motion, except to the extent that

8   SMUD's counterclaim was based on the False Claims Act.

9        **II. STANDARD FOR MOTION FOR SUMMARY JUDGMENT UNDER**

10                **FEDERAL RULE OF CIVIL PROCEDURE 56**

11        Summary judgment is appropriate when it is demonstrated

12   that there exists no genuine issue as to any material fact, and

13   that the moving party is entitled to judgment as a matter of

14   law.  Fed. R. Civ. P. 56(c); <u>see also</u> <u>Adickes v. S.H. Kress &</u>

15   <u>Co.</u>, 398 U.S. 144, 157 (1970); <u>Secor Ltd. v. Cetus Corp.</u>, 51

16   F.3d 848, 853 (9th Cir. 1995).

17            Under summary judgment practice, the moving party
             [A]lways bears the initial responsibility of informing
18            the district court of the basis for its motion, and
             identifying those portions of "the pleadings,
19            depositions, answers to interrogatories, and
             admissions on file, together with the affidavits, if
20            any," which it believes demonstrate the absence of a
             genuine issue of material fact.

21

22   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here

23   the nonmoving party will bear the burden of proof at trial on a

24   dispositive issue, a summary judgment motion may properly be

25   made in reliance solely on the 'pleadings, depositions, answers

26   to interrogatories, and admissions on file.'"  <u>Id.</u>  Indeed,

1  summary judgment should be entered, after adequate time for

2  discovery and upon motion, against a party who fails to make a

3  showing sufficient to establish the existence of an element

4  essential to that party's case, and on which that party will

5  bear the burden of proof at trial.  See id. at 322.  "[A]

6  complete failure of proof concerning an essential element of the

7  nonmoving party's case necessarily renders all other facts

8  immaterial."  Id.  In such a circumstance, summary judgment

9  should be granted, "so long as whatever is before the district

10 court demonstrates that the standard for entry of summary

11 judgment, as set forth in Rule 56(c), is satisfied."  Id. at

12 323.

13    If the moving party meets its initial responsibility, the

14 burden then shifts to the opposing party to establish that a

15 genuine issue as to any material fact actually does exist.

16 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

17 586 (1986); see also First Nat'l Bank of Ariz. v. Cities Serv.

18 Co., 391 U.S. 253, 288-89 (1968); Secor Ltd., 51 F.3d at 853.

19    In attempting to establish the existence of this factual

20 dispute, the opposing party may not rely upon the denials of its

21 pleadings, but is required to tender evidence of specific facts

22 in the form of affidavits, and/or admissible discovery material,

23 in support of its contention that the dispute exists.  Fed. R.

24 Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; see also First

25 Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954

26 (9th Cir. 1998).  The opposing party must demonstrate that the

1  fact in contention is material, i.e., a fact that might affect

2  the outcome of the suit under the governing law, Anderson v.

3  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local

4  No. 169, Ass'n of Western Pulp and Paper Workers, 971 F.2d 347,

5  355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific

6  Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)), and

7  that the dispute is genuine, i.e., the evidence is such that a

8  reasonable jury could return a verdict for the nonmoving party,

9  Anderson, 477 U.S. 248-49; see also Cline v. Indus. Maint. Eng'g

10  & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

11      In the endeavor to establish the existence of a factual

12  dispute, the opposing party need not establish a material issue

13  of fact conclusively in its favor.  It is sufficient that "the

14  claimed factual dispute be shown to require a jury or judge to

15  resolve the parties' differing versions of the truth at trial."

16  First Nat'l Bank, 391 U.S. at 290; see also T.W. Elec. Serv.,

17  809 F.2d at 631.  Thus, the "purpose of summary judgment is to

18  'pierce the pleadings and to assess the proof in order to see

19  whether there is a genuine need for trial.'"  Matsushita, 475

20  U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

21  note on 1963 amendments); see also Int'l Union of Bricklayers &

22  Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752

23  F.2d 1401, 1405 (9th Cir. 1985).

24      In resolving the summary judgment motion, the court

25  examines the pleadings, depositions, answers to interrogatories,

26  and admissions on file, together with the affidavits, if any.

22

1  Rule 56(c); <u>see</u> <u>also</u> <u>In re Citric Acid Litigation</u>, 191 F.3d

2  1090, 1093 (9th Cir. 1999).  The evidence of the opposing party

3  is to be believed, <u>see</u> <u>Anderson</u>, 477 U.S. at 255, and all

4  reasonable inferences that may be drawn from the facts placed

5  before the court must be drawn in favor of the opposing party,

6  <u>see</u> <u>Matsushita</u>, 475 U.S. at 587 (citing <u>United States v.</u>

7  <u>Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (<u>per</u> <u>curiam</u>)); <u>See</u> <u>also</u>

8  <u>Headwaters Forest Def. v. County of Humboldt</u>, 211 F.3d 1121,

9  1132 (9th Cir. 2000).  Nevertheless, inferences are not drawn

10  out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be

12  drawn.  <u>See</u> <u>Richards v. Nielsen Freight Lines</u>, 602 F. Supp.

13  1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898, 902 (9th

14  Cir. 1987).

15       Finally, to demonstrate a genuine issue, the opposing party

16  "must do more than simply show that there is some metaphysical

17  doubt as to the material facts. . . . Where the record taken as

18  a whole could not lead a rational trier of fact to find for the

19  nonmoving party, there is no 'genuine issue for trial.'"

20  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

21                          **III. ANALYSIS**

22       SMUD has brought a motion for summary judgment against Fru-

23  Con on three issues and a motion for summary judgment against

24  Travelers on its sole cause of action and on several of

25  Travelers' affirmative defenses to SMUD's counterclaim. The

26

                                   23

1  court considers each in turn. For the reasons discussed herein,

2  the court grants each motion in part.

3  **A.   SMUD's Motion for Summary Judgment Against Fru-Con**

4  SMUD has moved for summary judgment against Fru-Con on

5  three grounds. First, SMUD seeks summary judgment on its first

6  cause of action of its First Amended Counterclaim, in which SMUD

7  seeks a declaratory judgment that SMUD properly terminated Fru-

8  Con based on the latter's breach of contract. Second, SMUD seeks

9  summary judgment on Fru-Con's breach of contract claim based on

10  SMUD's failure to extend the contract completion date due to

11  weather delays. Third, SMUD seeks summary judgment on Fru-Con's

12  breach of contract claim, to the extent that that claim alleges

13  disputes for which an accord and satisfaction had been reached.

14      **1.   SMUD'S First Cause of Action: Termination For Fru-**

15           **Con's Breach of Contract**

16  In its first cause of action in its First Amended

17  Counterclaim, SMUD seeks a declaratory judgment that, inter

18  alia, Fru-Con had breached the parties' contract and that SMUD

19  properly terminated Fru-Con as a result. For the reasons

20  provided herein, the court denies SMUD's motion as to this

21  issue.

22  As the court stated in its June 15, 2007 order, under

23  California law, "[i]f contractual language is clear and

24  explicit, it governs." <u>Bank of the West v. Superior Court</u>, 2

25  Cal. 4th 1254, 1264 (1992). Contracts should be interpreted by

26  their plain language, unless doing so would result in an absurd

24

1  construction. Cal. Civ. Code § 1638. The entire contract should
2  be read together as a whole, giving effect to every part. Id. §
3  1641. If there is an apparent contradiction in the contract, the
4  contract should be interpreted to give some effect to repugnant
5  portions, in light of the contract's overall purpose and intent.
6  Id. § 1652. When a contract has been reduced to writing, the
7  intent of the parties should be ascertained by the writing
8  alone. Id. § 1639. A court may turn to extrinsic evidence to
9  construe the contract, if the evidence shows the intent of the
10  contracting parties and offers a meaning to which the contract
11  is reasonably susceptible. Pacific Gas & Elec. Co. v. G. W.
12  Thomas Drayage & Rigging Co., Inc., 69 Cal. 2d 33 (1968).

13      One of the grounds SMUD cited in its notice of termination
14  was Fru-Con's failure to remove and replace the Section C
15  concrete.  I turn first to the propriety of invocation of SMUD's
16  termination right under General Condition 36.

17          **a.   The Termination Was Premised On SMUD's Reasonable**
18                **Understanding That the Concrete Was Faulty**

19      Although Fru-Con now disputes it, at the time of Fru-Con's
20  termination there was no dispute that Section C's concrete did
21  not meet the plan specifications. It remains undisputed that
22  Fru-Con reported to SMUD on May 3, 2004 (in "Non-Conformance
23  Report No. 72"), June 8, 2004 (in "Non-Conformance Report No.
24  97"), and July 27, 2004, that the samples of Section C concrete
25  did not meet the plan requirements for air entrapment and
26  compression strength. The undisputed evidence shows that SMUD

1  based its conclusion that Section C concrete should be replaced

2  in substantial part on the test results that Fru-Con provided to

3  SMUD. <u>See</u> Disney Decl. ¶¶ 3-4, Exh. 10-11; Moffitt Decl. ¶ 25,

4  Exh. 6; Nelson Decl. ¶¶ 5, 9, Exh. 17, 20.

5       Moreover, although Fru-Con now offers evidence that the

6  concrete was not defective or that the prior test results could

7  be read in a way that would permit the conclusion that the plan

8  specifications had been met, there is no evidence that Fru-Con

9  presented either of these facts to SMUD during any of their

10  communications about the Section C concrete.[8]

11       Moreover, evidence that the concrete was not faulty would

12  not defeat SMUD's motion. The issue before the court is whether

13  SMUD lawfully terminated Fru-Con under General Condition 36 of

14  the contract. That condition allows SMUD to terminate Fru-Con if

15  Fru-Con "refuses or fails to prosecute the work" as demanded by

16  SMUD. General Condition 36 contains no requirement that SMUD's

17  work demands be based on a certain type or amount of concrete

18  testing.

19       Here, there is no dispute that SMUD demanded that Fru-Con

20  remove and replace Section C. If that demand was based on SMUD's

21  mistaken belief that the concrete should be replaced, Fru-Con's

22  recourse was to protest under General Condition 32. It does not

23  follow, however, that SMUD could not invoke General Condition

24  ———————————

25       [8]The fact is, of course, that Fru-Con reported the concrete
    did not meet contract specifications. Its attempt to now contradict
26  the deficiency simply will not lie.

26

1  36.[9] Therefore, even if there is a genuine issue of fact as to

2  whether the concrete was faulty, this fact is not material and

3  therefore could not defeat SMUD's motion for summary judgment.

4  See Fed. R. Civ. P. 56(c).

5         **b.   There Is No Evidence That SMUD Waived Fru-Con's**

6            **Compliance With General Condition 32**

7       As noted, if Fru-Con believed SMUD was in error in

8  concluding that the Section C concrete should be replaced, the

9  contract provided a procedure for protest in General Condition

10  32.   Under the multi-step procedure created there, Fru-Con could

11  file a written protest with the Engineer within ten days of

12  receiving an instruction or decision. Specifically, Fru-Con

13  could protest if it "consider[ed] any work demanded of it to be

14  outside of the requirements of the Contract, or if [Fru-Con]

15  consider[ed] any instruction, ruling, or decision of the

16  Engineer, or Engineer's authorized representative, to be

17  incorrect." After filing the protest, Fru-Con was to attempt to

18  resolve the dispute with the Engineer. If no resolution

19  occurred, the next step was that the Engineer would forward the

20  ───────────────

21      [9]Fru-Con also argues that SMUD could not have terminated Fru-Con under General Condition 36 if doing so was not in good faith.

22  Under California law, a party does not breach the duty of good faith and fair dealing by invoking an express contractual right.

23  Carma Developers. Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342, 374 (1992). The case Fru-Con cites, Call v. Alcan

24  Pacific Co., 251 Cal. App. 2d 442 (1967) does not contradict this. There, the court held that where a contract provides that the

25  performance of one party be done to the personal satisfaction of the other party, the latter could not withhold their satisfaction

26  in bad faith. General Condition 36 in the contract at issue here is not discretionary in that sense.

protest to the Contracting Officer for a final decision. While the final decision was pending, Fru-Con was required to proceed with the work as demanded by the Engineer. Once the Contracting Officer reached a final decision, he would notify Fru-Con of it in writing. Fru-Con was required to comply with that decision, but retained the right to have the dispute resolved by a court.

It is undisputed that SMUD's Engineer was Chris Moffitt. Moffitt Decl. ¶ 1. SMUD's "Contracting Officer" was Jan Shori. Nelson Decl. ¶ 3. The Contracting Officer's authorized representative was James Shetler. Shetler Decl. ¶ 1. SMUD's "Project Director," for purposes of the contract, was Colin Taylor and his authorized representatives included Bob Nelson and Kevin Disney. Nelson Decl. ¶ 3; Disney Decl. ¶ 1.

Fru-Con argues that there is a genuine issue of material fact as to whether General Condition 32 was implicated by SMUD's acts, whether SMUD waived compliance with General Condition 32, and whether SMUD executed its duties under General Condition 32. These contentions will not lie.

First, the actions by SMUD's representatives in directing Fru-Con to remove and replace the Section C concrete would have allowed Fru-Con to protest under General Condition 32. Fru-Con asserts that it could only invoke its protest rights under this provision upon a directive of the Engineer of the project, Chris Moffitt. Fru-Con points out that the only directives it received were from Kevin Disney and Bob Nelson. Fru-Con misreads General Condition 32, however. The provision states that Fru-Con may

file a written protest "[i]f [it] considers any work demanded of
it to be outside the requirements of the Contract . . . ."
Construing the contract in accordance with its plain meaning,
see Bank of the West, 2 Cal. 4th at 1264, Fru-Con could protest
"any work demanded of it," even if the demand was not made by
the Engineer. Therefore, under General Condition 32, Fru-Con
could have protested the demands in Kevin Disney's September 9,
2004 or September 27, 2004 letters or Bob Nelson's  December 10,
2004 or February 4, 2005 letters.[10] A reasonable jury could not
conclude that under the plain language of the contract Fru-Con
could not protest SMUD's decisions because those decisions were
not expressed by Chris Moffitt.

Fru-Con has presented no evidence that would permit a jury
to reasonably conclude that it filed a written protest with the
Engineer within ten calendar days of having received a directive
from SMUD. Although Fru-Con alludes to on-going discussions
about repairing Section C, there is simply no evidence that Fru-
Con complied with General Condition 32's requirement for filing
a protest. On September 9, 2004, Kevin Disney informed Bruce
McPherson by letter that the Section C concrete was unacceptable
and demanded a plan for replacement. There is no evidence that
Fru-Con filed anything in writing, whether it was fashioned as a

---

[10]Viewing each of these letters as separate demands by SMUD is
the interpretation that is the most favorable to Fru-Con. One
could, however, also view Kevin Disney's September 9, 2004 letter
as the only demand made of Fru-Con for purposes of General
Condition 32, and subsequent letters as merely reiterations of this
demand.

1 │ protest or not, to Engineer Chris Moffitt or to any other of

2 │ SMUD's project staff within ten calendar days of this letter.

3 │ Similarly, after Kevin Disney's September 29, 2004 letter

4 │ demanding that Fru-Con provide a schedule for demolition and

5 │ replacement of Section C, there is no evidence that Fru-Con

6 │ filed anything in writing, protest or not, with Chris Moffitt or

7 │ anyone else within ten calendar days.

8 │    Fru-Con did respond in writing after Bob Nelson's December

9 │ 10, 2004 letter. Its response may be characterized as a protest,

10 │ as in it Earle Hardgrave stated that Fru-Con would not replace

11 │ the concrete because the concrete could be repaired. The letter

12 │ is dated December 22, 2004, indicating that it was not lodged

13 │ within ten calendar days of the December 10, 2004 directives.

14 │ Accordingly, this letter cannot be considered compliant with the

15 │ requirements of General Condition 32.

16 │    Finally, the closest Fru-Con came to complying with General

17 │ Condition 32 occurred on February 10, 2005. On February 4, 2005,

18 │ Bob Nelson sent a letter to Earle Hardgrave reiterating that

19 │ repair of the Section C concrete was not an acceptable course of

20 │ action. On February 10, Mr. Hardgrave responded to Mr. Nelson by

21 │ letter, stating "See Fru-Con letter . . . of December 22, 2004

22 │ and letter . . . of February 2, 2005." In each of these

23 │ referenced letters, Fru-Con had stated that repairing the

24 │ concrete was more appropriate than replacing it. Even if the

25 │ February 10 letter can be correctly construed as a "protest"

26 │

1   within the meaning of General Condition 32, it was not filed

2   with the Engineer, Chris Moffitt, as required by the contract.

3        Fru-Con also argues SMUD waived Fru-Con's compliance with

4   General Condition 32 through its conduct. The only possible

5   evidence to support this argument is: (1) a "global change

6   order" dated January 28, 2005, and (2) a note written by Matti

7   Jaekel on February 10, 2005, in which he recorded a conversation

8   with James Shetler of SMUD. Neither of these suffice to

9   establish that there is a genuine issue of material fact as to

10  whether SMUD waived compliance with General Condition 32's

11  terms.

12       The "global change order," as Fru-Con describes it, is

13  titled a "Global Settlement Between Fru-Con and SMUD," which Jim

14  Shetler of SMUD and Matti Jaekel of Fru-Con had been drafting in

15  January 2005.[11] See Gandee Decl. ¶ 37, Exh. GGG. The first

16  paragraph of the document states, "SMUD and Fru-Con believe it

17  to be in their best interest to settle their differences now

18  through a global settlement" and the third paragraph states,

19  "Fru-Con and SMUD hereby agree to the following procedures . . .

20  to settle all claims pending . . . ." The court has already

21  observed that the parties were engaged in settlement

22  negotiations in January 2005. Order Denying Motion Fru-Con's

23  Motion Summary Judgment In Part and Granting It In Part, June

24  _____

25       [11]It appears that this document did not result in a settlement
     agreement that supercedes the construction contract, as neither
26   party seeks to enforce it as such.

31

1   15, 2007, at 22. It is apparent, therefore, that this "global

2   change order" was generated for the purpose of negotiating a

3   settlement, which was never achieved.  Because it is offered to

4   show Fru-Con's non-liability on the theory of SMUD's waiver, it

5   fails its offered purpose. <u>See</u> Fed. R. Civ. P. 408.

6       The second piece of evidence offered to support Fru-Con's

7   waiver argument is the February 10, 2005 note recording the

8   conversation that allegedly occurred between Matti Jaekel and

9   Jim Shetler. Matti Jaekel has not testified as to his

10   recollection of the conversation; the note itself and the

11   testimony authenticating it are the only evidence before the

12   court.[12] The pertinent contents of the note are: "Cooling tower

13   concrete, Jim [Shetler] promised to look at the issue again. I

14   asked that the proposed technical conference take place on-site

15   between UE and FCEI." Even assuming this evidence is admissible,

16   it fails to demonstrate a genuine issue of material fact as to

17   SMUD's waiver of its right to termination based on SMUD's

18   acceptance of the faulty concrete. At most, it indicates that

19   Jim Shetler represented that SMUD may consider accepting the

20   defective concrete. However, the statement that "Jim promised to

21   look into the issue again" as the only admissible evidence of

22   waiver could not permit a reasonable jury to conclude that

23   SMUD's intention to commit a waiver was clearly expressed by the

24

25       [12] Although, as observed above, settlement negotiations were occurring between the parties at this time, it is not possible for the court to discern whether this communication occurred within the

26   context of that negotiation.

declaration of its agent or by undisputed conduct "so
inconsistent with a purpose to stand upon the contractual right
allegedly waived as to leave no possibility of any reasonable
inference to the contrary." Order Denying Motion Fru-Con's
Motion Summary Judgment In Part and Granting It In Part, June
15, 2007, at 19-20. Fru-Con has not shown that SMUD's motion for
summary judgment should be denied because of evidence of waiver.

Consequently, the court concludes that there is no evidence
to permit a jury to reasonably determine that SMUD's actions
prevented Fru-Con from pursuing protest procedures under General
Condition 32. As explained previously, the plain language of a
contract controls; a court will not read ambiguity into a
contract where there is none. Bank of the West, 2 Cal. 4th at
1264. Parties are bound by the terms of the contract for which
they bargained. Id.; Cal. Civ. Code § 1636. Here, the parties
agreed on a particular procedure for filing a protest, and Fru-
Con has presented no evidence that it complied with that
procedure.

### c.   Whether SMUD Could Properly Invoke General Condition 36 and Terminate Fru-Con

Nonetheless, the court concludes that SMUD's motion must be
denied on this issue because there is a genuine issue of
material fact as to whether SMUD's demand of work by Fru-Con was
in accordance with General Condition 24 and therefore whether
SMUD could properly terminate Fru-Con for failing to perform
that work.

1    General Condition 24 permits the "Engineer or the Field

2    Representative of the Engineer" to reject defective work. Once

3    the work was rejected, SMUD could require Fru-Con to replace it

4    and could terminate Fru-Con under General Condition 36 if Fru-

5    Con did not replace the defective work "at once."[13]

6    From September 9, 2004 to February 4, 2005, SMUD

7    unfalteringly demanded that Fru-Con remove and replace the

8    Section C concrete. See Disney Decl. ¶¶ 3-4, Exh. 10-11; Nelson

9    Decl. ¶¶ 5, 9, Exh. 17, 20. Fru-Con's unfaltering reply was that

10   it would not do so.[14] See Nelson Decl. ¶¶ 6, 8, 15, Exh. 18-19,

11   26. Nevertheless, under General Condition 24 SMUD could only

12

13   [13]The court has reviewed the supplemental briefing on the
     issue of whether SMUD could have terminated Fru-Con simply for
     having deviated from the plan specifications, in violation of

14   Special Condition 35. It appears that SMUD could not.  Of course,
     as a matter of ordinary contract law, material failure to provide

15   what is contracted for is a breach of contract.  In the instant
     case, however, the parties provided an elaborate mode of proceeding

16   in case of a breach.  It is those provisions which give rise to the
     complex analysis which the court must undertake. In construing the

17   contract the court cannot ignore that the parties chose to employ
     language in General Condition 24 that directs SMUD to the remedy

18   of invoking General Condition 36. The absence of this language in
     Special Condition 35 indicates that the parties did not contemplate

19   such a remedy for violation of SC-35. See Vazquez v. Cargill, Inc.,
     509 F. Supp. 2d 903 (C.D. Cal. 2007).

20

21   [14]Although Fru-Con characterizes the communications during
     this time as inconclusive discussions as to whether Section C

22   should be repaired or should be replaced, the evidence does not
     support such a characterization. The court also finds unmeritorious

23   Fru-Con's assertion that SMUD's December 10, 2004 letter in which
     SMUD notified Fru-Con that it would withhold payment under Special

24   Condition 14.5 precluded SMUD's later invocation of its remedies
     under General Condition 36. See Mansfield v. Pickwick Stages,

25   Northern Division, 191 Cal. 129, 131 (1923)(election of one remedy
     only precludes later election of another remedy when "the assertion

26   of one [is] necessarily repugnant to or a repudiation of the
     other").

34

make demands of Fru-Con to remove and replace work if the work had been rejected by the "Engineer or Field Representative of the Engineer." Nelson Decl. ¶ 3, Exh. 16. The Engineer was Chris Moffitt. Moffitt Decl. ¶ 1. Neither party has presented any evidence that Chris Moffitt rejected Fru-Con's work, either expressly or constructively. SMUD has presented evidence that Kevin Disney and Bob Nelson sent letters to Fru-Con, demanding that the Section C concrete be removed and replaced. Neither Mr. Disney nor Mr. Nelson were the Engineers or Field Representatives of the Engineer. See Disney Decl. ¶ 1; Nelson Decl. ¶ 1. In several of these letters, Mr. Disney and Mr. Nelson included letters from Tim Pillsbury, UE's engineer, to Chris Moffitt, recommending replacement of the concrete. See Disney Decl. ¶ 4, Exh. 11; Nelson Decl. ¶ 5, Exh. 17. Although Mr. Pillsbury was the "Engineer of Record" for the purposes of California's statutory requirements, see SMUD's Motions for Partial Summary Judgment or Summary Adjudication at 15, there is no evidence tendered that he was the "Engineer" for the purposes of the contract. See Moffitt Decl. ¶ 1.[15] Consequently, SMUD has not met its burden to show that there is no genuine issue that SMUD properly terminated Fru-Con upon Fru-Con's refusal to execute work as required under General Condition 24.

>    **2.   Fru-Con's Breach of Contract Claim Based on SMUD's Failure to Extend the Contract Completion Date Due to Weather Delays**

---

[15]Again, given the elaborate contract between the parties, what might otherwise seem plain is made obscure.

1    SMUD moves for summary judgment on Fru-Con's breach of

2 contract claim, in which Fru-Con alleged that SMUD breached the

3 terms of the construction contract by not granting time

4 extensions for the completion of the work. The court denies this

5 motion.

6         **a.   The Time For Performance Under the Contract Was**
          **Measured in Calendar Days, Not Workdays**
7
      The parties dispute to what extent General Condition 19
8
  governed the computation of work time under the contract. The
9
  court concludes that the plain language of the contract supports
10
  SMUD's position, that much of General Condition 19's provisions
11
  were rendered irrelevant by the parties' agreement that the time
12
  for performance under the contract was to be measured in
13
  calendar days, not workdays.
14
      General Condition 19 provides that, unless otherwise stated
15
  in the Special Conditions of the contract, the time for
16
  performance would be measured in working days rather than
17
  calendar days. Then, General Condition 19 explains how working
18
  days are to be calculated. This includes adjustments for
19
  inclement weather and imposes a duty on SMUD to generate
20
  statements of the working days charged each week.
21
      The provisions of General Condition 19 that describe this
22
  process of computing working days, however, are rendered
23
  irrelevant by Special Condition 10, which integrates Appendix G.
24
  As General Condition 19 states, completion time would be
25
  measured in working days unless otherwise specified by a Special
26

1  Condition. Special Condition 10, titled "Commencement,

2  Completion Time & Liquidated Damages," provides a schedule of

3  liquidated damages as defined in Appendix G. Appendix G contains

4  a chart of intermediate milestones for the completion of the

5  construction project as well as days for the full (or

6  "substantial") completion of the entire project.

7       It appears that the only fair reading of Appendix G,

8  Special Condition 10, and General Condition 19 are that the

9  former two provisions establish that the time for performance

10 would be measured in calendar days.[16] Although Appendix G is

11 fashioned as a table of liquidated damage calculations,

12 liquidated damages are available only for a breach of the

13 contract. See Cal. Civ. Code § 1671. Appendix G, therefore,

14 provides the dates at which the contract would be breached if

15 Fru-Con did not complete parts of its performance. It is

16 possible to read this table as indicating that SMUD had condoned

17 these breaches so long as Fru-Con paid the stated liquidated

18 damages amount, but that Fru-Con's failure to achieve the

19 specified milestones would not be grounds for SMUD's termination

20 of Fru-Con. The court is reluctant to enforce such a

21 construction without language in the contract that indicates

22 this was the parties' intent. There is no such language, and

23 instead the contract appears to be written so that Appendix G,

24

25  [16]Moreover, if there is ambiguity, it would be resolved by the
    fact that both parties expressed their understanding that contract
    performance would be measured in calendar days. Nelson Decl. ¶ 20-

26  21, Exh. 29.

1  via Special Condition 10, establishes the method for calculating

2  the performance dates in the contract. This is the possibility

3  for which General Condition 19 expressly provides.

4     Interpreting the contract this way renders General

5  Condition 19's requirements for how working days would be

6  computed inapplicable. That the parties wrote a contract so that

7  the majority of General Condition 19 is irrelevant is, in the

8  least, odd. Nevertheless, this appears to be the case. Other

9  than their contract, neither party has presented any extrinsic

10 evidence of what the parties' intent was at the time of the

11 contract formation that would indicate that a different

12 construction better comports with that intent. See Pacific Gas &

13 Elec., 69 Cal. 2d at 39-40. As such, the contract could not

14 reasonably be interpreted to permit Fru-Con to measure its

15 performance in working days.

16          **b.    There Is a Genuine Issue of Material Fact As to**

17                **Whether SMUD Acted Improperly In Failing to Grant**

18                **Fru-Con a Time Extension**

19    Given that the time for performance of the contract was

20 measured in calendar days, General Condition 27 described the

21 basis for an extension and the process by which a request would

22 be considered. Under that provision, Fru-Con could request a

23 time extension from the Engineer, for "acts of God, acts of

24 public enemy, strikes, fires, floods, quarantine restrictions,

25 shortage of materials, or failure of the District to acquire

26 right of way."

1    Here, Fru-Con has presented some evidence that the basis
2 for their requests for extensions might have entitled them to
3 some extension under General Condition 27, though the amount of
4 extension has not been the subject of this motion. The evidence
5 before the court, which had been presented to SMUD in the
6 requests for extensions, alleged that weather disturbances had
7 prevented work from being done on certain days. Funk Decl. ¶¶
8 15-38, 44-45. Most of these appear to be fairly mild and
9 therefore would not fall under the ambit of General Condition
10 27. For example, on several of the days, Fru-Con reported "light
11 rain," or "muddy conditions;" on most of the days for which rain
12 is listed as a condition preventing work, Fru-Con reported less
13 than one inch of rain on that day. See id.
14    On some occasions, however, Fru-Con reported weather
15 problems that a jury might conclude were "floods" or other
16 "abnormal and unforeseeable causes." On January 2, 2004, Fru-Con
17 reported the inability to work due to "overflowing of sediment
18 basin." Funk Decl. ¶ 26. On February 18, 2004, Fru-Con reported
19 "heavy rain." Id. ¶ 31. On several other days, Fru-Con reported
20 high winds that prevented work from being completed. See id. ¶¶
21 32-33, 38. High winds, however, was a weather condition, the
22 risk of which was specifically assumed by Fru-Con.  See Special
23 Condition 31. In sum, however, Fru-Con has tendered evidence
24 that could permit a reasonable jury to find that Fru-Con had a
25 factual basis upon which to invoke a time extension under
26 General Condition 27 for at least some of the delay.

1    If Fru-Con sought to obtain an extension, General Condition
2    27 described the process to be employed. Fru-Con was to file a
3    written request with the Engineer that "state[d] specifically
4    the reasons for and the extent of the delay and shall include
5    full substantiating evidence thereof." The request must be made
6    within seven calendar days of the date of the delay, but only
7    one request was necessary for a "continuing delay." The Engineer
8    would then determine the reasonableness of the request and make
9    a recommendation to the Contracting Officer.

10    There is no evidence before the court that Fru-Con complied
11    with this process. The communications that Fru-Con did have with
12    SMUD on this issue were not tendered in the manner required by
13    General Condition 27. See Moffitt Decl. ¶ 32, Exh. 9 (letter to
14    SMUD Engineer Chris Moffitt, but not requesting an extension
15    under General Condition 27 nor including "full substantiating
16    evidence thereof"); Moore Decl. ¶¶ 6, 60, Exh. 5, 58 (describing
17    an oral presentation by Fru-Con to SMUD describing weather
18    delays).

19    Nevertheless, Fru-Con has presented evidence that SMUD
20    confounded Fru-Con's ability to properly request an extension of
21    time under General Condition 27. It appears from several pieces
22    of deposition testimony and declarations that SMUD staff
23    directed Fru-Con to omit mentions of weather delays from Fru-
24    Con's scheduling reports.[17] Moore Decl. ¶¶ 44-45, Exh. 42-43;

25
26    [17]The evidence before the court shows that Fru-Con requested
an extension of time, invoking General Condition 27, on January 1,

1   Ellis Decl. ¶¶ 19, 21-22, Exh. X. For example, according to one

2   Fru-Con staff member, "[M]embers of Fru-Con team had been

3   directed by SMUD staff to not show any impact to the project

4   completion milestone." Moore Decl. ¶ 45, Exh. 43. While it is

5   far from clear that such directions somehow modified the

6   contractual obligations, they serve to create a genuine issue of

7   material fact as to whether SMUD acted in a manner that

8   prevented Fru-Con's performance in accordance with General

9   Condition 27 and whether the acts constituted SMUD's breach or

10  repudiation of the contract in part. See Bomberger, 35 Cal. 2d

11  at 613; Orton, 91 Cal. App. 2d at 438-39. As such, summary

12  judgment must be denied on this issue. See Fed. R. Civ. P. 56(c)

13      **3.   Accord and Satisfaction For Claims Relating to Change**

14          **Order 3**

15      In Fru-Con's first cause of action for breach of contract,

16  it alleges that SMUD failed to provide design specifications and

17  failed to issue change orders as requested by Fru-Con. SMUD

18  moves for summary judgment on this claim to the extent that it

19  is based on issues that were resolved in Change Order 3. The

20  court grants the motion as to this issue.

21

22  2004. Moore Decl. ¶ 50, Exh. 48. This letter was directed to Bob
    Nelson, not the Engineer as required by General Condition 27. There
23  is no evidence that SMUD responded to this request. At oral
    argument, Fru-Con's counsel advised the court that this letter does
24  not show that Fru-Con attempted to seek an extension under General
    Condition 27 and was frustrated by SMUD's inaction, but that Fru-
25  Con's personnel understood the distinction between General
    Condition 27 and Special Condition 31. The court therefore does not
26  rely on this for its above analysis.

                                    41

1     An accord is an agreement between the parties to a contract

2 whereby a party releases something to which it is entitled under

3 the contract in exchange for something different. Cal. Civ. Code

4 § 1521. Acceptance of the accord by the entitled party

5 constitutes satisfaction of the original contract obligation.

6 Id. § 1523. Put plainly, "accord and satisfaction" is the

7 process whereby the parties to a contract substitute a new

8 agreement in satisfaction of the original contract. See In re

9 Marriage of Thompson, 41 Cal. App. 4th 1049 (1996); Huber, Hunt

10 & Nichols, Inc. v. Moore, 67 Cal. App. 3d 278, 302 (1977).

11     Here, there is no genuine issue of material fact as to the

12 accord and satisfaction represented by Change Order 3. Change

13 Order 3 provides that it was a full resolution of the items

14 described therein and that it served to change the terms of the

15 original contract. Specific to SMUD's motion, item nineteen

16 provides that Fru-Con would receive $1,050,000 for "[a]ll

17 costs/impacts related to Contract drawing changes through

18 4/1/04" and specifically references relevant documents of Fru-

19 Con. In interpreting the change order, the court is guided by

20 its plain language and will only consider extrinsic evidence to

21 resolve ambiguity. Cal. Civ. Code §§ 1638, 1639. Here there is

22 no ambiguity.[18] Change Order 3 resolved Fru-Con's claims as to

23

24     [18]Fru-Con presents evidence in the form of deposition
testimony that some Fru-Con staff believed that Change Order 3 only
25 disposed of Fru-Con's claims for an increased contract price and
not time extensions. The source of such belief is not explained,
and in any event, this is belied by the express language of Change
26 Order 3, which states "The parties agree that this Contract Change

42

1  costs and delays stemming from project drawing changes through
2  April 1, 2004. As a matter of law, Fru-Con's breach of contract
3  claim cannot rely on those particular drawing changes, unless
4  Fru-Con attacks the accord as void on some unarticulated ground,
5  such as fraud, misrepresentation, or mistake. <u>See</u> Cal. Civil
6  Code § 1567.

7      Fru-Con does not attack Change Order 3 for these or any
8  other creditable reason. Aside from asserting that Change Order
9  3 is ambiguous in its terms, Fru-Con emphasizes that item
10  nineteen of Change Order 3 only applies to project drawing
11  changes through April 1, 2004 but not afterwards. This is not
12  disputed by SMUD and is apparent upon reading Change Order 3.

13      Because Change Order 3 plainly and unambiguously
14  constitutes accord and satisfaction for a dispute between SMUD
15  and Fru-Con for contract drawing changes through April 1, 2004
16  and because Fru-Con has adduced no evidence by which a
17  reasonable jury could attack the validity of the accord, the
18  court grants SMUD's motion as to this issue.

19  **B.   SMUD's Motion for Summary Judgment Against Travelers**

20      In its sole cause of action against SMUD, Travelers seeks a
21  declaratory judgment that SMUD materially breached the contract
22  between Travelers and SMUD by wrongfully terminating Fru-Con and

23  _____

24  fully resolves all cost *and scheduling issues* regarding the
    referenced Fru-Con Change Order Requests, Field Directives, or
    other items referenced herein . . ." (italics added). Fru-Con has
25  presented nothing to the court to show why the language of Change
    Order 3 should not govern, as it is clear and explicit and would
26  not result in absurdity. <u>See</u> Cal. Civ. Code §§ 1638, 1639.

43

1   therefore that Travelers has no obligation to SMUD under the

2   performance bond. SMUD counterclaimed against Travelers seeking

3   a declaratory judgment that SMUD properly performed under the

4   terms of its contracts. SMUD also alleges breach of contract by

5   Travelers in failing to fulfill its obligations under the

6   performance bond.

7        In its motion, SMUD seeks summary judgment on several

8   grounds. First, it asks the court to find as a matter of law

9   that the performance bond is valid and enforceable pursuant to

10  its terms. Second, it seeks summary judgment on the issue that

11  Fru-Con was in default of its contractual obligations at the

12  time of its termination. Third, SMUD seeks summary judgment on

13  the issue of the adequacy of Travelers' cure of Fru-Con's

14  default. Finally, SMUD seeks summary judgment on Travelers'

15  affirmative defenses, to the extent that they rely on a theory

16  that the performance bond had been exonerated, and also seeks

17  summary judgment on those elements of Travelers' claim for

18  declaratory relief that rest on the same theories as the

19  affirmative defenses.

20       For the reasons described herein, the court denies the

21  motion in part.

22       **1.    Validity of the Performance Bond**

23       SMUD asserts that the performance bond was valid on its

24  face and therefore enforceable. Travelers disputes this on the

25  basis that SMUD withheld material facts at the time of the

26  creation of the performance bond, which renders the bond null

44

1  and void. As explained below, the court denies SMUD's motion as

2  to this issue.

3       A creditor has a duty to disclose material facts to a

4  surety where (1) the creditor knows the facts and the surety

5  does not, (2) the creditor has the opportunity to disclose these

6  facts to the surety, and (3) the creditor knows or has reason to

7  know that the surety is being deceived or misled or that the

8  surety is being induced to enter into a contract in ignorance of

9  facts materially increasing the surety's risks. <u>Sumitomo Bank of</u>

10 <u>Cal. v. Iwasaki</u>, 70 Cal. 2d 81, 90 (1968). If these factors have

11 been met, the surety has a complete defense to the enforcement

12 of the contract. <u>Id.</u>

13      Here, Travelers alleges that the bond is unenforceable

14 because SMUD failed to disclose that SMUD anticipated litigation

15 against Fru-Con prior to the issuance of the performance bond

16 and because SMUD failed to disclose that the construction

17 project design was less than 70 percent complete at the time of

18 the issuance of the bond. Travelers asserts that each of these

19 facts, had they been known to Travelers at the time of the

20 bond's issuance, would have caused Travelers not to issue the

21 bond.

22      To substantiate its contention that <u>Sumitomo</u> compels non-

23 enforcement of the bond on the basis of SMUD's contemplation of

24 litigation against Fru-Con, Travelers offers the deposition

25 testimony of Steven Cohn, SMUD's in-house counsel. Lee Decl. ¶¶

26 2-7, Exh. A-F. In his testimony, Mr. Cohn stated that he had a

1  "growing feeling" that there might be litigation between Fru-Con

2  and SMUD, owing to Fru-Con's conduct during the contract

3  negotiations. Id. ¶ 3, Exh. B. This led to Mr. Cohn's

4  recommendation that outside counsel be retained. Id.

5       Mr. Cohn's "feelings," impressions, beliefs, and instincts

6  about the possibility of litigation with Fru-Con do no

7  constitute "facts" within the meaning of Sumitomo. Even if

8  SMUD's retention of outside counsel is a fact in this sense,

9  Travelers has offered no evidence at all that SMUD

10 misrepresented or concealed this fact from or deceived Travelers

11 in any way. See Sumitomo, 70 Cal. 2d at 90. Travelers has

12 adduced no facts that would permit a reasonable jury to conclude

13 that this element of the Sumitomo rule has been met.

14      With regards to its contention that the bond is

15 unenforceable under Sumitomo due to SMUD's misrepresentations as

16 to the completeness of the project design, Travelers first

17 offers evidence that SMUD informed it that "all significant

18 portions of the Project design were complete (except for minor

19 engineering changes)" at the time of the issuance of the bond.

20 Lee Decl. ¶ 8; DuPont Decl. ¶¶ 9-10. Travelers also presents

21 evidence that at the time of the issuance of the bond, the

22 design was less than 80 percent complete. Lee Decl. ¶¶ 11, 22-

23 23. SMUD counters with evidence that Travelers did know of the

24 level of completeness of the design at the time of the issuance

25 of the bond. Declaration of John Poulos in Reply to Travlers'

26 Opposition ("Poulos Decl.") ¶¶ 2, 4, Exh. A, C.

1   Travelers has adduced sufficient evidence to show that

2   there is a genuine issue of material fact as to whether the

3   contract is unenforceable because SMUD withheld facts regarding

4   the completeness of the project design. Travelers has presented

5   evidence that SMUD knew of the completeness of the design and

6   Travelers did not, that the design completeness was material to

7   the issuance of the performance bond, that SMUD could have

8   disclosed this fact to Travelers, and that SMUD misrepresented

9   the level of completeness by assuring Travelers that the design

10  was more complete than it was.[19] A reasonable factfinder could

11  credit this evidence and find in Travelers' favor on this issue.

12  Therefore, the court denies SMUD's motion on the issue of

13  whether Travelers may assert that the bond is unenforceable

14  because of SMUD's concealment of material facts, per <u>Sumitomo</u>.

15          **2.    Fru-Con's Default Under the Contract**

16      SMUD seeks summary judgment on the issue of whether Fru-Con

17  was in default under the terms of its contract with SMUD. This

18  issue is relevant to both Travelers' claim against SMUD and

19  SMUD's counterclaim. <u>See</u> Travelers' First Amended Complaint for

20  Declaratory Relief ¶ 54(1); Answer to First Amended Complaint

21  for Declaratory Relief and First Amended Counterclaim of SMUD ¶

22

23          [19]The case cited by SMUD, <u>National Steel Corp. v. Golden Eagle</u>
    <u>Ins. Co.</u>, 121 F.3d 496, 502 (9th Cir. 1997), permits the court to
24  disregard declarations containing conclusory legal allegations.
    Here, the declarations Travelers has offered contain the
25  declarants' recitations of what SMUD represented to them, not legal
    conclusions. <u>See</u> Dupont Decl. ¶¶ 9-10; Lybeck Decl. ¶ 21. It would
26  not be improper for a factfinder to rely on them.

1   45(a)-(b). Just as the court denied SMUD's motion against Fru-
2   Con on this issue, <u>see</u> sections III.A.1-2, *supra*, the court
3   similarly cannot conclude that SMUD has met its burden to show
4   that summary judgment should be entered in its favor here. As to
5   this issue, therefore, the court denies SMUD's motion against
6   Travelers.

7       **3.    Travelers' Failure to Acceptably Cure Fru-Con's**
8             **Default**

9       Under California law, surety contracts are to be
10  interpreted in the same manner as all other contracts. Cal. Civ.
11  Code § 2837. A court first turns to the plain language of the
12  contract to interpret its meaning. <u>Id.</u> § 1638. The terms of a
13  surety contract should be read and interpreted in light of the
14  underlying contract between the principal and obligee (here,
15  Fru-Con and SMUD, respectively). <u>See</u> <u>Pacific Employers Ins. Co.</u>
16  <u>v. City of Berkeley</u>, 158 Cal. App. 3d 145, 152 (1984).

17      A contract granting discretion to one party that would
18  affect the rights of the other does not grant unfettered
19  discretion. <u>Mission Ins. Group, Inc. v. Merco Constr.</u>, 147 Cal.
20  App. 3d 1059, 1065 (1983); <u>Call</u>, 251 Cal. App. 2d 442. Instead,
21  the party granted discretion must exercise it in good faith and
22  in accordance with fair dealing. <u>Mission Ins. Group</u>, 147 Cal.
23  App. 3d at 1065.

24      Here, there is a genuine issue of material fact as to
25  whether SMUD properly exercised its rights under the performance
26  bond. The performance bond provides that if SMUD declared Fru-

48

1  Con to be in default under the contract, "the Surety may

2  promptly remedy the default in any manner acceptable to the

3  obligee." General Condition 36 of the contract between SMUD and

4  Fru-Con also provides that, in the event of Fru-Con's default,

5  SMUD could "take over the work and prosecute the same to

6  completion, by contract or otherwise." By the plain terms of the

7  contract between Fru-Con and SMUD, and by reading that

8  performance bond in light of SMUD's rights under its contract

9  with Fru-Con, SMUD did not per se violate the terms of the

10 performance bond by hiring another contractor to complete the

11 work upon Fru-Con's termination.[20] General Condition 36 expressly

12 granted SMUD this right and the terms of the performance bond

13 state nothing that abrogated this.

14      There remains a genuine issue of material fact, however, as

15 to whether SMUD's actions violated the implied covenant of good

16 faith and fair dealing towards Travelers. The performance bond

17 grants SMUD discretion to determine the acceptability of

18 Traveler's remedy of Fru-Con's default. Travelers has presented

19 evidence that SMUD gave Travelers no opportunity to remedy the

20 default, did not notify it of the retention of new contractors

21 immediately after Fru-Con's termination, and would not meet with

22 Travelers' staff to discuss possible remedies. Lybeck Decl. ¶¶

23 5-9, Exh. C-D; Lee Decl. ¶¶ 13-14, Exh. L-M. Although SMUD

24 asserts now that Travelers had suggested the remedy of

25 _____

26      [20]This assumes that the factfinder concludes that Fru-Con was
   properly terminated under the terms of the construction contract.

49

1    reinstatement of Fru-Con, which would have been unacceptable to

2    SMUD, Travelers' evidence shows that it made this recommendation

3    after -- unbeknownst to Travelers -- SMUD had already elected

4    its own remedy for Fru-Con's default. Lybeck Decl. ¶ 5; Lee

5    Decl. ¶¶ 13-14.  This evidence would permit a reasonable jury to

6    conclude that, though the performance bond granted SMUD

7    discretion, SMUD did not act in good faith and in accordance

8    with fair dealing when it exercised this discretion.[21]

9

10

11

12

13

14

15

16

17      [21]As SMUD points out, California law provides that a surety
     may not make demands under the terms of the bond without having
     implicitly accepted its own responsibilities under the bond. As the
18   California Court of Appeals explains,

19           [I]mplicit in such a demand is recognition by the surety
             of its obligation under the bond and, in effect, its
20           admission of liability to the creditor. Here, there was
             no such demand, and in fact [the surety] denied *any*
21           liability to [the obligee] under the bonds. [The surety]
             elected to resist the claim, and denied liability at
22           trial.

23   Sukut-Coulson, Inc. v. Allied Canon Co., 85 Cal. App. 3d 648, 655
     (1978)(emphasis in original). Having chosen to assert that the bond
24   created no obligation for it, the surety could not later attack the
     obligee for alleged failures to perform under the bond. Id. If
25   Travelers wishes to proceed with its defense that the bond itself
     is unenforceable, it must abandon its argument that SMUD did not
26   act in accordance with the bond's requirements.

1  See Mission Ins. Group, 147 Cal. App. 3d at 1065.

2      **4.   Travelers' Exoneration From Liability Due To SMUD's**

3          **Actions**

4      As a preliminary matter, Travelers waives its third (statue

5  of limitations), sixteenth (laches), and eighteenth (lack of

6  properly formed bond claim) defenses. The court grants SMUD's

7  motion on these defenses.

8      SMUD seeks summary judgment on those of Travelers'

9  affirmative defenses that allege, at least in part, that SMUD

10 did not complete its obligations under the performance bond.

11 SMUD also seeks summary judgment on those portions of Traveler's

12 request for declaratory relief that rely on the same theory.[22] As

13 discussed in sections III.A.1-2 and III.B.3.b, *supra*, there

14 remain genuine issues of material fact as to whether SMUD

15 repudiated or breached its construction contract with Fru-Con

16 and whether SMUD acted in good faith and in accordance with fair

17 dealing in exercising its rights under the performance bond. For

18 these reasons, SMUD's motion for summary judgment on the issue

19 of exoneration -- as it relates to Travelers' cause of action

20 for declaratory relief and its affirmative defenses -- is

21 denied.

22     Moreover, Travelers asserts that several of its defenses do

23 not rely on an exoneration theory. Travelers is correct that its

24 sixth, eleventh, fourteenth, and seventeenth defenses need not

25

26     [22]See Travelers' First Amended Complaint for Declaratory
Relief ¶ 54(1), (3)-(6).

51

1  rely on a theory that SMUD failed to fulfill its obligations

2  under the bond in order to remain viable. See Valle de Oro Bank

3  v. Gamboa, 26 Cal. App. 4th 1686, 1691 (1994)(duty to mitigate

4  damages); Ware Supply Co. v. Sacramento Sav. & Loan Ass'n, 246

5  Cal. App. 2d 398, 406-408 (1966)(estoppel); McDougall v. O'Hara,

6  129 Cal. App. 2d 12, 14 (1954)(unclean hands); 20th Century

7  Lites, Inc. v. Goodman, 64 Cal. App. 2d Supp. 938, 944-45

8  (1944)(frustration of purpose or, as Travelers describes it,

9  "prior performance"). Therefore, even if SMUD were correct in

10  its argument that, as a matter of law, it performed all of its

11  obligations under the performance bond, these defenses would

12  remain viable.

13      SMUD has not borne its burden to show that a reasonable

14  jury could not find in Travelers' favor as to these defenses,

15  except those that have been waived as noted above. See Fed. R.

16  Civ. P. 56(c). Therefore, the court denies SMUD's motion as to

17  Travelers' first, second, fourth, fifth, sixth, seventh, tenth,

18  eleventh, twelfth, thirteenth, fourteenth, seventeenth, and

19  nineteenth affirmative defenses.

20                    **IV. CONCLUSION**

21      As provided herein, the court ORDERS as follows:

22  1.    SMUD's motion for summary judgment against Fru-Con is

23            GRANTED as to Fru-Con's first cause of action for

24            breach of contract, to the extent that this claim is

25            based on elements of the contract for which there has

26

1        been accord and satisfaction. The motion is DENIED as

2        to all other issues.

3   2.   SMUD's motion for summary judgment against Travelers

4        is GRANTED as to Travelers' third (statute of

5        limitations), sixteenth (laches) and eighteenth (lack

6        of a properly formed bond claim) defenses. The motion

7        is DENIED as to all other issues.

8   IT IS SO ORDERED.

9   DATED: March 28, 2008.

10

11

12                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
13                              UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26